**QWEST COMMUNICATIONS COMPANY, Plaintiff/Counterclaim Defendant,**

v.

**AVENTURE COMMUNICATIONS TECHNOLOGY, LLC; Dixon Telephone Company; Reasnor Telephone Company, LLC, Audiocom, LLC; Free Conferencing Corporation; Futurephone.Com, LLC; and Hometown Telecom, Inc; Defendants/Counterclaim Plaintiffs.**

No. 4:07–cv–00078–JEG.

United States District Court, S.D. Iowa, Central Division.

Signed Feb. 17, 2015.

Charles W. Steese, Sandra L. Potter, Armstrong Teasdale LLP, Phillip L. Douglass, Steese & Evans, P.C., Denver, CO, David S. Sather, Richard W. Lozier, Jr., Belin McCormick, P.C., Des Moines, IA, for Plaintiff/Counterclaim Defendant.

Steven L. Nelson, Robert F Holz, Jr., Davis Brown Law Firm, Kris Holub Tilley, Thomas George Fisher, Jr., Des Moines City Attorney, Davis, Brown, Koehn, Shors & Roberts, PC, Des Moines, IA, Matthew Alexander Henry, William Scott McCollough, McCollough Henry, PC, West Lake Hills, TX, David J. Hellstern, Sullivan & Ward PC, West Des Moines, IA, Gary M. Joye, Maxwell M. Blecher, Blecher Collins Pepperman & Joye, P.C., Los Angeles, CA, Paul D. Lundberg, Lundberg Law Firm, Sioux City, IA, Larry D. Espel, Greene Espel PLLP, Minneapolis, MN, R. Bruce Beckner, Garvey Schubert Barer, Washington, DC, Scott R. Swier, Swier Law Firm, Prof. LLC, Avon, SD, for Defendants/Counterclaim Plaintiffs.

## ORDER

JAMES E. GRITZNER, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................939

II. JURISDICTION....................................................940

III. BACKGROUND ....................................................941
 A. Telecommunication Regulatory Backdrop ................................941
 1. Communications Act of 1934 ......................................941
 2. Anti–trust Litigation ...........................................942
 3. Telecommunications Act of 1996 ..................................943
 4. The Act: IXCs, ILECs, and CLECs ................................943
 5. Relevant Provisions of the Act ..................................945
 B. "Traffic Pumping" Litigation .......................................947
 1. *Farmers v. Qwest* ..............................................947
 a. *FCC: Farmers I* ............................................948
 b. *FCC: Farmers Reconsideration I* ............................949
 c. *FCC: Farmers II* ..........................................950
 d. *FCC: Farmers Reconsideration II* ...........................953
 e. *D.C. Circuit: Farmers & Merchants v. FCC* ..................953
 2. *FCC: All American Tel. Co. v. AT & T Corp.* .....................954
 a. *FCC: All American I* .......................................954
 b. *FCC: All American Reconsideration I* .......................956
 c. *FCC: All American II* ......................................956
 d. *FCC: All American Reconsideration II* ......................959
 3. *FCC: AT & T v. YMax* ...........................................960
 4. *Northern Valley Cases* .........................................963
 a. *FCC: Qwest v. Northern Valley (N. Valley I)* ...............963
 b. *FCC: N. Valley Reconsideration I* ..........................965
 c. *FCC: Sprint v. Northern Valley (N. Valley II)* .............966
 d. *FCC: N. Valley Reconsideration II* .........................967
 e. *D.C. Circuit: N. Valley v. FCC* ............................967
 5. *Sancom and Splitrock Cases* ....................................967
 a. *FCC: Qwest v. Sancom (Sancom I)* ...........................968
 b. *FCC: Sancom Reconsideration I* .............................971
 c. *Qwest v. Free Conferencing 4:07–cv–04147 (D.S.D.)* .........971

6. *Tekstar Cases* ............................................... 972
7. *Connect America* ............................................ 972
C. Procedural History ............................................. 976
D. Factual Background ............................................ 978
 1. Factual Allegations in Qwest's Second Amended Complaint ............ 979
 a. Qwest's Claims ........................................ 985
 2. Factual Allegations in Dixon's Counterclaims ...................... 986
 a. Dixon ................................................ 986
 3. Factual Allegations in Aventure's Claims and Counterclaims .......... 987
 a. Aventure's Claims/Counterclaims ........................ 987
 4. Factual Allegations in Futurephone's Counterclaims ................ 987
 a. Futurephone's Counterclaims ........................... 990
 5. Factual Allegations in Free Conferencing's Counterclaims ............ 990
 a. Free Conferencing's Counterclaims ...................... 992
 6. LECs' Tariff Definitions: Customer, End User, Switched Access ..... 992
 a. Dixon: NECA Tariff FCC No. 5 .......................... 992
 b. Reasnor: ICORE Tariff FCC No. 2 ...................... 992
 c. Aventure: Tariff FCC No. 1 ............................. 993

IV. DISCUSSION ..................................................... 993
A. Motions to Dismiss ............................................. 993
 1. Standard for Motion to Dismiss ............................... 993
 2. Hometown's Motion to Dismiss for Insufficient Service of Process ..... 994
 3. Reasnor's Motion to Dismiss .................................. 995
 a. Primary Jurisdiction of the FCC ........................ 995
 b. Filed Rate Doctrine .................................... 997
 c. Dismissal under the Doctrine of Primary Jurisdiction ...... 998
 4. Aventure's Motion to Dismiss Claims under the Act ............... 999
 a. 12(b)(1) Dismissal for Lack of Standing .................. 999
 b. 12(b)(6) Dismissal for Failure to State a Claim ........... 1001
 i. § 201(b) claim(s) ................................. 1001
 ii. § 203(c) claim .................................. 1003
 5. Aventure's/FCSC Defendants' Motions to Dismiss State Law
 Claims ...................................................... 1005
 a. Unfair Competition .................................... 1005
 b. Fraudulent Concealment .............................. 1010
 c. Tortious Interference with Contract ..................... 1014
 d. Civil Conspiracy ...................................... 1016
 e. Unjust Enrichment .................................... 1018
B. Qwest's Motion for Judgment on the Pleadings on Non–Tariff
 Counterclaims ................................................ 1019
 1. Standard for Motion for Judgment on the Pleadings ............... 1019
 2. Communications Act Claims ................................... 1019
 3. Unjust Enrichment and Quantum Meruit Counterclaims ............. 1023

V. CONCLUSION .................................................... 1026

## I. INTRODUCTION

Before the Court and addressed in this Order are Motions for Judgment on the Pleadings filed by Plaintiff /Counterclaim Defendant Qwest Communications Corporation [1] (Qwest) against local exchange car-

---

**1.** Qwest Communications Company, LLC, filed a corporate disclosure statement advising the Court that Qwest Communications Company, LLC, continues to be a wholly owned subsidiary of Qwest Services Corporation, which in turn continues to be a wholly-owned subsidiary of Qwest Communications International, Inc., which is now a wholly-

owned subsidiary of CenturyLink, Inc. *See* ECF No. 374. Despite the change in the corporate structure, the Court refers to Plaintiff/Counterclaim Defendant as Qwest Communications Corporation (Qwest), which was the entity's name at the time the case was filed.

rier (LECs) Defendants/Counterclaim Plaintiffs Aventure Communication Technology, LLC (Aventure); Dixon Telephone Company (Dixon); and Reasnor Telephone Company, LLC (Reasnor)[2] (collectively, LEC Defendants); and free conferencing service companies (FCSCs) Audiocom, LLC (Audiocom); Free Conferencing Corporation (Free Conferencing);Futurephone.com, LLC (Futurephone); and Hometown Telecom, Inc. (Hometown) (collectively, FCSC Defendants).[3] Also before the Court and addressed in this Order are Motions to Dismiss filed by Reasnor, Free Conferencing, Hometown, and Aventure against Qwest.

On July 23 and July 24, 2014, the Court conducted omnibus hearings on the motions in this case and on the motions in related cases 4:07–cv–00043, 4:07–cv–00194, 4:08–cv–00005, and 5:07–cv–04095 (NDIA). Representing Qwest were attorneys Charles Steese and Sandra Potter; representing Aventure were attorneys Paul Lundberg and Gary Joye; representing Dixon were attorneys Steven Nelson and Kris Tilley; representing Reasnor were attorneys William "Scott" McCollough and Matthew Henry; representing Audiocom[4] were attorneys Larry Espel and Paul Lundberg; representing Free Conferencing was attorney Scott Swier; and representing Futurephone was attor-

ney Gary Joye. The motions are fully submitted and ready for disposition.[5]

## II. JURISDICTION

Qwest filed this action asserting jurisdiction based on federal question pursuant to 28 U.S.C. § 1331 and diversity of citizenship pursuant to 28 U.S.C. § 1332.[6] Qwest alleges claims against Aventure, Dixon, and Reasnor that arise under the Telecommunications Act of 1996, 47 U.S.C. § 201 et seq., as well as claims that arise under Iowa state law. This Court has original jurisdiction over the federal law claims, see 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims, see id. § 1367.

Qwest's claims against Audiocom, Free Conferencing, Futurephone, and Hometown are all state law causes of action. The Court ordered Qwest as the party asserting jurisdiction to demonstrate that at the time this action was filed, complete diversity existed between Qwest and Audiocom, Free Conferencing, Futurephone, and Hometown. See Jones v. Gale, 470 F.3d 1261, 1265 (8th Cir.2006). The Court specifically required Qwest to identify the citizenship and principal places of business of every member of any Defendant that was a limited liability entity, see OnePoint

---

2. Reasnor has filed a pre-answer motion to dismiss and has not filed counterclaims.

3. On July 8, 2013, the Court entered an order severing and staying claims against Defendant/Counterclaim Plaintiff Global Conference Partners, LLC, ECF No. 715, based upon the automatic stay imposed by Global Conference having filed a voluntary petition for relief under Chapter 7 of the U.S. Bankruptcy Code.

4. In advance of the July 24, 2014, omnibus hearing, Hometown advised the Court it would not have a representative present at the omnibus hearing but would join in the oral argument presented by Audiocom with regard

to its Rule 12(b)(6) motion to dismiss and would rely on its written submissions in regard to its Rule 12(b)(5) motion to dismiss for improper service.

5. At the omnibus hearings, the Court also heard oral arguments on the pending motions for summary judgment in this case and in the related cases, 4:07–cv–00043, 4:07–cv–00194, 4:08–cv–00005, and 5:07–cv–04095 (NDIA), which will be addressed in subsequent orders.

6. In its First and Second Amended Complaints, ECF Nos. 225 and 318, Qwest modified its jurisdictional statement to include diversity of citizenship as an additional basis of this Court's jurisdiction.

*Solutions, LLC v. Borchert*, 486 F.3d 342, 346–47 (8th Cir.2007).

In compliance with that order, Qwest demonstrated to the Court's satisfaction that at the time this case was filed (1) Plaintiff Qwest was a Delaware corporation with its principal place of business in Denver, Colorado; (2) Defendant Free Conferencing was a Nevada corporation with its principal place of business in Long Beach, California; (3) Defendant Hometown was a Nevada corporation with its principal place of business in Inglewood, California; and (4) Defendant Audiocom was a limited liability company organized under the laws of Nevada, with its principal place of business in Los Angeles, California, and that the three members of Audiocom's limited liability company were natural persons—two were citizens of California, and one was a citizen of Texas;[7] and Defendant Futurephone was a limited liability company organized under the laws of Nevada, with its principal place of business in Reno, Nevada, and that the two members of Futurephone's limited liability company were both natural persons—one was a citizen of California, and the other was a citizen of Nevada.

The Court finds complete diversity of citizenship exists under 28 U.S.C. § 1332(c) and that Qwest's claims against each defendant exceed the minimum amount in controversy, *id.* § 1332(a). *See LaPree v. Prudential Fin.*, 385 F.Supp.2d 839, 842 (S.D.Iowa 2005) ("Generally, a complaint that alleges the jurisdictional amount in good faith will suffice to confer jurisdiction, but the complaint will be dismissed if it 'appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount.'" (alteration in original) (quoting *Larkin v. Brown*, 41 F.3d 387, 389 (8th Cir.1994) (quoting *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938))));[8] *see generally* 14AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3704 (4th ed.2011).

## III. BACKGROUND

### A. Telecommunication Regulatory Backdrop

The Communications Act of 1934, 47 U.S.C. § 151 et seq., is the comprehensive act that codified telecommunication regulations and created the Federal Communications Commission (FCC or Commission) to oversee and regulate the telecommunications industry.[9]

#### 1. Communications Act of 1934

The stated purpose of the Communications Act of 1934 was

---

**7.** During his deposition, Warren Jason, a member of Audiocom's limited liability company, disclosed that Audiocom had two additional "very minor" partners, and that both were residence of California. *See* Qwest's Add'l Juris. Info., ECF No. 582.

**8.** The FCSC Defendants have not challenged Qwest's amount in controversy allegation.

**9.** Telephone companies have been required "to provide service on request at just and reasonable rates, without unjust discrimination or undue preference," since 1910 when they were added to the list of "common carriers" subject to regulation by the Interstate Commerce Commission (ICC). *Essential Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*, 610 F.2d 1114, 1117 (3d Cir.1979) (citing Mann–Elkins Act of 1910, ss 7, 12, ch. 309, 36 Stat. 539). Legislation exclusive to telecommunications, however, did not occur until Congress passed the Communications Act of 1934 to address the ICC's minimal oversight of the telecommunications industry and the Bell System's virtual monopoly over all interstate and international telephone communications. *See generally In re: Policy & Rules Concerning Rates for Competitive Common Carrier Servs. & Facilities Authorizations Therefor*, 84 F.C.C.2d 445, 459–61 (1981).

regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States,[10] a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission" [FCC], which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

47 U.S.C. § 151 (1934).

The Communications Act of 1934 required telecommunications carriers to file tariffed rates with the FCC and to provide notice to the FCC and to the public when they changed their tariffs, see § 203(c), but it did nothing to regulate or protect equipment sellers or competitors, see *Essential Commc'ns Sys.*, 610 F.2d at 1120. Thus,

American Telephone and Telegraph (AT & T), the parent company of the Bell System, continued to dominate the telecommunication industry. *See id.*

## 2. Anti-trust Litigation

In the 1980s, fifty years after the 1934 Communications Act was passed, and following decades of litigation between the U.S. Department of Justice (DOJ) and AT & T, the telecommunication industry confronted a massive corporate reorganization.[11] As part of a consent decree in the second of two cases between the DOJ and AT & T, *United States v. Am. Tel. & Tel. Co.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), AT & T was divested of the local arms of the Bell System—the Bell Operating Companies (BOCs)—which were reorganized into seven Regional BOCs (RBOCs). *United States v. W. Elec. Co.*, 569 F.Supp. 990, 993–94 & n. 11 (D.D.C. 1983). The Bell System territories were divided into 164 local access and transport areas (LATAs) that "mark[ed] the boundaries beyond which a Bell Operating Company [could] not carry telephone calls." *Id.* The BOCs (1) performed exchange telecommunications, that is, transported traffic between telephones located within a LATA; and (2) provided exchange access within a LATA, that is, linked a subscrib-

---

10. The 1996 Amendments to the Act added, "without discrimination on the basis of race, color, religion, national origin, or sex."

11. In 1949, with the telecommunication industry still largely regulated by state regulatory agencies and AT & T's monopoly generally remaining intact, the U.S. Department of Justice (DOJ) filed an antitrust lawsuit in the District of New Jersey (Civil Action No. 17–49) against AT & T for violations of the Sherman Act, 15 U.S.C. §§ 1–3. *See Am. Tel. & Tel. Co.*, 552 F.Supp. at 135–36. The case, which resolved in 1956 by consent decree, was followed in 1975 by a second DOJ antitrust action filed in the District Court for the

District of Columbia, Civil Action No. 74–1698, against AT & T and its subsidiaries, seeking to, inter alia, divest AT & T of the Bell Operating Companies (BOCs). *Am. Tel. & Tel. Co.*, 552 F.Supp. at 139. The second case also resulted in a consent decree in 1982 that required AT & T's divestiture of the BOCs, equal access to interconnection facilities, and division of assets between the corporation and the divested companies. *Id.* at 139–233; *see generally* Joseph D. Kearney, From the Fall of the Bell System to the Telecommunications Act: Regulation of Telecommunications Under Judge Greene, 50 Hastings L.J. 1395, 1419 (1999).

er's telephone to their long distance carrier's nearest transmission facility, but only to and from telephones located within the same LATA (intra-LATA traffic). *Id.* Because BOCs held local monopoly positions, they could not carry calls between different LATAs (inter-LATA traffic); only AT & T and its competitors, such as MCI and Sprint, could carry telecommunications traffic that originated in one LATA and terminated in another. *Id.*

Predictable obstacles and pervasive changes in technology compounded judicial oversight of the consent decree and resulted in more than a decade of subsequent litigation. *See generally SBC Commc'ns, Inc. v. FCC,* 154 F.3d 226, 231 (5th Cir. 1998) ("[The consent decree]'s enforcement and alteration in the light of technological progress and changing market circumstances ultimately required substantial monitoring on the part of the district court, and the extensive judicial tinkering that resulted prompted many pundits to dub District Judge Greene the country's 'telecommunication's czar.' "). "Congress—responding, in part, to the argument that competition in the huge telecommunications industry should no longer be governed by an antitrust consent decree administered by a single federal district judge, *see* S.Rep. No.104-23, at 5, 9 (1995)—set forth a new legislative framework, the Telecommunications Act of 1996...." *SBC Commc'ns Inc. v. FCC,* 138 F.3d 410, 412 (D.C.Cir.1998).

### 3. Telecommunications Act of 1996

The Senate Report on the Telecommunications Act of 1996 (the Act) cited several reasons for the legislation.

The 1934 Act has not been rewritten since its original passage. Its provisions are no longer adequate in a world of competition for telephone services and increasing diversity of media. Further, much of current communications policy is being set by a single Federal district court enforcing the [consent decree]. Reducing regulation of the telecommunications industry will spur the development of new technologies and increase investment in these industries, which will create jobs and greater choices for consumers. The United States telecommunications industry is competitive worldwide. By reducing regulation and barriers to competition, the bill will help ensure the future growth of these industries domestically and internationally.

S. Rep. 104-23, at 9-10 (1995).

The preamble of the Act declares it is: "An Act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub.L. No. 104-104, S. 652, 110 Stat. 56 (codified as amended in scattered sections of Title 47 of the United States Code).

### 4. The Act: IXCs, ILECs, and CLECs

 The Act "revis[ed] the regulatory scheme under which local exchange carriers ("LECs") assess costs to long-distance ("IXCs") and other carriers for use of the LECs' local telephone networks to complete interstate telephone calls." *Sw. Bell Tel. Co. v. FCC,* 153 F.3d 523, 535 (8th Cir.1998). The Act subdivided the LECs into the former local telephone companies—incumbent local exchange carriers (ILECs)—and the new emergents to the local exchange arena—competitive local exchange carriers (CLECs). *Id.* at 536. Under § 203 of the Act, ILECs "are required to file and maintain tariffs with the Commission." *In re: Establishing Just & Reasonable Rates for Local Exch. Carriers (Access Stimulation NPRM),* 22 FCC Rcd. 17989, 17990 (2007). CLECs, on the other hand, are allowed "to tariff interstate access charges if the charges are no higher

than the rate charged for such services by the competing incumbent LEC (the benchmarking rule)." *Id.* at 17994 (citing 47 C.F.R. § 61.26; *In re: Access Charge Reform, Reform of Access Charges Imposed by Competitive Local Exchange Carriers, Seventh Report and Order and Further Notice of Proposed Rulemaking (Seventh Report and Order)*, 16 FCC Rcd. 9923, 9925 (2001)). CLECs "may not tariff rates that are higher than [the benchmark], but may negotiate any such higher charges with interexchange carriers (IXCs)." *Id.*

At issue in this litigation are commercial arrangements LECs formed with conference calling services (FCSCs) who advertise free services, such as, conference bridge lines, chat rooms, international calling, podcasts, and pornographic and other adult calling. Under these arrangements, the FCSCs' equipment is installed at locations controlled by the LECs, the LECs assign telephone numbers to the FCSCs, and when a consumer calls the phone number provided by the FCSC, the respective IXC is required to deliver the call to the LEC's exchange area, or in some cases, outside that area. The LEC then bills the respective IXC for the switched access service. When the LEC receives payment from the IXC, the LEC sends the FCSC an agreed upon portion of the access revenues. These arrangements, referred to as access stimulation or traffic pumping, resulted in dramatic increases in the volume of long distance calls the IXCs delivered to the LECs and for which the IXCs were billed at the LECs' higher tariffed rates.[12] (By way of example, as alleged in Qwest's second amended complaint, in June 2006, Qwest delivered approximately 15,000 minutes of long distance traffic to the 180

---

**12.** In *All Am. Tel. Co. v. AT & T Corp. (All Am. Recon. I)*, 28 FCC Rcd. 3469, 3479 (2013), *see* discussion *infra* Part III.B.2.b., the Commission provided the following description of the ILECs' and CLECs' rate structures:

> The Commission regulates access charges that LECs apply to interstate calls. As a general matter, ILECs must file and maintain tariffs with the Commission for interstate switched access services. Commission rules provide rate-of-return LECs ... with alternate means for filing individual interstate access tariffs. One option is to participate in the traffic-sensitive pool managed by the National Exchange Carrier Association (NECA) and in the traffic-sensitive tariff filed annually by NECA. The rates in the traffic-sensitive tariff are set based on the projected aggregate costs (or average schedule settlements) and demand of all pool members and are targeted to achieve an 11.25 percent return. Each participating carrier historically received a settlement from the pool based on its costs plus a pro rata share of the profits, or based on its settlement pursuant to the average schedule formulas. Stated differently, all NECA pool members share revenues in excess of costs. Alternatively, a rate-of-return carrier that has 50,000 or fewer access lines in a study area may elect to file its access tariffs in accordance with Section 61.39 of the Commission's rules, which the Commission adopted in the Small Carrier Tariff Order. A carrier choosing to proceed under this rule (Section 61.39 Carrier) must file access tariffs in odd numbered years to be effective for a two-year period. Section 61.39 Carriers base their initial rates on historical costs (or average schedule settlements) and associated demand for the preceding year. They base their subsequent rates on their costs and traffic volumes for the prior two year period. Section 61.39 Carriers do not pool their costs and revenues with any other carrier. Thus, if demand increases, Section 61.39 Carriers retain the revenues to the extent they exceed any cost increases. The Commission considers CLECs ... to be nondominant carriers subject to minimal rate regulation.... [Historically,] CLECs had two means by which to provide and charge IXCs for functionally equivalent interstate access services. A CLEC generally may tariff interstate access charges if the charges are no higher than the rate charged for such services by the competing ILEC (the benchmarking rule). Alternatively, a CLEC must negotiate and enter into agreements with IXCs to charge rates higher than those permitted under the benchmarking rule.

customers of ILEC Superior Telephone Cooperative (Superior).[13] Qwest's Second Am. Compl. 11, ECF No. 318. By November 2006, after Superior entered into arrangements with several FCSCs, the traffic volume to Superior increased to over 6.4 million minutes per month, an increase of over 42,000 percent. *Id.* Superior billed Qwest switched access charges for this traffic.)

Qwest, and other IXCs, disputed these charges arguing the services provided were not tariffed services, and therefore the LECs could not bill the IXCs under the tariff for those services. The IXCs eventually stopped paying the LECs' billed charges. The IXCs and the LECs filed actions against one another with the FCC, state utility boards and commissions, as well as in federal and state court, alleging causes of action under the Act, state communications law, and common law.

### 5. Relevant Provisions of the Act

The IXCs allege that consequent to the LECs' arrangements with the FCSCs, the LECs violated various provisions of the Act, including by billing the IXCs switched access charges for services not covered by the LECs' tariffs. Contrariwise, the LECs allege the IXCs violated the Act by refusing to pay the switched access charges.

The sections of the Telecommunications Act relevant to these claims and discussed in this order are 47 U.S.C. §§ 201(a), (b); 203(c); 206; 207; 223(a)(1); and 254(k).

Section 201(a) (Service):

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

Section 201(b) (Charges):

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, ... That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

Section 203(c) (Overcharges and rebates):

13. On November 14, 2013, the Court entered an order, ECF No. 741', granting the joint motion filed by Qwest, Superior, and CLEC Great Lakes Communication Corporation to dismiss all claims the parties had between one another.

(c) No carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.

Section 203(e) (Penalty for violations):

In case of failure or refusal on the part of any carrier to comply with the provisions of this section or of any regulation or order made by the Commission thereunder, such carrier shall forfeit to the United States the sum of $6,000 for each such offense, and $300 for each and every day of the continuance of such offense.

Section 206 (Carrier's liability for damages):

In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

Section 207 (Recovery of damages):

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

Section 223(a)(1) (Obscene or harassing telephone calls....):

(a) Prohibited acts generally. (1) Whoever—in interstate or foreign communications—(A) by means of a telecommunication device knowingly—(i) makes, creates, or solicits, and (ii) initiates the transmission of, any comment, request, suggestion, proposal, image, or other communication which is obscene or child pornography, with intent to abuse, threaten, or harass another person ...

Section 254(k) (Universal service—Subsidy of competitive services prohibited):

(k) A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services.

## B. "Traffic Pumping" Litigation

■ Around the same time traffic pumping cases were filed in this Court, similar cases were filed in other federal district courts. In many, if not all, cases filed in other federal district courts, the district court stayed the litigation and referred questions to the FCC.[14] Recognizing that the tariffs and the arrangements between the LECs and the FCSCs in the cases before this Court were essentially indistinguishable from those in the cases that had already referred questions to the FCC, this Court determined that referral of the same questions to the FCC would be duplicative and cause unnecessary expense and therefore stayed these cases to await the rulings in those cases already before the FCC. This procedure was also intended to retain some control over when activity could resume in this Court in what promised to be a long litigation process.

As will be discussed, *see* discussion *infra* Parts III.B.1–III.B.6, in all the referral cases, the IXCs and the LECs settled their claims during the pendency of the referral. Accordingly, the referring district courts never ruled on the merits of the dispositive motions between the LECs

and the IXCs. With two exceptions, *see* discussion *infra* Parts III.B.5.c. and III. B.6., the IXCs and the FCSCs also settled their claims. Due to those settlements, the referral courts had no reason to consider dispositive motions on the claims between the LECs and the IXCs in light of the FCC's decisions. Although this Court must do so now, it does not do so in a vacuum. The Court's determinations must reflect the extensive, expert guidance provided in the FCC decisions that have been released over the years of this protracted traffic pumping litigation. Thus, in consideration of the motions before it, having stayed these cases in anticipation of this guidance, and to reflect the details of the analysis, this Court finds it essential and unavoidable to provide a comprehensive discussion of the background and dispositions of the other traffic pumping cases.[15]

### 1. *Farmers v. Qwest*

Farmers and Merchants Mutual Telephone Company of Wayland, Iowa (Farmers), an ILEC that served approximately 800 access lines for local residents, provided access services that Qwest purchased to terminate calls to customers located in Farmers' exchange. *See Qwest Commc'ns*

---

14. More precisely, when a court "refers" a question to an agency, such as the FCC, the agency will direct the party to file an administrative complaint setting forth the issues to be considered. *Reiter v. Cooper*, 507 U.S. 258, 269 n. 3, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (" 'Referral' is sometimes loosely described as a process whereby a court refers an issue to an agency. But [most statutes] contain[ ] no mechanism whereby a court can on its own authority demand or request a determination from the agency; that is left to the adversary system, the court merely staying its proceedings while the [party] files an administrative complaint under [the agency's enabling statute].... *Mitchell Coal [& Coke Co. v. Pennsylvania R. Co.*, 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472 (1913) ], spelled out the actual procedure contemplated, holding that further action by the district court should 'be stayed so as to give the plaintiff a reason-

able opportunity within which to apply to the Commission for a ruling as to the reasonableness of the practice.' " (internal citations omitted)); *accord Telecom Int'l Am., Ltd. v. AT & T Corp.*, 67 F.Supp.2d 189, 219 (S.D.N.Y.1999) (" 'Referral' by the District Court is technically a misnomer. The District Courts do not actually refer matters to the FCC. The proper procedure is for the District Court to stay the matter, and one of the parties to the litigation files a complaint with the FCC." (citing *Reiter*, 507 U.S. at 268, 113 S.Ct. 1213)).

15. The cases discussed in this section do not purport to be an exhaustive accounting of traffic pumping litigation. Rather, this section includes those cases relied upon and cited extensively by the parties, which the Court consequently deems significant to its analysis.

*Corp. v. Farmers & Merchs. Mut. Tel. Co. (Farmers I)*, 22 FCC Rcd. 17973, 17974 (2007). In June 2005, Farmers left the National Exchange Carrier Association (NECA) tariff pool and filed a tariff (the Kiesling Tariff) that contained Farmers' switched access rates. *Id.*

At the same time Farmers left the NECA pool, it entered into multiple commercial arrangements with several FCSCs as a method of increasing interstate switched access traffic and revenues, also referred to as traffic pumping. *Id.* at 17976. Under the terms of the arrangements, Farmers paid the FCSCs. *Id.* As result of these arrangements, the number of minutes delivered to the Farmers exchange increased exponentially and those minutes of use (MOUs) were directly attributable to the traffic delivered to the FCSCs and not due to an increase in the number of lines Farmers serviced. *Id.* In June 2007, instead of revising its tariff based on its traffic for the prior two years as required by Commission Rule § 61.39, Farmers elected to reenter the NECA pool. *Id.* Confronted with skyrocketing monthly access charges, Qwest stopped paying the full amount of Farmers' invoices. *Id.* at 17973.

### a. *FCC: Farmers I*

On May 7, 2007, Qwest filed a complaint with the FCC against Farmers alleging, inter alia, violations of federal tariffs.[16] Qwest asserted that beginning July 1, 2005, Farmers earned a rate of return far in excess of the prescribed maximum and thus those rates were unjust and unreasonable in violation of § 201(b) and were not entitled to deemed lawful status or protection because Farmers' acts were a deliberate, bad-faith plan to dramatically increase its access revenues and earn a rate of return that was in gross excess of the Commission's precepts. *Id.* at 17976–77. Qwest asked the Commission to declare Farmers' rates void ab initio and to hold Farmers liable for retrospective damages. *Id.* at 17977. In the alternative, Qwest contended that the traffic at issue was not terminating access traffic under Farmers' tariff, and therefore Farmers violated §§ 201(b) and 203(c) of the Act by applying charges inconsistent with its tariff. *Id.*

In its decision dated October 2, 2007, the Commission rejected Farmers' argument that its tariff's deemed lawful status insulated Farmers prospectively from overcharge claims explaining that "[s]ection 204(a)(3) does not mean that tariff provisions that are deemed lawful when they take effect may not be found unlawful subsequently" because "the Commission retains its ability to find under section 208 that a rate will be unlawful if charged in the future." *Id.* at 17980 (internal quotation marks and citations omitted). In determining the lawfulness of Farmers' rate of return, the Commission applied the NECA average schedule formula noting that Farmers chose not to produce its actual cost data, and concluded Farmers revenues increased many fold without a concomitant increase in costs and that Farmers vastly exceeded the prescribed rate of return. *Id.* at 17982–83. Although the Commission agreed with Qwest that Farmers earned an unlawful rate of return, the Commission declined to either

---

**16.** On February 20, 2007, Qwest had filed a similar complaint with the Iowa Utilities Board against several LECs, including Farmers, alleging violations of Iowa state tariffs. *See Qwest Commc'ns v. Superior Tel. Coop. (IUB I)*, Docket No. FCU–07–2, 2009 WL 3052208 (Iowa Util.Bd. Sept. 21, 2009), *recon. granted in part, (IUB Recon. I)*, 2009 WL 4571832 (Iowa Util.Bd. Dec. 3, 2009), *further recon. denied*, 2011 WL 459685, *(IUB Recon. II)* (Iowa Util.Bd. Feb. 4, 2011), *aff'd sub nom. Farmers & Merchants Mut. Tel. Co. of Wayland v. IUB*, 829 N.W.2d 190 (Iowa Ct. App.2013) (unpublished table decision).

rule that Farmers' tariff was void ab initio or award Qwest damages reasoning that to do so would be a departure from the Commission's prohibition against awarding retrospective relief in conjunction with "deemed lawful" tariffs. *Id.* at 17983. The Commission reasoned that while it agreed with Qwest that "Farmers manipulated the Commission's rules to achieve a result unintended by the rules," Qwest had not identified the use of any improper accounting techniques nor had Qwest alleged that Farmers' revenue-sharing arrangements with the FCSCs constituted a per se violation of § 201(b). *Id.* at 17984.

The Commission denied Farmers' request to rule that Qwest's withholding partial payment of Farmers' tariffed charges was unlawful self-help in violation of §§ 201(b) and 203(c), stating that the request was akin to a cross-complaint prohibited under Commission's rules and that any complaint Farmers might file to recover fees Qwest allegedly owed would constitute a collection action, which the Commission would not consider. *Id.* at 17984–85.

The Commission next rejected Qwest's allegation that Farmers violated §§ 201(b) and 203 by imposing terminating access charges on traffic bound for FCSCs that did not terminate in Farmers' exchange but merely passed through and terminated elsewhere. *Id.* at 17985. The Commission agreed with Farmers' characterization that calls using FCSC numbers were connected and then terminated at the conference bridge.[17] *Id.* at 17985–86. Referring to the record before it, the Commission found that under the terms of Farmers' tariff, the FCSCs were customers and end users because the FCSCs did subscribe to a service. *Id.* at 17987.

### b. *FCC: Farmers Reconsideration I*

Qwest filed a petition for partial reconsideration of *Farmers I* identifying evidence that Farmers withheld critical facts regarding Farmers' relationship with the FCSCs that should have been produced in the initial underlying proceeding. *Qwest Commc'n Corp. v. Farmers & Merchs. Mut. Tel. Co. (Farmers' Recon. I)*, 23 FCC Rcd. 1615, 1615 (2008). Qwest identified statements by Farmers after the Commission released *Farmers I* that indicated certain contract amendments and bills were not contemporaneously created with the delivery of traffic to the FCSCs; statements contained in the April 13, 2007, affidavit of Farmers' counsel, which indicated Farmers back-billed the FCSCs to ensure compliance with its tariff; and backdated bills and contracts Farmers delivered even after the complaint proceeding began. *Id.* at 1616.

In granting the petition for reconsideration, the Commission explained that in *Farmers I*, it made the key determination that the FCSCs were end users who subscribed to services offered under Farmers' tariff, in reliance upon Farmers' representation that the FCSCs purchased interstate End User Access Service and paid federal subscriber line charges, a representation that was brought into question by evidence that purportedly showed Farmers' invoices and agreements with the FCSCs were backdated. *Id.* at 1617–18. The Commission initiated additional proceedings to allow review of the newly discovered evidence and ordered Farmers to produce all discovery documents submitted in discovery in the IUB proceeding. *Id.* at 1617. The Commission rejected Farmers' assertion that the protective order issued

---

**17.** "Newton's [Telecom Dictionary] describes a conference bridge as '[a] telecommunications facility or service which permits callers from several diverse locations to be connected together for a conference call.'" *Farmers I*, 22 FCC Rcd. at 17986 n. 112 (quoting H. Newton, *Newton's Telecom Dictionary* 260 (2006)).

in the IUB proceeding insulated the documents from being produced, explaining that the Commission had the authority to order a party to produce that party's documents in a proceeding before it irrespective of whether those same documents were produced and subject to a protective order in a different proceeding. *Id.* at 1619.[18]

### c. FCC: Farmers II

On November 25, 2009, the Commission released its order on reconsideration finding the evidence Qwest presented after the release of *Farmers I* warranted a change of that ruling and compelled the conclusion that Farmers violated §§ 203(c) and 201(b) of the Act and was liable to Qwest for damages suffered as a result of those violations. *Qwest Commc'n Corp. v. Farmers & Merchs. Mut. Tel. Co. (Farmers II)*, 24 FCC Rcd. 14801, 14801 (2009).

The Commission clarified that in *Farmers I*, it found the FCSCs were customers and thus end users based upon Farmers' representations that the FCSCs purchased tariffed access service and paid federal subscriber line charges (SLC) and that evidence came to light afterward calling those representations into question. *Id.* at 14803. The Commission found evidence presented on reconsideration demonstrated that the FCSCs had never taken tariffed services and that after Farmers' activities came under legal scrutiny, Farmers "undertook to fabricate evidence of a tariffed customer-carrier relationship that did not in fact exist, sending backdated bills to the [FCSCs] and executing contract 'addenda' purporting to have taken effect months or years earlier," and then selectively submitted some of the documents in the earlier proceeding without disclosing that those documents had not been issued contemporaneous with the service provided. *Id.* at 14804 (internal quotation marks and citations omitted).

Revisiting its *Farmers I* end user determination in light of the new evidence, the Commission noted that Farmers' tariff defined that (1) "[s]witched access service allows a customer to, originate calls from an *end user's* premises to a customer designated premises and to terminate calls from a customer designated premises to an *end user's* premises," (2) "[a]n *end user* is any *customer* of an interstate or foreign

---

**18.** References made in this Order to the IUB's proceedings and findings are included as part of the review of access stimulation proceedings that impact the cases before this Court, as well as to address arguments (made at the time these motions were filed) that the IUB's proceedings were still in the review process and were not binding because a final order had not been entered. *See* discussion *infra* Part IV.A.3.c. Given the procedural posture of the motions addressed in this Order, the Court looks to the allegations made in the complaints/counterclaims and does not rely upon nor adopt the IUB's findings in resolving the present motions. Nevertheless, the Court acknowledges that the IUB's proceedings, as well as various FCC decisions, are now final and conclusive. The Court distinguishes, however, that in the Court's subsequent orders on motions for summary judgment, the Court may consider the relevance of the IUB's findings. *See, e.g., In re: Request for Review by Aventure Commc'n Tech., LLC, of A Decision of the Universal Serv. Adm'r*, 29 FCC Rcd. 9536, ——, 2014 WL 3907897, at *2 (Aug. 11, 2014) ("Aventure objects to relying on the Iowa Utilities Board Decision, arguing that the Iowa Utilities Board Decision is based on inapplicable state law. That argument misses the point: even if we were to agree with Aventure's contention that the legal conclusions reached in the Iowa Utilities Board Decision are based on inapplicable state law, *we can still find persuasive the findings of fact made by the Iowa Utilities Board from its investigation into Aventure's practices.*" (emphasis added) (citing *AT & T v. All Am. Tel. Co. (All American II)*, 28 FCC Rcd. 3477, 3495 (2013) (discussing the relevance of the state regulatory board's findings reasoning that the board had "conducted extensive proceedings into [the LEC]'s operations, and its findings [were] credible and independently supported by the record"))).

telecommunications service that is not a carrier," and (3) "[a] *customer* is any entity that subscribes to the *services offered under this tariff.*" *Id.* at 14805 (internal quotation marks and citations omitted). The Commission reasoned that to be an end user, an entity must also be a customer and to be a customer the entity must subscribe to the services offered under the tariff, but because the FCSCs did not subscribe to a services offered under Farmers' tariff, the FCSCs were not customers and thus could not be end users. *Id.* The Commission noted that the evidence showed "Farmers expressly structured their telecommunications service contracts *to avoid* strict adherence to the terms of Farmers' filed tariff." *Id.* Based upon these determinations, the Commission concluded "Farmers was not entitled to charge Qwest switched access charges under the terms of Farmers' tariff." *Id.*

In examining the contracts between the FCSCs and Farmers, the Commission found that the FCSCs received a free service accessed by way of toll calls placed over long-distance networks that were delivered to the FCSCs over Farmers' network, and that in exchange, Farmers provided support services to the FCSCs and paid the FCSCs a per-minute fee for the traffic generated through this relationship. *Id.* at 14806. Notably, the Commission found that unlike ordinary end-user customers under the tariff, nothing in the Farmers–FCSCs' contracts suggested the FCSCs subscribed to any Farmers' tariffed service or paid Farmers for connecting the FCSCs to the interexchange network. *Id.*

The Commission also noted that Farmers provided the FCSCs connections that differed from those provided to customers of Farmers' tariffed services, including high-capacity DS3 trunks that fed into a new soft switch that Farmers purchased specifically to handle traffic bound for the FCSCs rather than the standard circuit switch used to serve all of its other customers. *Id.*

Another difference the Commission observed was that Farmers—FCSCs' agreements did not resemble traditional tariffed switched access service agreements, noting that those agreements (1) included provisions prohibiting Farmers from providing services to the respective FCSC's competitors, which were antithetical to the nondiscriminatory notion of tariffed services; (2) the agreements contained terms not available under Farmers' tariff, which reinforced the conclusion the parties did not establish tariffed-defined carrier/customer relationships; and (3) various terms, such as, the per minute fee paid, volume of traffic generated, duration of the agreement, and terms of cancellation, varied between the different FCSC agreements. *Id.* The Commission found it telling that "the parties in no way behaved as if they were operating under tariff until *after* Farmers became embroiled in litigation over the traffic stimulation plan." *Id.* The Commission reasoned that its conclusion that Farmers never intended to treat the FCSCs as tariff service customers was supported by Farmers having never entered FCSCs' account information into its customer billing systems, Farmers had no business records of FCSCs having purchased end user services under Farmers' tariff, Farmers did not contemporaneously bill FCSCs for any services, and Farmers did not take any steps to bill FCSCs until shortly before discovery began in the underlying proceeding. *Id.* at 14808. The Commission found Farmers' justification that backdating was standard practice unpersuasive given Farmers' conduct throughout its business relationships with the FCSCs and that the conduct was inconsistent with provision of tariffed services. *Id.* The Commission concluded that "[t]he evidence overwhelmingly demon-

strates that Farmers willingly incurred all of the expenses associated with providing the underlying services to the conference calling companies, including the payment of a fee to these companies, in exchange for these companies directing the free service they offered to the public to Farmers' exchange." *Id.* at 14809 (internal quotation marks omitted).

The Commission squarely rejected Farmers' assertion that the application of the filed rate doctrine compelled a finding that the services it provided were pursuant to its tariff, and therefore customer status should be imputed to the FCSCs even though the services they were provided were outside the scope of the tariff. *Id.* at 14810. The Commission reasoned that "[t]he purpose of the filed rate doctrine is to prevent unreasonable and unjust discrimination among similarly-situated customers of a particular common carrier's service, and to ensure that carriers impose like charges for like services," but that the overwhelming evidence developed on reconsideration demonstrated "a purposeful deviation from the tariff's terms that allowed the conference calling companies to reap benefits from a free service offered only to them, which thereby enabled Farmers to dramatically increase its access charge billing to Qwest," making it abundantly clear that Farmers intentionally avoided a customer relationship under the tariff. *Id.* Accordingly, the Commission found Farmers did not provide Qwest switched access service for the FCSCs' calls, and therefore the filed rate doctrine did not require Farmers to charge Qwest its tariffed switched access charges nor require Qwest to pay such charges for terminating the FCSCs' calls. *Id.* at 14811.

Next, the Commission rejected Farmers' argument that the voluminous tariff provisions had to be construed as a whole to determine exchange access, explaining that each of the provisions Farmers relied upon were subsections of section 6.1 of the NECA tariff, which limits the scope of the tariff to traffic transmitted to end users. *Id.* at 14811–12 (distinguishing that under the well-established rules of construction, a service that does not constitute switched access under a section cannot constitute switched access under a subordinate section). The Commission found that neither the Act nor Commission rules bolstered Farmers' theory of what constitutes switched access because "the relevant tariff defines switched access service as providing a communications path to an end user" and "[w]hether or not this definition is narrower than that used for purposes of the Act and Commission rules, it is nonetheless the definition to which Farmers is bound for purposes of determining whether its charges are in compliance with its tariff." *Id.* at 14812.

The Commission summarized the factors it found to be very strong evidence that Farmers did not believe it was providing, nor intended to provide, the FCSCs tariffed services, and thus supported its conclusion that the FCSCs were not end users within the meaning of the tariff provisions: (1) Farmers' individualized contracts with the FCSCs that involved an exchange of services and business relationship quite distinct from Farmers' tariffed switched access service; (2) Farmers did not offer the same terms of service to others that requested it; (3) the parties' actual course of dealing demonstrated no tariffed services were purchased; (4) the absence of an explanation why the FCSCs were not entered into Farmers' customer systems or why over its two year relationship with the FCSCs, Farmers failed to bill and collect payment from the FCSCs as required under its tariff; and (5) Farmers having sent bills to the FCSCs only after the first round of discovery in the case and then sent no further bills until additional

discovery was ordered. *Id.* at 14812–13. The Commission thus concluded "that Farmers' practice of charging Qwest tariffed switched access rates for its termination of traffic from the conference calling companies is unjust and unreasonable in violation of section 201(b) of the Act." *Id.* at 14813.

### d. *FCC: Farmers Reconsideration II*

Farmers filed a petition for reconsideration of *Farmers II*, which the Commission denied on March 17, 2010. *Qwest Commc'n Corp. v. Merchs. Mut. Tel. Co. (Farmers Recon. II)*, 25 FCC Rcd. 3422, 3422 (2010). Farmers argued the FCC's *Farmers II* decision was arbitrary and capricious, contrary to law, and that the Commission lacked jurisdiction to issue it because it was not issued within ninety days of the filing of the petition as required under § 405(b)(1). *Id.* The Commission dispensed with Farmers' jurisdiction argument, clarifying that the ninety-day requirement found in § 405(b)(1) refers to the grant or denial of a petition. The Commission noted that it had complied with § 405(b)(1) by granting Qwest's petition for reconsideration within ninety days of the date Qwest filed that petition and therein ordered additional proceedings. *Id.* at 3424. The Commission furthermore explained that failure to rule on a petition for reconsideration within ninety days would not have deprived the Commission of jurisdiction to consider the petition. *Id.* at 3425.

The Commission also rejected Farmers' assertion that the Commission should not have altered its end user finding in *Farmers I* without additional evidence. *Id.* at 3426. The Commission remarked its findings in *Farmers I* were based on Farmers' representations at that time that the FCSCs purchased interstate end user services and paid federal subscriber line charges but that upon reconsideration, the landscape shifted dramatically as the new evidence Farmers previously withheld made clear the FCSCs never paid subscriber line charges nor made any other payments to Farmers. *Id.* Disposing of Farmers' challenge that by leaving intact *Farmers I* regarding count one of Qwest's complaint *Farmers II* was rendered arbitrary and capricious, the Commission explained that its finding in *Farmers I* that Farmers received an excessive rate of return was an alternative basis of liability. *Id.* at 3427.

### e. *D.C. Circuit: Farmers & Merchants v. FCC*

Farmers appealed the *Farmers* decisions to the U.S. Court of Appeals for the District of Columbia Circuit arguing the Commission ignored jurisdictional requirements, misread the tariff, and failed to adhere to its own precedent and rules. *Farmers & Merch. Mut. Tel. Co. of Wayland v. FCC*, 668 F.3d 714 (D.C.Cir.2011). The D.C. Circuit rejected each of Farmers' arguments, holding (1) the Commission complied with § 405(b)(1) in granting Qwest's petition for reconsideration within ninety days; (2) the Commission's determination that Farmers' services were not tariffed service and Qwest was not required to pay Farmers' tariff, did not result in the Commission being without jurisdiction to consider Qwest's complaint because § 208(a) provides the Commission the authority to adjudicate acts and omissions of common carriers; (3) the Commission properly interpreted the tariff in finding the FCSCs were not end users as the tariff's switched access service diagram illustrates, an end user is one of the sub-elements of that service; (4) Farmers' tariff rates were "deemed lawful" until the Commission determined otherwise, which it did in reviewing the new evidence; (5) the Commission found two alternate bases for § 201(b) liability: (a) Farmers did not provide switched access under its tariff making Farmers' practice of charging Qwest for such services unjust and unrea-

sonable under § 201(b), and (b) even if traffic Farmers carried from Qwest to the FCSCs could be considered switched access service, Farmers violated § 201(b) by earning an excessive rate of return; (6) the Commission's finding that the FCSCs were not end users did not contravene prior precedent set in *AT & T Corp. v. Jefferson Telephone Co.*, 16 FCC Rcd. 16130 (2001), because in *Jefferson Telephone*, end user status was assumed; and (7) because the Commission properly concluded the FCSCs were not end users under the tariff, the filed rate doctrine did not apply. *Farmers v. FCC*, 668 F.3d at 718–24.

## 2. *FCC: All American Tel. Co. v. AT & T Corp.*

On February 5, 2007, All American Telephone Co. (All American), e-Pinnacle Communications, Inc., and ChaseCom (collectively referred to as CLECs or All American), CLECs located in Utah and Nevada, filed a lawsuit against IXC AT & T, in the U.S. District Court for the Southern District of New York, 1:07–cv–00861–WHP (S.D.N.Y.), asserting claims for collection of amounts AT & T allegedly owed for interstate tariff access services, violation of § 201(b) by invoking self-help and failing to pay tariffed access services, violation of § 203(c) by failing to pay tariffed services, and compensation under the theories of quantum meruit for telecommunications services allegedly provided. *See All Am. Tel. Co. v. AT & T (All American I)*, 26 FCC Rcd. 723, 725 (2011). AT & T filed counterclaims against the CLECs for violations of §§ 201(b) and 203(c) of the Act, state law fraud, civil conspiracy, and unjust enrichment alleging the CLECs did not provide AT & T switched access service as defined by the terms of their tariffs, and that even if the services were pursuant to the tariffs, the CLECs committed unreasonable practices by using sham arrangements to inflating access charges. *See id.* On February 5,

2010, the district court referred two issues to the FCC: (1) did AT & T violate § 201(b) or § 203(c), or any other provision of the Act, by refusing to pay the billed charges; and (2) did AT & T violate any provision of the Act by refusing to pay the billed charges and not filing a rate complaint with the FCC. *See id.*

### a. *All American I*

On May 7, 2010, the CLECs filed a formal complaint with the FCC against AT & T alleging AT & T violated §§ 201(b) and 203(c) by engaging in unlawful self-help by not paying the CLECs for use of their local networks services to complete long distance calls and that AT & T violated § 201(b) by not filing a rate complaint against the CLECs. *Id.* at 726.

Addressing whether AT & T violated any provision of the Act by refusing to pay the CLECs' billed charges, the Commission found that the CLECs failed to state a claim reasoning that the Commission only had authority to adjudicate claims that a carrier has violated the Act, and allegations by a carrier that a customer, such as AT & T, refused to pay charges failed to give rise to a claim at the Commission under § 208 or in court under § 206. *Id.* at 727. The Commission remarked that "[t]his long-standing commission precedent that 'collection actions' fail to state a claim for violation of the Act has been acknowledged and followed by courts." *Id.* at 727 (footnote omitted). The Commission rejected the CLECs' attempt to distinguish that the allegations of AT & T's failure to pay was not a collection action because the action had been filed in district court, and the district court, not the Commission, would determine any damages owed stating, "the CLECs fail to recognize that the reason the Commission does not hear collection actions is that *a failure to pay tariffed access charges does not constitute a violation of the Act*," and therefore, "*the CLECs*

*have no claim in a court or at the Commission* that AT & T violated the Act in its role as a customer." *Id.* at 728 (second emphasis added). The Commission also rejected the CLECs' assertion that the *Seventh Report and Order* stood for the proposition that an IXC's failure to pay a CLEC's access charges constituted a violation of the Act reiterating that while the *Seventh Report and Order* did observe that failures to pay *tariffed rates* may constitute *breaches of the tariff* actionable in the appropriate federal court, the *Seventh Report and Order* went on to say that "our tariff rules were historically intended to protect purchasers of service from monopoly providers, not to protect sellers from monopsony purchasing power." *Id.* at 729 (quoting the *Seventh Report and Order,* 16 FCC Rcd. at 9957). The Commission noted the irony in the CLECs' reliance on the *Seventh Report and Order* given that the focus of the *Seventh Report and Order* was "to eliminate regulatory arbitrage opportunities that previously [had] existed with respect to tariffed CLEC access charges." *Id.* at 729–30 (quoting the *Seventh Report and Order,* 16 FCC Rcd. at 729–30). The Commission also noted that the Commission's remark in the *Seventh Report and Order* that "the Act and the Commission rules require IXCs to pay *tariffed* CLEC access charges . . . merely reinforce[d] the undisputed notion that tariffs govern carrier-customer relationships and that parties are precluded from negotiating separate agreements that affect the rate for services once a tariff has been filed." *Id.* at 730 n. 47 (emphasis added) (internal citations and quotation marks omitted).

The Commission next found misplaced the CLECs' comparison to, and reliance

upon, *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.,* 550 U.S. 45, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007), in which the U.S. Supreme Court held a carrier's failure to pay charges for payphone usage was a violation of the Act. The Commission explained that at issue in *Global Crossing* was the Act's requirement that the Commission adopt rules to ensure payphone service providers received compensation for completed calls originating from their payphones and thus, as the Commission found in subsequent cases, a carrier's failure to pay those charges was a violation of the Act. *Id.* at 730. The Commission distinguished that "[b]y stark contrast, the provisions of the Act and the Commission's rules apply only to the provider of the service, not to the customer; and they govern only what a provider may charge, not what the customer must pay." *Id.*

The Commission also dispelled the CLECs' notion that footnote 96 in *Farmers II* stood for the proposition that a carrier is always entitled to at least some compensation for a service rendered, whether or not that service is covered by the tariff, and that if a carrier is always entitled to some compensation for service rendered, AT & T's failure to pay any compensation must be a violation of the Act. *Id.* at 731 (citing *Farmers II,* 24 FCC Rcd. at 14812 n. 96). The Commission explained that *Farmers II* did not hold that a carrier is *always* entitled to compensation for a service rendered, rather *depending upon the totality of the circumstances,* a carrier *may* be entitled to some compensation for non-tariffed services. *Id.*[19]

---

**19.** Aventure filed a petition with the Commission for reconsideration of the *All American* decision, and Qwest filed a petition seeking permission to file an opposition to Aventure's petition. *All Am. Tel. Co. v. AT & T Corp.,* 26 FCC Rcd. 15016 (2011). The Commission denied Aventure's petition reasoning that Aventure's assertion that *All American I* was "vague" and "subject to multiple interpretations" did not meet the "adversely affected"

### b. *All American Reconsideration I*

The CLECs filed a petition for reconsideration, which the Commission denied finding all the CLECs' arguments had either been fully considered and rejected in *All American I* or the CLECs could have raised the arguments during the underlying proceeding. *All Am. Recon. I*, 28 FCC Rcd. at 3471–72. The Commission noted, for example, that the CLECs "persist in relying on the same out-of-context snippets from old Commission orders" that the Commission already distinguished in *All American I. Id.* at 3471–72. The Commission remarked that it was perplexed by the CLECs' request to (1) reverse the *All American I* decision, (2) find the Commission lacked jurisdiction to hear the questions referred by the district court, and (3) dismiss the complaint without prejudice, noting it was the CLECs, over AT & T's objection, who requested the referral from the district court, and who now asserted that they knew all along that the Commission was precluded from ruling on the merits of the complaint because it was a collection action. *Id.* at 3472–73. Significantly, the Commission dispelled the CLECs' notion that a claim against an IXC for failure to pay purportedly tariffed access charges was cognizable in a court proceeding, even though the very same conduct did not constitute a cognizable claim in a § 208 Commission proceeding reasoning that "[u]nder the plain language of sections 206–208 of the Act, both the Commission and courts *can award relief only upon finding a violation of the Act." Id.* at 3473 (emphasis added) (footnote

omitted). The Commission clarified that a "federal court *can* adjudicate a local exchange carrier's claim seeking to enforce an IXC's access charge payment obligations *under a federal tariff,* whereas the Commission cannot under the longstanding precedent that 'collection actions' fail to state a claim for violation of the Act." *Id.* (second emphasis added).

### c. *FCC: All American II*

On April 30, 2010, AT & T filed a formal complaint with the FCC alleging the CLECs violated §§ 203 and 201(b) of the Act by billing AT & T for access services that were not pursuant to a valid tariff, and violated § 201(b) of the Act by participating in a traffic pumping scheme to inflate billed access charges to AT & T and other IXCs. *AT & T v. All Am. Tel. Co. (All American · II),* 28 FCC Rcd. 3477, 3477 (2013). The Commission granted AT & T's complaint concluding the evidence showed that the CLECs participated in a traffic pumping scheme "designed to collect in excess of eleven million dollars of improper terminating access charges." *Id.*

The Commission described the revenue-sharing agreement between the LECs Beehive Telephone Co., Nevada, and Beehive Telephone Co., Utah (collectively, Beehive); FCSC Joy Enterprises, Inc. (Joy); and CHR Solutions (CHR), a telecommunications consulting company that provided services to Beehive (and the subsequently-created CLECs) and drafted the tariffs at issue. *Id.* at 3478–79.

In 1994, Beehive withdrew from the NECA pool and became a § 61.39 carrier,

---

criteria for a non-party to seek reconsideration. *Id.* at 15017 (internal quotation marks and citations omitted). The Commission explained that "the mere precedential value of an adjudicatory order in a section 208 complaint proceeding cannot 'adversely affect' a non-party to the adjudication within the meaning of section 405(a) of the Act and section 1.106 of the Commission's rules." *Id.*

at 15018 (internal quotation marks) (citing *AT & T Corp. v. Business Telecom, Inc.,* Order on Reconsideration, 16 FCC Rcd. 21750, 21754 (2001)). The Commission similarly denied Qwest's petition for reconsideration as being tantamount to a petition to intervene and that Qwest failed to satisfy the requirements for intervention. *Id.* at 15019.

which meant Beehive did not have to share revenues with other ILECs in the pool. *Id.* at 3480. At about the same time, Beehive and Joy entered into an access revenue-sharing agreement, under the terms of which Beehive would pay Joy a portion of the access charges for the long distance traffic routed to Joy's assigned numbers. *Id.* As a result of this arrangement, Beehive's interstate local switched access minutes of use (MOU) grew exponentially from 3.6 million minutes in 1994, to 313.5 million minutes in 2005. *Id.* Due to the significant increase in traffic between 2001 and 2005, Beehive was required to reduce its rates from 4.59 to 1.02 cents per minute, but instead of continuing to provide terminating access service, and consequently having to further reduce its rates, Beehive reentered the NECA pool in mid–2007. *Id.* at 3480–81.

Beehive then created the CLEC defendants—All American, ePinnacle, and ChaseCom—to assume the role of terminating access carrier and continue the traffic pumping scheme. *Id.* at 3481. Because they were CLECs rather than ILECs, their rates were not subject to reductions due to the large increases in traffic volume. *Id.* Defendants were providing the termination service, while Beehive continued charging the IXCs for tandem switching and transport of the traffic. *Id.*

The CLEC defendants applied for certification to operate as CLECs in Utah, representing to the Utah public service commission (PSC) that they did not intend to operate or provide services in Beehive's territory. *Id.* at 3482. Beehive supported and assisted the CLEC defendants in filings it made with the PSC. *Id.* Although the certification issued to the CLEC defendants by the PSC precluded the CLEC defendants from competing in Beehive's territory, the CLEC defendants filed switched access tariffs in Utah bench-

marked for access service against Beehive's tariffed rates in Utah. *Id.* Beehive helped CLEC defendants establish initial operations and set up locations to maximize transport mileage they could charge. *Id.* at 3483. The Commission observed that Beehive (1) installed and maintained CLEC defendants' equipment, which was located at Beehive's facility; (2) coordinated and managed the CLEC defendants' billing and collections; (3) assigned its equipment to CLEC defendants and allowed them to continue using it at no cost; (4) advised CHR when to revise the CLEC defendants' tariffs after Beehive had increased its own rate; (5) advanced money to and became co-lessees with CLEC defendants; and (6) decided whether CLEC defendants could relocate their equipment. *Id.* In addition, the CLEC defendants' operations were designed and engineered exclusively to provide service to FCSCs, and the CLECs did not market local exchange services. *Id.* at 3484.

Joy and All American had common directors, officers, and ownership, and shared the same business address. *Id.* at 3479. All American's operations only provided services to the chat line and conferencing services of its affiliate Joy; in fact, All American never had its own operating switch, and traffic to All American's telephone numbers terminated to Joy's equipment at Beehive's facilities. *Id.* at 3484. ChaseCom and e-Pinnacle, likewise, served a total of five FCSCs, and the only equipment either owned was conference bridge equipment; they did not own any of the equipment typically used to provide competitive LEC services to the public. *Id.* All three CLEC defendants ceased operation without complying with Commission discontinuation of service rules. *Id.* at 3485.

In 2010, the Utah public service commission (PSC) characterized All American

as a mere shell company that lacked technical, financial, and managerial resources to serve customers as it had represented it would; found that All American never intended to comply with its state authorization; revoked All American's authorization; and ordered All American to withdraw from the state. *Id.* The state's revocation order depicted collusion between All American and Beehive and determined Beehive was party to All American's scheme and aided All American in its illegal operation. *Id.* at 3486. The state rescinded All American's authorization concluding All American did not merit the privileges obtained therein, which included the right to levy access charges. *Id.*

Turning to AT & T's complaint against the CLEC defendants, the Commission concluded that the extensive record in the case overwhelmingly supported the conclusion that the CLEC defendants were sham CLECs "created to capture access revenues that could not otherwise be obtained by lawful tariffs," and therefore, billing AT & T for access charges in furtherance of this scheme constituted an unjust and unreasonable practice in violation of § 201(b). *Id.* at 3487-88 (internal quotation marks omitted). Agreeing with the PSC's findings, the Commission held that the CLEC defendants never intended to be bona fide CLECs but instead intended to contravene the prohibition from providing service in Beehive's service areas; Beehive masterminded the sham that allowed the traffic pumping arrangements to continue at rates that would have been unsustainable if Beehive had remained a § 61.39 carrier and created the CLEC defendants who were not subject to NECA's requirements and thus could benchmark their rates. *Id.* at 3489. The Commission observed that even after the CLEC defendants took over, the callers still used the same telephone numbers used when Beehive carried the traffic, the calls were routed through

the same facilities, Beehive still charged the IXCs for transporting the calls, and Beehive still made money off the traffic. *Id.*

The Commission rejected the CLEC defendants' argument that they were lawfully billing AT & T at benchmarked rates that were compliant with § 61.26(b)(1) reasoning the CLEC defendants were not competing with Beehive, rather Beehive and CLEC defendants were collaborating to circumvent the Commission's CLEC access charges and tariff rules, compliance with which would have ended the traffic pumping scheme. *Id.* at 3491. The Commission also distinguished that in *Jefferson Telephone*, upon which the CLEC defendants relied, although the Commission held that the IXC had not demonstrated the revenue sharing violated § 201, it emphasized its narrow holding was based upon the specific facts presented and that it expressed no view whether a different record could have demonstrated the revenue sharing arrangement did, in fact, violate sections of the Act. *Id.* at 3491–92 (citing *Jefferson Telephone*, 16 FCC Rcd. at 16137). The Commission next rejected the CLEC defendants' contention that AT & T was attacking non-party Beehive's rates clarifying that the gravamen of AT & T's complaint was that the CLEC defendants were operating sham entities to purposefully inflate access charges IXCs had to pay, and thus it was the CLEC defendants' conduct, not Beehive's rates, that was at issue. *Id.* at 3492.

The Commission also granted count two of AT & T's complaint finding the CLEC defendants violated §§ 203 and 201(b) by billing AT & T for services not provided pursuant to a valid and applicable tariff reasoning that neither the traffic nor the billing complied with the terms of the filed tariffs. *Id.* The Commission dispelled the CLEC defendants' contention that as

CLECs, they had unfettered ability to provide interstate services nationwide without regard to tariff limitations stating,

> CLECs have blanket Section 214 authority under Section 63.01 of our rules to provide domestic, interstate communications services, but the blanket authority extends only to entry certification requirements for initial operating authority; it does not impact CLECs' obligations under any other section of the Act or Commission rules. Accordingly, until a CLEC files valid interstate tariffs under Section 203 of the Act or enters into contracts with IXCs for the access services it intends to provide, it lacks authority to bill for those services. In addition, Defendants' assertion that the geographic scope of their tariffs is merely "illustrative" and "not binding if the carrier actually provides the service in territory not identified in its interstate tariff" is inconsistent with Section 203 and the "filed tariff" doctrine. Finally, contrary to Defendants' characterization, the geographic limitations in their tariffs were not mere "technical defects" or "ministerial errors." Rather, they are terms fundamental to whether the access tariffs apply at all. *Defendants have offered no justification for deviating from Section 203 and the filed tariff doctrine, and they may not simply pick and choose the provisions of their Tariffs with which they will comply.*

*Id.* at 3493–94 (emphasis added) (footnotes omitted).

The Commission next reasoned that the CLEC defendants did not terminate calls within the meaning of their tariffs and therefore could not bill for access services thereunder. *Id.* at 3494. The Commission explained that although the tariffs defined switched access service as calls originating from, or terminating to, end users on the CLEC defendants' networks and it defined end users as users of local telecommunications carriers' service who are not carriers,

the CLEC "[d]efendants were sham entities that did not provide local telecommunications services or terminate calls to any 'user' of local telecommunications services." *Id.* The Commission noted that the CLEC defendants (1) admitted they had no written agreements for, nor provided any local services to, any customers pursuant to the tariffs; (2) never registered the FCSCs accounts into their billing, accounting, and ordering systems; and (3) never billed the FCSCs for local telecommunications services, charged subscriber line charge, universal service fee, or carrier common line charges, nor did the FCSCs ever order local telecommunications services or pay for such services from the CLEC defendants. *Id.* at 3494–95.

In rejecting the CLEC defendants' contention that the PSC's findings were irrelevant to its analysis, the Commission reasoned that the PSC conducted extensive proceedings into All American's operations and its findings were credible and independently supported by the record. *Id.* at 3495. The Commission also found no "factual basis for concluding that All American's Nevada operations or ChaseCom's and e-Pinnacle's Utah operations differed in any material respect from All American's Utah operations." *Id.*

The Commission dismissed the CLEC defendants' assertion that the *Farmers'* decisions had no bearing on the case reasoning parties had to comply with the terms of their respective tariffs and under the CLEC defendants' tariffs, the FCSCs were not users of local telecommunications services provided by the CLEC defendants. *Id.*

#### d. *FCC: All American Reconsideration II*

The CLEC defendants filed a petition for reconsideration of *All American II,* which the Commission denied on procedural grounds finding the issues raised in the

petition had either been considered and rejected in *All American II* or should have been raised before the release of *All American II*. *AT & T Corp. v. All Am. Tel. (All Am. Recon. II)*, 29 FCC Rcd. 6393 (2014). On the merits of the petition, the Commission rejected the CLEC defendants' procedural, discovery, and jurisdictional challenges as baseless. *Id.* at *3. The Commission specifically rejected the CLEC defendants' challenge that the Commission did not have jurisdiction to consider what, or if, AT & T must pay for services provided by the CLEC defendants, clarifying that *All Am. Recon. I* did state that a customer-carrier's failure to pay another carrier's tariffed charges was a collection action that did not give rise to a claim under Section 208, but it said nothing about a customer's claims against carriers concerning the carriers' unjust and ·unreasonable conduct. *All Am. Recon. II*, 29 FCC Rcd. at *3.

The Commission also disposed of the CLEC defendants' allegation that the Commission was biased noting that aside from a series of orders adverse to the CLEC defendants' interests, the CLEC defendants provided no evidence of bias. *Id.* at *3–4. Finally, the Commission dismissed the CLEC defendants' suggestion that *All American II* contravened the Commission's findings in *In re: Connect Am. Fund—Transformation Order (Connect America Order)*, 26 FCC Rcd. 17663, 17667 (2011), *aff'd sub nom. In re: FCC*, 753 F.3d 1015 (10th Cir.2014), emphasizing that the *Connect America Order* took steps to restrict "wasteful arbitrage schemes" and identified access stimulation as "one of the 'most prevalent arbitrage activities.'" *All Am. Recon. II*, 29 FCC

Rcd. at *4 (quoting *Connect America Order*, 26 FCC Rcd. at 17873). The Commission reasoned that contrary to the CLEC defendants' assertions, the *Connect America Order* did not "'expressly legitimize' access stimulation in every instance" nor did it insulate the CLEC "[d]efendants from the consequences of a finding that their conduct was unjust, unreasonable, and unlawful, in violation of the Act and the Commission's rules." *Id.*[20]

The case in the U.S. District Court for the Southern District of New York remains stayed pending the outcome of the supplemental damages proceeding AT & T expects to file with the Commission. *See All Am. Tel. Co. v. AT & T Corp.*, 1:07–cv–00861–WHP (S.D.N.Y.), ECF No. 131.

### 3. *FCC: AT & T v. YMax*

On September 14, 2010, YMax Communications Corp. (YMax), a nationwide CLEC, filed a complaint against AT & T in the U.S. District Court for the Northern District of California for failure to pay charges for switched access services it purportedly provided to AT & T. *See YMax Commc'ns, Corp. v. AT & T & Bellsouth Long Distance, Inc.*, 4:10–cv–04115 (N.D.Cal.), ECF No. 1. On October 26, 2010, AT & T answered the complaint and filed six counterclaims against YMax, including claims for violations of §§ 203(c) and 201(b) of the Act. *Id.*, ECF No. 15.

On November 9, 2010, AT & T filed a fourteen-count formal complaint with the FCC under § 208 of the Act against YMax alleging, inter alia, YMax violated §§ 203(c) and 201(b) of the Act by assessing AT & T interstate switched access charges that were not authorized under YMax's tariff. *AT & T Corp. v. YMax*

---

**20.** The Commission also dismissed a petition for reconsideration filed by Beehive holding (1) Beehive did not satisfy the requirements of non-party petitioner, (2) Beehive had not been deprived of the opportunity of having the issues regarding its tariffed heard before a neutral-decision maker, and (3) Beehive offered no credible justification for not seeking to intervene earlier in the proceeding. *All Am. Recon. II*, 29 FCC Rcd. at *5–6.

*Commc'ns Corp.*, 26 FCC Rcd. 5742, 5742 (2011). On January 14, 2011, the U.S. District Court for the Northern District of California stayed *YMax's* case pending the outcome of the FCC proceeding. *YMax Commc'ns*, 4:10–cv–04115 (N.D.Cal.), ECF No. 66.

The Commission detailed that YMax, a certificated CLEC, lacked typical local exchange carrier characteristics: YMax did not provide physical transmission facility connecting YMax to the premises of any carrier or non-ISP entity; YMax had no customers that purchased local exchange service from YMax's state tariffs; YMax did not access or collect universal service fund (USF) or end user common line (EUCL) fees; and YMax did not have the capacity to effectuate the selection of preferred IXC (PIC) and therefore did not assess or collect any PIC charges. *YMax*, 26 FCC Rcd. at 5743–44. Instead, YMax could only participate in the transmission of calls at issue by way of its working relationship with Magic Jack, L.P. (Magic Jack), which marketed and sold a device, the magicJack (the MJ device), for $39.95, that enabled use of the Internet to make and receive calls throughout North America. *Id.* at 5744. The MJ device had a USB "dongle" that plugged into a computer's USB port, and a telephone jack that could be plugged into an ordinary landline telephone. *Id.* Magic Jack relied on YMax to obtain telephone numbers and interconnection to the public switched network (PSTN) for purchasers of the MJ device; all the calls at issue in the case involved use of the MJ device. *Id.*

Purchasers of the MJ device had to register the device on Magic Jack's website by signing a terms of service click agreement that required the purchaser to separately procure high speed internet access service through a third-party ISP provider. *Id.* at 5745. The agreement stated that it constituted "the entire agreement between *you*

*and magicJack and YMAX* ... and governs your use of the magicJack device ... and Software and items and/or services which may be provided by YMAX, [and] it trumps any prior agreements between you and magicJack ... and/or YMAX." *Id.* (alterations in original) (emphasis added).

In dispute were two types of calls for which YMax billed AT & T originating/terminating switched access charges: calls initiated by an AT & T long distance customers to a called party and calls received from a calling party to an AT & T toll-free long distance customer. *Id.* A call initiated by an AT & T long distance customer would be delivered by a LEC to AT & T's point-of-presence (POP) in the LATA where the initiating caller was located; and AT & T would transport the call and hand it off to the LEC that serviced the called party, which would then deliver the call to one of YMax's points of interconnection (POIs). *Id.* at 5745–46. However, most of YMax's POIs existed only on paper and had no physical presence; YMax had no equipment of its own and did not lease any space at these "empty POIs," instead, at these locations, AT & T exclusively provided YMax the equipment, facilities, configurations and interconnections. *Id.* at 5746. Once at the empty POIs, the call was picked up by a private digital signal 1 (DS–1) line provided to YMax by AT & T, and then transported to Dallas, Texas, where YMax's equipment was collocated in an AT & T facility. *Id.* YMax's equipment (an access gateway, servers, and a router) converted the call from a time-division multiplexing (TDM) to an IP format, and then under AT & T's managed Internet service contract, the call was sent back to AT & T's Dallas facility over a single, high-capacity line, from which AT & T sent the call over the Internet to one or more ISPs, the last of which delivered the call to the called party's MJ device. *Id.*

YMax billed AT & T, purportedly pursuant to Ymax's tariff, terminating switched access charges for calls routed to, and from, the MJ devices. *Id.* at 5747. After unsuccessfully disputing these charges, AT & T filed a formal complaint with the FCC alleging, inter alia, that YMax did not provide switched access services as defined in its tariff and therefore violated §§ 203(c) and 201(b) of the Act by billing for services not provided pursuant to its tariff. *Id.*

In determining whether YMax provided AT & T switched access services, the Commission noted that under the terms of YMax's tariff, switched access was available to IXCs for use in furnishing services to end users through a two-point communication path between the IXC's premises and the end users premises, which YMax's tariff defined as "[t]he premises specified by the Customer or *End User* for termination of access services at the *End User's* physical location." *Id.* at 5749 (alteration in original). Based upon this definition, the Commission reasoned that "the term, 'End User' is integral to the meaning of 'Switched Access Service,'" and that "YMax provides Switched Access Service under its Tariff if—and only if—a call involves an 'End User' as defined in the Tariff." *Id.* The Commission concluded that YMax did not provide switched access service stating,

> YMax may assess Switched Access Service charges on AT & T pursuant to its Tariff only if YMax provided Switched Access Services to AT & T as described in the Tariff. YMax's Tariff describes Switched Access Service as a service involving originating and terminating calls to an "End User." An "End User," in turn, is defined as a person or entity who "uses" a YMax service "under the terms and conditions of [its] tariff." No such End User exists here because: (I) no Called/Calling Party uses YMax's End User Access service under section 5 of the Tariff; and (ii) no Called/Calling

> Party uses Switched Access Service under section 3 of the Tariff, because under the terms of the Tariff, Switched Access Service is available only to IXCs, not to any Called/Calling Party. Thus, YMax did not provide Switched Access Service to AT & T within the meaning of the Tariff because YMax did not originate calls from, or terminate calls to, an End User. YMax's charges to AT & T for such Service therefore violate sections 203(c) and 201(b) of the Act.

*Id.* at 5755 (alterations in original) (footnote omitted).

The Commission went on to find that apart from the absence of end users under the tariff, YMax's charges for end office switching rate elements and switched transport rate elements were likewise not authorized by YMax's tariff. *Id.* at 5755–59. In concluding YMax had not provided switched access service within the meaning of the tariff, the Commission rejected YMax's construction of various terms in the tariff as "contrary to the common meaning of these terms in the telecommunications industry," and that "even if YMax's construction of these terms were plausible—and it is not—it would, at best, merely show that their meaning is ambiguous and . . . [the Commission] would be bound to resolve the ambiguities against YMax, the drafter." *Id.* at 5759. Thus, the Commission granted AT & T's complaint as to counts three and four and authorized AT & T to file a supplemental complaint for damages. *Id.* at 5743 & n. 6.

YMax timely filed a petition for reconsideration, *AT & T Corp. v. YMax Commc'ns Corp.,* 28 FCC Rcd. 10011, 10012 (2013); however, while the petition was pending, AT & T and YMax informed the Commission that they had settled their disputes, YMax withdrew its petition for reconsideration, AT & T informed the Commission it would not file a supplemen-

tal complaint for damages, and AT & T withdrew its informal complaint. *Id.* The parties also filed a stipulation of dismissal in the district court proceeding. *See YMax Commc'ns,* 4:10–cv–04115 (N.D.Cal.), ECF No. 130.

#### 4. *Northern Valley Cases*

Northern Valley Communications, LLC (Northern Valley), a South Dakota CLEC, filed lawsuits in U.S. District Court for South Dakota against four IXCs: *N. Valley v. MCI Communications Services, Inc., d/b/a Verizon Business Services (MCI),* 1:07–cv–01016–KES (D.S.D.); *N. Valley v. Sprint,* 1:08–cv–01003–KES (D.S.D.); *N. Valley v. AT & T,* 1:09–cv–01003–CBK; and *N. Valley v. Qwest,* 1:09–cv–01004–CBK, to recover amounts the respective inter-exchange carriers allegedly owed Northern Valley for unpaid originating and terminating access charges. Northern Valley asserted claims for breach of contract, breach of implied contract, violations of §§ 201 and 203 of the Act, collection actions pursuant to South Dakota tariffs, and unjust enrichment. The IXCs filed counterclaims against Northern Valley and various FCSCs for violations of §§ 201, 203, and 254 of the Act and South Dakota's tariff law, as well as claims for common law unfair competition, breach of contract, civil conspiracy, unjust enrichment, and declaratory judgment alleging the CLECs and the FCSCs engaged in traffic pumping schemes.

The district court considered various motions in each of the cases and thereafter referred questions to the FCC and stayed three cases; the fourth case, *N. Valley v. MCI,* 1:07–cv–04147, settled.

#### a. **FCC: *Qwest v. Northern Valley (N. Valley I)***

Qwest's formal complaint with the FCC alleged that Northern Valley's interstate access service tariff violated § 201(b) and requested that the Commission order Northern Valley to withdraw its tariff.

*Qwest Commc'ns Co. LLC v. N. Valley Commc'ns, LLC (N. Valley I),* 26 FCC Rcd. 8332, 8332 (2011).

In considering Qwest's complaint, the Commission first distinguished ILEC and CLEC tariff regimes distinguishing that "ILECs are required to publish the rates, terms, and conditions applicable to their access service in tariffs filed with the Commission." *Id.* at 8334. The Commission noted that since their promulgation, Commission rules have defined "end user" as "any Customer of an Interstate or Foreign Telecommunications Service that is not a carrier," and that the Commission "also has *required* that ILEC access tariffs define 'end user' as 'any customer of an interstate or foreign telecommunications service that is not a carrier.'" *Id.* (noting the rules were promulgated in 1983 in anticipation of the AT & T divestiture). The Commission compared that although CLECs had the ability to "impose interstate access charges either through tariffs or contracts negotiated with IXCs," by 2001, CLEC rates were found on average to be well above the ILECs' rates for similar service. *Id.* at 8335. Thus, from that point on, the Commission prohibited "CLECs from tariffing switched access rates that were higher than the switched access rates of the ILEC serving the same geographic area in which the CLEC was located," that is, CLEC switched access rates were to be "benchmarked" against ILEC rates. *Id.* (citing *Seventh Report and Order,* 16 FCC Rcd. at 9931). The Commission noted that a CLEC could, however, impose higher switched access rates by negotiating with the respective IXCs. *Id.* The Commission reiterated its prior holding in the *Seventh Report and Order* that "a CLEC may assess tariffed switched access charges at the appropriate benchmark rate only for calls to or from the CLEC's own end users." *Id.*

The Commission then addressed Northern Valley's tariff, which originally defined an end user as "any Customer of an Interstate or Foreign Telecommunications Service that is not a carrier," that was amended in 2010 adding the sentence: "An End User need not purchase any service provided by [Northern Valley]." *Id.* (alteration in original). The Commission deemed the tariff unlawful reasoning Commission "rules and orders establish that a CLEC may tariff access charges only if those charges are for transporting calls to or from an individual or entity to whom the CLEC offers service *for a fee.*" *Id.* at 8336. The Commission explained that the *Seventh Report and Order* promulgated rules, including 61.26(a)(3), which states that "[i]nter-state switched exchange access services shall include the functional equivalent of the ILEC interstate exchange access services typically associated with the ... rate elements [found in ILEC access service tariffs]," which thus requires that "tariffed CLEC charges for 'interstate switched exchange access services' be for services that are 'the functional equivalent' of ILEC interstate switched exchange access services." *Id.* (second and third alteration in original) (quoting 47 C.F.R. § 61.26(a)(3)). The Commission reiterated that a CLEC provides "the 'functional equivalent' of an ILEC's access services only if the CLEC transmits the call to its own end user" and that clearly, "when a CLEC is *not* transporting traffic to or from its own end user, the CLEC is *not* providing the functional equivalent of ILEC access services and thus not entitled to charge the full tariffed benchmark rate." *Id.* The Commission emphasized that "[a] CLEC's 'own end-users' do not include entities that receive free services from the CLEC," rather, as repeatedly stated, " 'end user' has been defined by the Commission's ILEC access charge rules and orders for more than 25 years as a 'customer of an interstate or foreign *tele-*

*communications service,*' " *id.* at 8337 (quoting 47 C.F.R. § 69.2(m)), and that "[t]he Act, in turn, defines 'telecommunications service' as 'the offering of telecommunications *for a fee,*' " *id.* (quoting 47 U.S.C. § 153(53)). The Commission concluded that because Northern Valley's tariff "purports to permit Northern Valley to charge IXCs for calls to or from entities to whom Northern Valley offers its services free of charge, ... the Tariff violates the Commission's CLEC access charge rules ..., and consequently also violates section 201(b) of the Act." *Id.*

The Commission rejected Northern Valley's argument that the dictionary definition of "customer" is not only a person who buys, but may also be "a person with whom one has dealings," remarking that in the context relevant to this dispute, "customer clearly means a *paying* customer." *Id.* (internal quotation marks omitted). The Commission also dismissed Northern Valley's assertion that its tariff was lawful even if Northern Valley did not provide the "functional equivalent" of ILEC exchange access because the Act's "exchange access" definition imposes no requirement that a LEC receive payment from the individual or entity placing or receiving the call reasoning that Northern Valley must not only comply with the Act, but with the Commission's rules and orders, too. *Id.* at 8338. Thus, the Commission announced that "if Northern Valley wishes to charge IXCs for terminating calls to entities that pay no fees, it must do so through a negotiated contract." *Id.*

Northern Valley also contended that there was no authority requiring tariff definitions to mimic the definitions in the Commission's rules, and that the Commission should analyze the complaint by referencing the tariff's terms as occurred in *Farmers I. Id.* at 8339. The Commission noted that at issue in *Farmers I* was

whether Farmers had complied with an otherwise valid tariff; there was no contention as to the lawfulness of the tariff as in the present case. *Id.*

The Commission also rejected Northern Valley's defense that the failure to act on Qwest's petition to reject, or suspend and investigate Northern Valley's tariff precluded Qwest's § 208 complaint noting that the rejection or suspension of a CLEC tariff was more demanding than the burden in a § 208 complaint proceeding. *Id.* at 8340. Finally, the Commission rejected Northern Valley's assertion that Qwest violated Commission Rule 1.721(a)(8) by not paying the disputed charges as set forth in the dispute resolution provisions of Northern Valley's tariff reasoning that compliance with a tariff's dispute resolution provision is not the standard for determining satisfaction of Rule 1.721(a)(8). *Id.*

**b. *FCC: N. Valley Reconsideration I***

Northern Valley filed a petition for reconsideration of *Northern Valley I*, which the Commission dismissed as procedurally defective noting Northern Valley repeated many of the same arguments addressed and rejected in *Northern Valley I* and that Northern Valley also raised new arguments that could have been raised earlier. *Qwest Commc'ns Co. LLC v. N. Valley Commc'ns, LLC (N. Valley Recon. I)*, 26 FCC Rcd. 14520, 14522 (2011). Nonetheless, the Commission considered the merits of Northern Valley's new argument that the *Seventh Report and Order*, specifically Commission Rule 61.26, did not require a CLEC's tariffed access charges to be for providing telecommunication services for a fee. *Id.* at 14523. Rejecting the argument, the Commission reasoned that precedent and rules of statutory construction require "end user," as used in Rule 61.26, to be construed as having the same meaning as when it is used in different but related Commission rules, which, for 25 years, have defined end user to

mean "an individual or entity to whom telecommunications are offered for a fee." *Id.* at 14524. The Commission further noted that Rule 1.26 requires "tariffed CLEC access charges be for services that are the 'functional equivalent' of ILEC access services" and because the *Seventh Report and Order* specified that a CLEC provides the "functional equivalent" of ILEC access charges if it provides access to its end user, "a CLEC's access service is 'functionally equivalent' only if the CLEC provides access to its end user, or *paying customer.*" *Id.* at 14524. The Commission also rejected Northern Valley's argument that because the *Seventh Report and Order* did not consider nor discuss whether a CLEC providing free access service to an entity provides functionally equivalent service, the order had no bearing on the issue noting that Northern Valley's argument failed to explain why the *Seventh Report and Order* did not, therefore, specifically redefine end user and that it defied logic to conclude the Commission "would have used 'end user' differently from how that term was used in the very rule it was clarifying." *Id.* at 14525. The Commission further noted that the Commission's "longstanding policy that users of the local telephone network for interstate calls should be responsible for a reasonable portion of the costs that they cause," and therefore, "construing 'end user' to mean a customer of a telecommunications services offered for a fee [was] consistent with the Commission's goal of ensuring that neither IXCs nor end users are charged an unfair share of the LEC's costs in transporting interstate calls." *Id.* The Commission disposed of Northern Valley's contention that its holding in *N. Valley I* was inconsistent with the Commission's long-standing precedent of not regulating the CLEC-end user relationship explaining that CLECs are free to offer their services for any fee or no fee at

all, but if a CLEC "chooses to assess access charges upon IXCs by *tariff,* the individuals or entities to whom Northern Valley provides access must be 'end users' (i.e., paying customers)." *Id.*

The Commission also dispelled Northern Valley's contention that *N. Valley I* was inconsistent with the Commission's *Farmers* decisions that pronounced that a LEC could provide a free subscription to its local customers as long as the tariff so provided. *Id.* The Commission pointed out that *Farmers I* was predicated upon the understanding that the FCSCs were obligated to pay for service and for subscriber line charges, whereas Northern Valley's tariff had no requirement that the FCSCs pay at all for services. *Id.* at 14526. Furthermore, upon reconsideration of *Farmers I,* the Commission held that the flow of money between Farmers and the FCSCs was essential to its analysis; thus, because the facts newly revealed upon reconsideration demonstrated that the FCSCs did not subscribe to any tariffed service, Farmers' reliance on the free subscription characterization was unavailing. *Id.* The Commission, once again, dismissed the argument that the Commission's order on reconsideration of *Farmers I* had no effect because it was not issued within 90 days as a misstatement of § 405(b)(2) and even if the Commission had not met the statutory 90-day provision, it would not nullify the effect of the subsequent order because § 405(b)(2) says nothing about losing jurisdiction if the Commission does not act within 90 days. *Id.* Nor did Commission Rule 1.106(n) require the Commission to suspend the effectiveness of *Farmers I* in order to retain authority to reconsider that decision rather Rule 1.106(n) requires regulated entities to comply with an order that is subject to a pending petition for reconsideration unless the Commission specifically suspends the effectiveness of the order. *Id.*

Non-party Aventure also filed a petition for reconsideration, which the Commission dismissed as it had done with Aventure's petition for reconsideration of *All American I* reasoning Aventure had shown neither of the two requirements of a non-party seeking reconsideration, that is, (1) that its interests had been adversely affected by the order, and (2) it had good reason for not participating in the earlier stages of the proceeding. *Id.* at 14527.

### c. FCC: Sprint v. N. Valley (N. Valley II)

Sprint's formal complaint with the FCC similarly alleged that Northern Valley's interstate access service tariff violated § 201(b). Sprint also requested that the Commission declare Northern Valley's tariff void ab initio, or in the alternative, to find Northern Valley's tariff access rates were unreasonable, and therefore unlawful. *Sprint Commc'ns Co. LP v. N. Valley Commc'ns, LLC (N. Valley II),* 26 FCC Rcd. 10780, 10780 (2011).

The Commission reiterated its holding in *N. Valley I* that Northern Valley's tariff violated Rule 61.26 as clarified by the *Seventh Report and Order* and § 201(b), most significantly with respect to the tariff's definition of end user. *Id.* at 10783–84. The Commission also found the jurisdictional reporting requirements, deposit, billing disputes, and attorney fees provisions of Northern Valley's tariff were unreasonably vague and violated § 201(b), but that the late payment fee provision was not. *Id.* at 10786–87. The Commission denied Sprint's request to find the tariff void ab initio reasoning Sprint had not established that Northern Valley engaged in furtive concealment; instead, the Commission ordered Northern Valley to revise its tariff. As it had in *N. Valley I,* the Commission found Northern Valley's affirmative defense of unclean hands lacked merit reasoning that even if such a defense were

available in a § 208 proceeding, Northern Valley had not established that Sprint refused to pay amounts invoiced *pursuant to the tariff. Id.* at 10790. The Commission also found meritless, Northern Valley's assertion that Sprint failed to negotiate in good faith explaining that Sprint's pre-complaint letter informed Northern Valley no complaint would be filed if Northern Valley withdrew its tariff and that Sprint also communicated to Northern Valley a willingness to listen and to entertain other ideas to resolve the issues. *Id.*

#### d. FCC: N. Valley Reconsideration II

The Commission summarily denied Northern Valley's petition for reconsideration, *Sprint Commc'ns Co. L.P. v. Northern Valley Commc'ns, LLC (N. Valley Recon. II)*, 26 FCC Rcd. 16549, 16549 (2011), explaining that it had addressed the same issue and made the same findings in *N. Valley I* and *N. Valley Recon. I,* and thus incorporated by reference the holding and discussion in those orders.

#### e. D.C. Circuit: Northern Valley v. FCC

Northern Valley sought judicial review of *N. Valley I, N. Valley II, N. Valley Recon. I,* and *N. Valley Recon. II* orders before the Court of Appeals for the District of Columbia Circuit contending the *N. Valley* decisions contradicted *Farmers I and II,* the FCC violated its own precedent by directly regulating the relationship between the CLEC and the end user, and the FCC impermissibly interpreted the Act as precluding Northern Valley's tariff provision requiring the IXC to dispute a charge in writing within ninety days. *N. Valley v. FCC,* 717 F.3d 1017, 1019 (D.C.Cir.2013). The court reviewed Northern Valley's challenges and denied the petitions for review reasoning (1) the Commission's decisions did not contradict *Farmers I* or *Farmers II* because in those decisions, the Commission construed only the tariff at issue and did not address FCC regulations as it did in the *N. Valley I* and *N. Valley II, id.;* (2) the Commission's *N. Valley* decisions resulted in the FCC regulating only the relationship between the CLEC and the IXC, and not the relationship between the CLEC and the end user, *id.;* and (3) the Commission properly concluded that Northern Valley's tariff provision requiring any dispute to be presented in writing within ninety days conflicted with the two-year statute of limitations contained in § 415(b) reasoning that although contracts may shorten statutes of limitation, CLEC's tariffs are unilaterally imposed and thus contract principles that permit the shortening of a statute of limitations do not apply here, *id.* at 1020 (citing *MCI Worldcom Network Servs., Inc. v. Paetec Commc'ns, Inc.,* 204 Fed.Appx. 271, 272 (4th Cir.2006) (unpublished per curiam)).

During the pendency of the referrals to the FCC and the petition for review to the Court of Appeals for the District of Columbia Circuit, the claims between the IXCs and Northern Valley settled in all cases before the District Court of South Dakota. The IXCs also settled claims between the FCSCs in all cases, with the exception of claims between Qwest and FCSC Global Conferencing Partners, in case number 1:09–cv–01004 (D.S.D.), which were stayed on June 28, 2013, when GCP filed a notice of bankruptcy.

#### 5. Sancom and Splitrock Cases

During the same general time frame as the *Northern Valley* cases were filed, another South Dakota CLEC, Sancom, Inc. (Sancom), filed similar lawsuits in the District of South Dakota against MCI, Sprint, AT & T, and Qwest: *Sancom v. MCI,* 4:07–cv–04106–KES (D.S.D.); *Sancom v. Sprint,* 4:07–cv–04107–KES (D.S.D.); *Sancom v. AT & T,* 4:08–cv–04211–KES (D.S.D.); and *Sancom. v. Qwest,* 4:07–cv–04147–KES (D.S.D.), respectively. South

Dakota ILEC, Splitrock Properties, Inc. (Splitrock), also filed similar lawsuits against Qwest and Sprint: *Splitrock v. Qwest,* 4:08–cv–04172–KES (D.S.D.), and *Splitrock v. Sprint,* 4:09–cv–04075–KES (D.S.D.), respectively.

In Sancom's cases against Sprint, AT & T, and Qwest, the IXCs filed counterclaims against Sancom; in their respective cases, Sprint and Qwest also filed third-party claims against various FCSCs. The cases were eventually stayed for referral of questions to the FCC.[21] While the referral questions were pending before the FCC, Sancom settled its claims and counterclaims in its cases against AT & T and Sprint. Sprint also settled its third-party claims against the FCSCs. The Sancom case against Qwest, including counterclaims and third-party claims, remained.

In the Splitrock cases, Sprint and Qwest filed counterclaims against Splitrock; Qwest also joined filed third-party claims against South Dakota ILEC Alliance Communications Cooperative, Inc., and FCSC Free Conferencing Corporation. In March and July 2010, the district court referred questions to the FCC in both the Splitrock cases. For efficiency in considering similar issues then pending before the FCC, the FCC's Market Disputes Resolution Division determined that one IXC, Qwest, would file a complaint against the LEC, while the remaining IXCs would file informal complaints against the LEC and participate in the proceedings through amicus briefs.[22] On October 4, 2010, Sprint and Splitrock informed the district court of the status of the referral to the FCC and advised that they were exploring the possibility of mediation. On September-

ber 13, 2011, Splitrock and Sprint filed a stipulation of dismiss and the court entered an order dismissing the case. *Splitrock v. Sprint,* 4:09–cv–04075–KES (D.S.D.), ECF No. 49.

On January 21, 2011, Splitrock and Qwest submitted a joint status report to the district court indicating Qwest had filed its formal complaint against Sancom with the FCC and that Splitrock and Qwest agreed to await the Commission's *Qwest v. Sancom* decision with the expectation that resolution of issues in that case would allow for a narrowing of the issues in the Splitrock cases.

### a. *FCC: Qwest v. Sancom (Sancom I)*

On March 5, 2013, the Commission issued its order on the first consolidated referral question. *Qwest Commc'ns Co., LLC v. Sancom, Inc.,* 28 FCC Rcd. 1982 (2013). The Commission found, with regard to the traffic at issue, Sancom's interstate switched access charges were unlawful because "Sancom did not have 'end users' that were billed or paid for service, as required by [Sancom's] [t]ariff." *Id.* at 1982–83.

The Commission described that Sancom and FCSCs Free Conferencing Corporation and Ocean Bay Marketing (Ocean Bay) entered into agreements under the terms of which Sancom and the FCSCs would split access charge revenue that was the result of high volume originating and terminating interexchange traffic. *Id.* The Commission detailed that under Free Conferencing's agreement with Sancom, Free Conferencing had a bridge at Sancom's central office, Sancom assigned telephone

---

**21.** Sancom's case against MCI was consolidated with Northern Valley's case against MCI, 1:07–cv–01016–KES (D.S.D.). MCI amended its counterclaims against Sancom and Northern Valley and also brought third-party claims against several FCSCs. However, MCI, the CLECs, and the FCSCs settled

their claims against one another, and therefore the district court did not refer questions in that case to the FCC.

**22.** The FCC also bifurcated the referred issues.

numbers for Free Conferencing to use, Sancom provided various circuitry and equipment, and switching function; in turn, Free Conferencing would provide Sancom minutes of use, for which Sancom would pay Free Conferencing a per-minute fee once Qwest paid Sancom's related switched access charges. *Id.* at 1983–84. Free Conferencing did not pay Sancom any telecommunications fees, USCs, or taxes. *Id.* at 1984.

Ocean Bay provided advertising services to third parties by dialing 8YY calls and playing automated messages. *Id.* Sancom's agreement with Ocean Bay similarly involved Sancom providing a location for Ocean Bay's dialing equipment, suppling various circuitry and equipment, and switched functions; in turn, Ocean Bay provided a minimum minutes of use, for which Sancom agreed to pay Ocean Bay a per-minute fee after Qwest paid Sancom's related switched access charges. *Id.* at 1984–85.

Sancom's tariff during the relevant period defined switched access as follows:

> Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point communications path between a customer designated premises and an end user's premises, ... provides for the ability to originate calls from an end user's premises to a customer designated premises, and to terminate calls from a customer designated premises to an end user's premises in the LATA where it is provided....

*Id.* at 1985. "End user" was defined as "any customer of an interstate or foreign telecommunications service that is not a carrier" and "customer" was defined as "any individual partnership, association, joint-stock company, trust, corporation, or governmental entity or other entity which subscribes to the services offered under this [T]ariff, including both [IXCs] and

End Users." *Id.* (alterations in original) (footnotes omitted). The tariff additionally provided that "that Sancom *shall bill* on a current basis all charges incurred by and credits due to the customer under this tariff and that Sancom will establish a bill day *each month* for each customer account or advise the customer in writing of an alternate billing schedule." *Id.* (internal quotation marks omitted). The tariff also required Sancom to apply USC each month to billed charges for interstate access services provided to end users. *Id.* The Commission noted that neither of Sancom's agreements with the FCSCs described monthly charges the FCSCs were to pay Sancom for telecommunications services, rather the only rates set forth in the agreements were those fees Sancom would pay to the FCSCs. *Id.*

The Commission recapped the district court case Sancom filed against Qwest for its refusal to pay the switched access charges, which included claims for unjust enrichment, tortious interference with business relations, violation of South Dakota Deceptive Trade Practices and Consumer Protection Act, and civil conspiracy, noting that the district court granted Qwest's motion to dismiss those claims finding they were barred by the filed rate doctrine. *Id.* The district court then granted Sancom's motion to stay and referred three questions to the FCC. *Id.*

The Commission, addressing the first question in Qwest's formal complaint—whether the traffic billed to Qwest falls within the terms of Sancom's Tariff—reasoned its prior decision in *Farmers II* controlled because the definitions of "end user" and "customer" used in Farmers' tariff were identical to those in Sancom's tariff. *Id.* at 1987. Recapping *Farmers II,* the Commission noted that in determining that the FCSCs were not end users within the meaning of Farmers' tariff, it

considered six factors: (1) the parties' contracts did not contemplate that the conference calling companies would pay for service, nor did the parties pay for service; (2) Farmers never treated the FCSCs like other customers—never entered them into billing systems, Farmers' regular business records did not indicate the FCSCs purchased tariff end user service, and Farmers did not bill nor collect payment from the FCSCs; (3) the agreements contained exclusivity clauses and Farmers refused to offer its deals with the FCSCs to other similar parties; (4) Farmers handled the FCSCs' traffic differently than traffic to tariffed customers; (5) the agreements had unique terms that did not resemble traditional agreements for tariffed services—Farmers agreed to pay the FCSCs for terminated traffic, Farmers' deals included differing minimum usage commitments, duration of the agreements varied, termination notice periods varied, Farmers' board of directors approved each FCSCs' agreement, and the provisions of the agreements were kept confidential; and (6) Farmers did not timely report revenues from those services or submit universal service contributions. *Id.* at 1988. The Commission noted that it concluded, therefore, that neither Farmers nor the FCSCs intended to operate within Farmers' tariff and had "purposefully avoided a customer relationship with Farmers' tariff." *Id.* (internal quotation marks omitted). Because the FCSCs were not customers nor end users within Farmers' tariff, the Commission found Farmers was not entitled to charge Qwest switched access charges under the tariff. *Id.* The Commission noted that *Farmers II* was upheld by the U.S. Court of Appeals for the District of Columbia Circuit. *Id.* at 1989.

The Commission noted that under § 203(c) of the Act, a carrier is required "to provide communications services in strict accordance with the terms and conditions of its tariff," and Sancom's tariff required calls to originate or terminate with an "end user," that is, "a customer that subscribes to the services offered under the [t]ariff." *Id.* The Commission concluded that the FCSCs were not end users because Sancom did not bill the FCSCs for, nor did the FCSCs pay, switched access services noting that Sancom had not established any sort of genuine billing relationship with the FCSCs, did not adhere to established practices regarding transmission of monthly bills, billing system and collection efforts, and did not send monthly bills to the FCSCs. *Id.* at 1989–90. The Commission rejected Sancom's argument that it invoiced the FCSCs stating that the record only contains a handful of invoices, and those were not even for monthly tariffed charges. *Id.* at 1990. The Commission found the record "flatly contradict[ed]" Sancom's assertion that a netting process occurred by which the FCSCs generated revenue for Sancom sufficient to pay for Sancom's access charge. *Id.* It similarly refuted Sancom's argument that the access charge revenues it received from IXCs justified not charging the FCSCs a monthly rate explaining that such rationale "is plainly inconsistent with the Tariff's monthly rates and billing provisions," notwithstanding that the record lacked evidence the parties established any alternative payment arrangement. *Id.*

The Commission next found that Sancom and the FCSCs "behaved in a manner inconsistent with a tariffed carrier/customer relationship" noting Sancom's relationship with the FCSCs resembled those of business partners more than local exchange customers. *Id.* at 1991. The Commission considered that Sancom did not require the FCSCs to complete standardized forms other customers were required to complete, avoided similar arrangements with other entities, and had an exclusivity clause with the FCSCs—all of which un-

dermined Sancom's contention that it evaluated potential customers on a case by case basis, but instead demonstrated that Sancom evaluated potential customers by whether they would compete with the FCSCs. *Id.* at 1992. The Commission also rejected Sancom's attempt to classify its agreements with the FCSCs as Individual Case Basis (ICB) arrangements as defined in the tariff noting that while the ICB defined in the tariff denoted a condition that developed based on the circumstances in each case, Sancom's agreements with the FCSCs bore no indications at all that they pertained to the services offered under the tariff. *Id.* at 1993. Rather, the "agreements contain[ed] provisions that not only [were] inconsistent with the Tariff, but that appear[ed] to be *purposefully structured to avoid a traditional tariffed offering*"; that is, the agreements contained minimum usage requirements, required the FCSCs to renegotiate the agreements if Sancom was unable to collect access stimulation revenues from IXCs, and established a choice of law provision, none of which were found in the tariff. *Id.* (emphasis added). Acknowledging that while Sancom was not obligated to post its arrangements with the FCSCs, the Commission was reviewing Sancom's compliance with its *filed* tariff, and the fact that Sancom had confidential agreements with FCSCs served to bolster the Commission's conclusion "that Sancom was not acting as a common carrier indiscriminately serving End Users as defined by the [t]ariff." *Id.* at 1993. The Commission was equally unpersuaded by Sancom's argument that Qwest had unclean hands because it failed to first pay the amounts it owed Sancom under the tariff reasoning that even if such a defense were available in a § 208 proceeding, it would have failed because Sancom unlawfully charged Qwest for tariffed switched access services, thus Qwest's failure to pay the charges before disputing them could not

have violated any equitable principle. *Id.* at 1994.

Thus, the Commission concluded that the FCSCs "were not end users under the [t]ariff and, therefore, that Sancom was not entitled to charge Qwest for switched access under the [t]ariff" and by doing so, Sancom violated §§ 203(c) and 201(b) of the Act. *Id.*

### b. *FCC: Sancom Reconsideration I*

On April 4, 2013, Sancom filed a petition for reconsideration of *Sancom I. Qwest Commc'ns Co., LLC v. Sancom, Inc.,* 28 FCC Rcd. 8310 (2013). However, on May 31, 2013, with the petition for reconsideration still pending, the parties filed a joint motion to dismiss informing the FCC they had resolved their dispute. The FCC granted their request to dismiss the pending claims with prejudice.

On May 1, 2013, in the *Splitrock v. Qwest* case, Qwest and the ILECs issued a joint status report to the district court acknowledging the FCC's issuance of *Sancom I* and informing that Splitrock was in the process of evaluating that decision. *Splitrock v. Qwest,* 4:08–cv–04172 (D.S.D), ECF No. 92. In subsequent joint status reports to the district court on November 6, 2013, February 6, 2014, June 2, 2014, and August, 29, 2014, the parties indicated they were pursuing settlement negotiations. *Id.* ECF Nos. 93, 96, 101, and 102. The parties' most recent status report filed on December 16, 2014, indicates that Qwest and the ILECs were still pursuing settlement. *Id.* ECF No. 103. It appears no formal complaint was filed at the FCC by or against Splitrock.

### c. *Qwest v. Free Conferencing,* 4:07–cv–04147–KES (D.S.D.)

On July 19, 2013, Qwest and Sancom filed with the district court, a motion for dismissal of claims against each other indicating the petition for reconsideration be-

fore the FCC had been dismissed. 4:07–cv–04147–KES (D.S.D), ECF No. 280. The motion informed, however, that Qwest's claims against Free Conferencing remained. *Id.* On August 12, 2013, the district court granted Qwest and Sancom's joint motion to dismiss all claims and counterclaims against one another. *Id.,* ECF No. 284.

Qwest's claims against Free Conferencing proceeded to a six-day bench trial in May 2014. *Id.,* ECF No. 381. The district court entered its trial order on November 6, 2014, finding in favor of Free Conferencing. *Qwest Commc'ns Corp. v. Free Conferencing Corp.,* No. CIV. 07–4147–KES, 2014 WL 5782543 (D.S.D. Nov. 6, 2014). On December 4, 2014, Qwest filed a motion to vacate the judgment. *Id.,* ECF No. 411.

### 6. *Tekstar Cases*

In the U.S. District Court for the District of Minnesota, AT & T and Qwest filed traffic pumping cases against Minnesota CLEC Tekstar Communications (Tekstar) and various FCSCs: *AT & T v. Tekstar,* 0:07–cv–02563–ADM–JSM (D.Minn.); and *Qwest v. Tekstar,* 0:10–cv–00490–MJD–SER (D.Minn.). Tekstar also filed a case against Sprint: *Tekstar v. Sprint,* 0:08–cv–01130–MJD–SER (D.Minn.). The district court stayed each of the cases and referred questions to the FCC. As in the *Sancom* and *Splitrock* cases, the FCC's Market Disputes Resolution Division determined that one of the IXCs, in this case Sprint, would file a complaint against the LEC and Qwest and AT & T would file informal complaints against the LEC and participate in the proceedings through amicus briefs. During the pendency of the referrals, however, Tekstar settled with the IXC in each of the cases. The formal complaint Sprint filed with the FCC was dismissed with prejudice. *Sprint Commc'ns Co. L.P. v. Tekstar Commc'ns Inc.,* 27 FCC Rcd. 10123 (2012). Thereafter, AT & T settled its claims with the FCSCs and that case—0:07–cv–02563–ADM–JSM (D.Minn.)—was dismissed with prejudice. In the Qwest case—0:10–cv–00490–MJD–SER (D.Minn.)—Qwest and the FCSCs did not settle their claims. The FCSCs filed motions to dismiss Qwest's claims, which were granted in part and denied in part.[23] Motions for summary judgment on the remaining claims are pending.

### 7. *Connect America Order*

In 2011, responding to the need to bring "robust, affordable broadband to all Americans," the FCC acknowledged that its universal service fund (USF) rules and intercarrier compensation (ICC) procedures had been "designed for 20th century networks and market dynamics" and had "not been comprehensively reassessed in more than a decade." *In re: Connect Am. Fund—Notice of Proposed Rulemaking,* 26 FCC Rcd. 4554, 4557, 4559 (2011). The FCC "propose[d] to fundamentally modernize the Commission's Universal Service Fund (USF or Fund) and intercarrier compensation (ICC) system .... by elimi-

---

**23.** On November 20, 2013, the Honorable Steven E. Rau, U.S. Magistrate Judge, filed an Amended Report and Recommendation on the FCSCs' motions to dismiss recommending that the court deny the FCSCs' Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction, to grant the Rule 12(b)(6) motions to dismiss as to Qwest's claims for unfair competition, fraudulent concealment, and unjust enrichment, and to deny the Rule 12(b)(6) motions to dismiss as to Qwest's claims for tortious interference. *Qwest Commc'ns Co. v. Free Conferencing Corp.,* 990 F.Supp.2d 953, 959–984 (D.Minn.2014). On January 3, 2014, the Honorable Michael J. Davis, Chief Judge, U.S. District Court for Minnesota, adopted the Amended Report and Recommendation. *Id.* at 953.

This Court has reviewed that order and considered that court's disposition of issues that are likewise before this Court.

nating waste and inefficiency and reorienting USF and ICC to meet the nation's broadband availability challenge, transforming a 20th century program into an integrated program tailored for 21st century needs and opportunities." *Id.* at 4557.

The Commission acknowledged that inefficient ICC rules create[d] incentives for wasteful arbitrage. In particular, because rates that local carriers receive[d] to deliver a call var[ied] widely depending on where the call originated and the classification and type of service providers involved, the carriers paying such charges may mask the origination of voice traffic to reduce or avoid payments, creating "phantom traffic." In addition, regulations allowing some carriers to assess above-cost rates for delivering traffic to their subscribers create[d] incentives for local carriers to artificially inflate their traffic volumes, thereby increasing the payments they receive[d], a practice referred to as "access stimulation" or "traffic pumping." Practices like these and the disputes surrounding them cost hundreds of millions of dollars annually that could be used for investment and more productive endeavors—costs that are ultimately borne by consumers.

*Id.* at 4559.

Thus, on November 18, 2011, the FCC adopted landmark reforms to modernize universal service for the 21st century. *Connect America Order*, 26 FCC Rcd. at 17667 (2011). In Section XI of the *Connect America Order*, the Commission "adopt[ed] revisions to our interstate switched access charge rules to address access stimulation." *Id.* at 17874.

The Commission described the nature of access stimulation, noting

Access stimulation occurs when a LEC with high switched access rates enters into an arrangement with a provider of high call volume operations such as chat lines, adult entertainment calls, and "free" conference calls. The arrangement inflates or stimulates the access minutes terminated to the LEC, and the LEC then shares a portion of the increased access revenues resulting from the increased demand with the "free" service provider, or offers some other benefit to the "free" service provider. The shared revenues received by the service provider cover its costs, and it therefore may not need to, and typically does not, assess a separate charge for the service it is offering. Meanwhile, the wireless and interexchange carriers (collectively IXCs) paying the increased access charges are forced to recover these costs from all their customers, even though many of those customers do not use the services stimulating the access demand.

Access stimulation schemes work because when LECs enter traffic-inflating revenue-sharing agreements, they are currently not required to reduce their access rates to reflect their increased volume of minutes. The combination of significant increases in switched access traffic with unchanged access rates results in a jump in revenues and thus inflated profits that almost uniformly make the LEC's interstate switched access rates unjust and unreasonable under section 201(b) of the Act....

*Id.* (footnotes omitted).

The order noted that the record before the Commission reflected "the need for prompt Commission action to address the adverse effects of access stimulation and to help ensure that interstate switched access rates remain just and reasonable, as required by section 201(b) of the Act," and commented that "access stimulating LECs realize significant revenue increases and thus inflated profits that almost uniformly make their interstate switched access rates

unjust and unreasonable." *Id.* at 17875. The order further noted that access stimulation typically occurred in locations with higher than average access charges, which increases the average cost of long distance calling, but because § 254(g) of the Act prohibits long-distance carriers from passing the higher access costs directly to the customers making the calls to the access stimulating entities, *all* customers of long distance providers bear the costs, despite the fact that many do not use the services provided by the access stimulator, and that harm, too, was incurred by conferencing services that recover the costs of the conferencing/chat services from the user of those services rather than spreading those costs across the universe of long-distance subscribers, thus allowing "free" conferencing providers to leverage arbitrage opportunities and put companies that recover the cost of services from their customers at a distinct competitive disadvantage. *Id.* at 17876. Refuting the notion that access stimulation offered economic benefits by, inter alia, expanding broadband services to rural communities, the Commission explained that "how access revenues are used is not relevant in determining whether switched access rates are just and reasonable in accordance with section 201(b)," and furthermore, "excess revenues that [were] shared in access stimulation schemes provide[d] additional proof that the LEC's rates [were] above cost." *Id.* at 17876–77 (footnote omitted).

Having established the need for reform, the Commission promulgated a rule that requires carriers entering into revenue sharing arrangements "to refile their interstate switched access tariffs to reflect a rate more consistent with their volume of traffic." *Id.* at 17875. Thus, for rate-of-return LECs, i.e. ILECs, "the rate would be adjusted to account for new demand and any increase in costs," whereas, "[f]or competitive LECs, that rate would be benchmarked to that of the BOC in the

state, . . . or to the largest incumbent LEC in the state." *Id.*

To identify when access stimulating LECs were required to refile their interstate access tariffs, the Commission defined access stimulation as occurring when two conditions were met: (1) the LEC enters into an access revenue sharing agreement (as also defined in the order), and (2) where the LEC had a terminating-to-originating traffic ratio of three-to-one interstate in a calendar month or a greater than 100 percent increase in interstate originating and/or terminating switched access minutes of use (MOUs) in a month compared to the same month in the preceding year. *Id.* The revenue sharing agreement definition is met if an ILEC or a CLEC, has an agreement, "that, over the course of the agreement, would directly or indirectly result in a net payment to the other party (including affiliates) to the agreement, in which payment by the [ILEC] or [CLEC] is based on the billing or collection of access charges from interexchange carriers or wireless carriers." *Id.* The Commission clarified that the "rule focuses on revenue sharing that would result in a net payment to the other entity over the course of the agreement arising from the sharing of access revenues" and "does not encompass typical, widely available, retail discounts offered by LECs through, for example, bundled service offerings." *Id.* (footnotes omitted). The Commission declined to "declare revenue sharing to be a *per se* violation of section 201(b) of the Act," noting that such a ban could be overly broad, but that the rules adopted were part of a comprehensive intercarrier compensation reform, and that as the transition unfolded, the Commission would "address remaining incentives to engage in access stimulation." The Commission refuted the contention that it had explicitly approved revenue sharing in *CLEC Access Charge Reconsideration Or-*

*der*, 19 FCC Rcd. 9108, 9142–43, para. 70, (2004), where it found that commission payments from CLECs to toll-free traffic generators, "such as hotels and universities, did not create any incentives for the individuals who use those facilities to place excessive or fraudulent calls." *Connect America Order*, 26 FCC Rcd. at 17879 (footnote omitted). The Commission reasoned that case was inapposite because the Commission was responding to the IXC's assertions regarding incentives to artificially inflate 8YY calling and found "that it did not appear that the payments would affect calling patterns because the commissions did not create any incentive for those actually placing the calls to artificially inflate their 8YY traffic," whereas, "when access traffic [was] being stimulated, the party receiving the shared revenues has an economic incentive to increase call volumes by advertising the stimulating services widely." *Id.* (footnotes omitted).

The Commission also declined to address the potential that instead of making contracts with third parties, LECs may try to evade the access stimulation prohibition by integrating high call volume operations within the same corporate entity, thereby enabling the characterization of the arrangement as other than revenue sharing. *Id.* The Commission noted that the rules it was adopting pursuant to §§ 201 and 202 of the Act, addressed conferencing services provided by a third party, whether or not affiliated with the LEC and that § 254(k) applies to "a LEC's operation of an access stimulation plan within its own corporate organization," in which case terminating access would be a monopoly service. *Id.* The Commission reasoned that in contrast, "the conferencing activity portrayed by access stimulating parties, would be a competitive service, and therefore the use of non-competitive terminating access revenues to support competitive conferencing service within the LEC operating entity would violate section 254(k) . . . ." *Id.* Vali-

dating the addition of a traffic measurement component to the access stimulation definition, the Commission noted that such a component created "a bright-line rule that responds to record concerns about using access revenue sharing alone," and concluded "that these measurements of switched access traffic of all carriers exchanging traffic with the LEC reflect the significant growth in traffic volumes that would generally be observed in cases where access stimulation is occurring and thus should make detection and enforcement easier." *Id.*

Under the *Connect America Order*, LECs that meet both conditions of access stimulation definition must file a revised tariff: an ILEC "must file its own cost-based tariff under section 61.38 of the Commission's rules and may not file based on historical costs under section 61.39 of the Commission's rules or participate in the NECA traffic-sensitive tariff," and a CLEC "must benchmark its tariffed access rates to the rates of the price cap LEC with the lowest interstate switched access rates in the state, rather than to the rates of the BOC or the largest incumbent LEC in the state." *Id.* at 17882. Addressing the deemed lawful status of § 204(a)(3), the Commission "proposed that LECs that meet the revenue sharing definition be required to file revised tariffs on not less than 16 days' notice" and that failure to comply with the tariffing requirements would result in the Commission finding "such a practice to be an effort to conceal its noncompliance with the substantive rules that would disqualify the tariff from deemed lawful treatment." *Id.* at 17888. The Commission further proposed that ILECs "would be subject to refund liability for earnings over the maximum allowable rate-of-return," and CLECs "would be subject to refund liability for the difference between the rates charged and the rate that would have been charged if the

carrier had used the prevailing BOC rate, or the rate of the independent LEC with the largest number of access lines in the state if there is no BOC." *Id.* (footnotes omitted). Regarding compliance, the Commission concluded "that a LEC's failure to comply with the requirement that it file a revised tariff if the trigger is met constitutes a violation of the Commission's rules, which is sanctionable under section 503 of the Act" and "that such a failure would constitute 'furtive concealment,'" thus putting the parties "on notice that if we find in a complaint proceeding under sections 206–209 of the Act, that such 'furtive concealment' has occurred, that finding will be applicable to the tariff as of the date on which the revised tariff was required to be filed and any refund liability will be applied as of such date." *Id.* at 17888–89 (footnotes omitted). The Commission declined to address a CLEC's request for a declaratory ruling "that commercial agreements involving the sharing of access revenues between LECs and 'free' service providers did not violate the Communications Act" reasoning that the rules adopted in the order defined access revenue sharing agreement and prescribed the conditions under which a LEC that met that definition must file revised tariffs. *Id.*

Finally, regarding enforcement of the rules adopted, the Commission unequivocally noted that "[b]ecause the rules we adopt are prospective, they will have no binding effect on pending complaints." *Id.* at 17889 n. 1182.

## C. Procedural History

On February 20, 2007, Qwest filed this action against several LECs and FCSCs alleging causes of action under the Act and state common law. Similar actions were contemporaneously filed in this Court by other IXCs against several LECs and FCSCs: AT & T—4:07–cv–00043; and Sprint—4:07–cv–00194. Cases were also filed in the U.S. District Court for the Northern District of Iowa by LEC Aventure against Qwest and Sprint—5:07–cv–04094—and against MCI—5:07–cv–04095 (NDIA) (tariff actions). Aventure's action against Qwest and Sprint, 5:07–cv–04094 (NDIA), was transferred to this Court and given a new case number: 4:08–cv–00005.

The LEC Defendants in these related cases filed motions to dismiss or in the alternative to stay and refer questions to the FCC. While those motions were pending, the FCC released *Farmers I*. This Court, recognizing the potential impact *Farmers I* had on the issues in the cases before it, stayed the proceedings until the FCC ruled on Qwest's petition for reconsideration of *Farmers I*. After the FCC granted Qwest's petition for reconsideration, the Court continued the stay awaiting the FCC's reconsideration order. During the stay, more than a dozen actions were filed in the U.S. District Courts for the Northern and Southern Districts of Iowa by various LECs against the four IXCs for collection of unpaid switched access charges (collection actions). Upon joint motions of the parties, several collection actions were consolidated with the associated tariff actions. The Court also lifted the stay, in part, to allow the parties to file counterclaims.

In September 2009, the IUB issued its decision in *Qwest v. Superior*, and in November 2009, the Commission issued its order on reconsideration—*Farmers II*; Farmers' petition for reconsideration—*Farmers Recon. II*—was denied on March 2010.[24] On July 26, 2010, after affording

---

**24.** In May 2010, Farmers filed a petition with the U.S. Court of Appeals for the District of Columbia for review of the FCC's *Farmers* decisions. On December 7, 2011, that court denied Farmers' petition and affirmed the FCC. *See* discussion *supra* Part III.B.1.e.

the parties the opportunity to state their respective positions on the need to amend pleadings or supplement pending motions in light of the recent agencies' decisions, this Court denied without prejudice those motions that had been filed prior to November 2009, preserving the parties' rights to file renewed or substituted motions, reasoning those pleadings and motions had been significantly impacted or mooted by recent developments. Thereafter, the parties filed amended complaints and counterclaims; the FCSC Defendants and Reasnor filed motions to dismiss, and several LECs, including Aventure, filed motions stay and refer questions to the FCC.

In the same general time frame, the district courts in the *All American, N. Valley, Sancom,* and *Tekstar* cases stayed the cases and referred questions to the FCC, *see* discussion *supra* Part III.B.2.-III.B.6. On April 26, 2011, this Court held a hearing on the motions stay and refer questions to the FCC, during which the LECs acknowledged that the questions referred in *Sancom, N. Valley, All American,* and *Tekstar* were the same questions the LECs in this case proffered in their motions for referral, *see, e.g.,* Aventure's Mot. Ref. to FCC, ECF No. 157, including whether the revenue sharing agreements between CLECs and the FCSCs were per se illegal and, more generally, whether CLECs were entitled to collect federal tariffed charges from IXCs for switched access services to/from numbers the CLECs assigned to FCSCs in connection with those revenue sharing agreements (essentially, whether the *Farmers* decisions applied to CLECs, since *Farmers* involved arrangements between an ILEC and FCSCs).[25]

Shortly after the April 26, 2011, hearing, while the motions for referral were still pending, the Commission released *N. Valley I* and *N. Valley II, see* discussion *supra* Part III.B.4. Subsequently, Qwest filed a motion for judgment on the pleadings on non-tariff counterclaims arguing in light of the Commission's holdings in *YMax, All American, N. Valley I,* and *N. Valley II,* the CLECs' and FCSCs' non-tariff claims and/or counterclaims against Qwest failed as a matter of law.

On November 18, 2011, while the parties were still briefing Qwest's motion for judgment on the pleadings, Aventure withdrew its motion to stay and for referral of questions to the FCC; the same day, the Commission issued the *Connect America Order, see* discussion *supra* Part III.B.7. On December 30, 2011, the D.C. Circuit issued its order in *Farmers v. FCC,* denying Farmers' petition and affirming the FCC. After those developments, the parties each filed notices with the Court regarding the impact, or lack thereof, that the *Connect America Order* and the *Farmers v. FCC* decision had on the claims before this Court. Aventure was granted leave to amend its claims against Qwest and thereafter moved to dismiss seven of Qwest's eleven counts against Aventure.

Given the outpouring of notices and motions to supplemental the record in regard

25. Notably, in its motion for referral, Aventure stated that both the *Tekstar* and the *All American* cases raised questions *identical* to those Aventure raises in the present case and asked this Court to refer to the FCC the same questions referred by the district courts in those cases. *See* Aventure's Mot. Ref. to FCC 2–3, ECF No. 157 ("The *Tekstar* Complaint raised issues *identical* to the issues raised in Aventure's Complaint in this case.... Collection actions *identical* to Aventure's action here are pending against AT & T in the Southern District of New York. [citing, inter alia, *All American* ]. Aventure and the other plaintiffs are filing a Motion for Referral to the FCC with respect to *identical issues* of telecommunication law and policy as are at issue in the Southern District of Iowa cases." (emphasis added)).

to the *Connect America Order,* the Court held a status conference on June 14, 2012, and based upon the information presented at that status conference, the Court entered an order on June 16, 2012, lifting the previously imposed stay in its entirety and directing each party to advise the Court which motions that party was still prosecuting, withdrawing, and resisting.

Over the course of the next several months, the Honorable Ross A. Walters, U.S. Magistrate Judge, set scheduling orders and navigated the parties' discovery disputes. The parties also filed various dispositive motions: Dixon filed a motion for partial summary judgment relating to damages; Qwest filed a motion for summary judgment on claims and counterclaims by and against the FCSCs and a motion for summary judgment on all claims under the Act and all tariff claims and counterclaims by and against the LECs; and Aventure filed a combined motion for summary judgment on its claims and counterclaims against Qwest, Sprint, and AT & T.

In the later half of 2013, while the parties briefed the various motions, the Commission issued decisions in the *Sancom* and *All American* cases and the D.C. Circuit filed *N. Valley v. FCC* affirming the Commission's *N. Valley I* and *N. Valley II* decisions, *see* discussion *supra* Part III. B.4. In addition, on April 24, 2013, the Iowa Supreme Court issued an order denying further review of the IUB's decision. By the end of 2013, after joint motions of

voluntary dismissal had been filed between Qwest and various LECs, only three LECs remained in the case. In the same time frame, in related case, 4:07–cv–00194, Sprint and various LECs similarly filed joint motions for voluntary dismissal.

On April 14, 2014, the Court conducted a status conference in the related cases. The parties informed the Court that while many of the parties originally named in these related cases had settled their claims against one another, the parties that remained in each of five related cases [26] were not actively pursuing settlement. Following the status conference, the Court set the pending motions for omnibus hearings, which the Court held on July 23 and 24, 2014.

### D. Factual Background

■■ On motions to dismiss and motions for judgment on the pleadings, courts view the facts in complaints as true and grant all inferences in the nonmovant's favor. *McIvor v. Credit Control Servs., Inc.,* 773 F.3d 909, 912 (8th Cir.2014). However, "[c]ourts must not presume the truth of legal conclusions couched as factual allegations." *Hager v. Ark. Dep't of Health,* 735 F.3d 1009, 1013 (8th Cir.2013) (quoting *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). Further, "[c]ourts should dismiss complaints based on 'labels and conclusions, and a formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Bell*

---

**26.** More than twenty access stimulation and/or collection actions were initially filed in this district; some cases were consolidated, the majority of the cases eventually settled. The present case initially involved over fifteen defendants; only seven remain. The AT & T case, 4:07–cv–00043, initially involved over ten defendants; only two remain. The Sprint case, 4:07–cv–00194, initially involved more than sixteen defendants; only two remain. Aventure's case against MCI, 5:07–cv–04095 (NDIA), initially involved four defendants; Aventure settled all its claims and the only remaining claims are third-party claims/counterclaims between MCI and Futurephone. In the Aventure's case, 4:08–cv–00005, the only named defendants are Qwest and Sprint; Aventure's claims in that case are the same as Aventure's counterclaims against Qwest in the present case, and against Sprint in 4:07–cv–00194.

*Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

### 1. Factual Allegations in Qwest's Second Amended Complaint

As previously described in more detail, *see* discussion *supra* Part III.A.4., telephone calls are divided into local calls that originate and terminate in the same local exchange and long distance calls that are carried by a long distance carrier from one local calling area to another local calling area. Qwest Second Am. Compl. ¶ 36, ECF No. 318. At issue in this litigation are long distance calls that either originated on equipment and/or facilities owned by the LEC serving the end-user customer making the call (originating switched access) or terminate over equipment and/or facilities owned by the LEC serving the end-user customer receiving the call (terminating switched access). *Id.* ¶ 38. IXCs, such as Qwest, pay originating switched access charges to the LECs that serve end-user customers who initiate long distance calls from an end user premises within the LEC's certificated local calling area, and pay terminating switched access charges to the LECs that serve end-user customers who receive long distance calls delivered to an end-user premises within the LEC's certificated local calling area. *Id.* ¶ 39. The LECs charge IXCs switched access charges to recover from interstate customers the LECs' share of the cost incurred originating and/or terminating interstate calls. *Id.* ¶ 40. LECs sharing revenue with FCSCs for the purpose of substantially increasing long distance traffic is not a stated purposes for which switched access services are invoiced or billed. *Id.* ¶ 41.

As alleged in Qwest's second amended complaint, the switched access rate charged by many LECs is less than $0.01 per minute; whereas, the LEC Defendants, premised upon their status as rural LECs and accordant low traffic volumes, charged Qwest access rates between $0.05 and $0.136 per minute interstate and $0.09 per minute intrastate. *Id.* ¶ 43. Because the LEC Defendants exclusively service telephone customers in their local calling area, Qwest had no choice but to use the respective LEC Defendants' facilities to deliver traffic to the telephone number assigned by the respective LEC Defendant. *Id.* ¶ 44. During the relevant time period, ILEC Dixon, which had been participating in the NECA Tariff No. 5 and charging Qwest a terminating access rate of $0.05 per minute, dropped out of the NECA pool, and created its own terminating switched access rates. *Id.* ¶ 46. By dropping out of the NECA pool, instead of having to pool its switched access charge revenues and obtaining only a pro rata portion of the pooled assets, Dixon could instead keep all the money generated from its invoices for terminating switched access charges billed to Qwest and other IXCs. ¶ 45. Similarly, ILEC Reasnor, which had been served by Sully Telephone Company, was purchased and then, in anticipation of the tremendous traffic volume increase due to its business relationship with FCSC One Rate Conferencing, set its terminating switched access rates at over $0.10 per minute. *Id.* ¶ 47. CLEC Aventure had a tariff that allowed collection of terminating access charges in excess of $0.05 per minute. *Id.* ¶ 48. According to Qwest, Aventure was in business for two and one-half years "before ever serving an actual end user and was formed for the purpose of traffic pumping." *Id.* Qwest asserts that by deliberately establishing individual tariffs that generate revenues far exceeding what was necessary to compensate the LEC Defendants for the use of their local network, and with knowledge that their arrangements with the FCSC Defendants would stimulate massive increases in long distance telephone calls, the LEC Defendants abused their regulatory status as

common carriers to intentionally extract massively-increased fees from Qwest. *Id.* ¶ 49.

Qwest alleges that the LEC Defendants' tariffs applicable during the relevant time period contained the following definitions in § 2 and provisions in §§ 3, 4, and 6: [27]

**Access Minutes:**

For the purpose of calculating chargeable usage, the term "Access Minutes" denotes customer usage of exchange facilities in the provision of interstate or foreign service. On the originating end of an interstate or foreign call, usage is measured from the time the originating end user's call is delivered by the Telephone Company to and acknowledged as received by the customer's facilities connected with the originating exchange. On the terminating end of an interstate or foreign call, usage is measured from the time the call is received by the end user in the terminating exchange. Timing of usage at both originating and terminating ends of an interstate or foreign call shall terminate when the calling or called party disconnects, whichever event is recognized first in the originating and terminating exchanges, as applicable. § 2.6.

**Common Line:**

The term "Common Line" denotes a line, trunk, pay telephone line or other facility provided under the general and/or local exchange service tariffs of the Telephone Company, terminated on a central office switch. A common line-residence is a line or trunk provided under the residence regulations of the general and/or local exchange service tariffs. A common line-business is a line provided under the business regulations of the general and/or local exchange service tariffs. § 2.6.

**Customers:**

The term "Customer(s)" denotes any individual, partnership, association, joint-stock company, trust, corporation, or governmental entity or other entity which subscribes to the services offered under this tariff, including both Interexchange Carriers (ICs) and End Users. § 2.6.

**End User:**

The term "End User" means any customer of an interstate or foreign telecommunications service that is not a carrier, except that a carrier other than a telephone company shall be deemed to be an "end user" when such carrier uses a telecommunications service for administrative purposes, and a person or entity that offers telecommunications service exclusively as a reseller shall be deemed to be an "end user" if all resale transmissions offered by such reseller originate on the premises of such reseller. § 2.6.

**Premises:**

The term "Premises" denotes a building or buildings on continuous property (except Railroad Right–of–Way, etc.) not separated by a public highway. § 2.6.

***Federal Universal Service Charge.***

The Federal Universal Service Charge (FUSC) recovers the [LEC]'s contribution to various federal universal service funds. FUSC will be billed by only those [LECs] contributing to the universal service funds and listed in Section 17.7. . . .

***End User Access Service.***

The Telephone Company will provide End User Access Service (End User Access) to end users who obtain local exchange service from the Telephone Company under its general and/or local exchange tariffs. § 4. ***General Description.*** End User Access provides for the

---

27. *See* Qwest's First Amended Complaint— Exhibit 3, ECF No. 225–3.

use of an End User Common Line (EUCL). § 4.1. ***Rate Regulations. Who is Billed.*** EUCL per month charges will be billed to the end user of the associated Local Exchange Service. § 4.6.1.

### Switched Access Service—General.

Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point communications path between a customer designated premises and an end user's premises. It provides for the use of common terminating, switching, and trunking facilities and for the use of common subscriber plant of the Telephone Company. Switched Access Service provides for the ability to originate calls from an end user's premises to a customer designated premises, and to terminate calls from a customer designated premises to an end user's premises in the LATA where it is provided. § 6.1

Qwest alleges that the LEC Defendants entered into relationships with the FCSC Defendants, and other FCSCs, for the purpose of exploiting the LEC Defendants exclusive ownership of facilities associated with the telephone numbers the LEC Defendants assigned to those FCSCs. *Id.* ¶ 58. Qwest alleges ILEC Dixon provided connections for FCSC Defendants Audiocom and Free Conferencing, *id.* ¶ 21; CLEC Aventure provided connections for FCSC Defendants Futurephone and Audiocom,[28] *id.* ¶ 25; and Reasnor provided connections for FCSC One Rate Conferencing, which is not named as a party in this lawsuit. *Id.* ¶ 23.

According to Qwest, the intended goal of the LEC Defendants–FCSCs relationship was to dramatically increase the amount of long distance traffic delivered by and through the LEC Defendants' switches to their FCSC partners, and to then bill the IXC, here Qwest, the higher tariffed switched access rate for each call. *Id.* Qwest further asserts that as the IUB has already found, while purporting to be the FCSCs' local exchange provider, the LEC Defendants never provided the FCSCs tariffed local exchange services. *Id.* ¶ 59. Qwest explains that in executing this scheme, the LEC Defendants would assign to the FCSCs, telephone numbers that had, in turn, been assigned to the LEC Defendants for use in a particular local exchange by the FCC's authorized administrator, Neustar, and then the FCSCs would connect their equipment to the LEC Defendants' network facilities. *Id.* ¶¶ 60–61. The LEC Defendants' placement of the FCSCs' equipment differed: Dixon placed their FCSC partners' equipment, which included routers, call-recorded playback equipment or other voice recognition equipment, in its own central office, which is within its certificated exchange; Reasnor placed their FCSC partners' equipment in other LECs' buildings, and thus the calls destined for telephone numbers assigned to FCSCs were delivered to locations where Reasnor was not certificated; and Aventure delivered all or a portion of calls destined for telephone numbers assigned to FCSCs to locations where Aventure was not certificated. *Id.* ¶ 62. Consequently, as the IUB has already expressly found, the FCSCs' equipment, routers, call-recorded playback equipment and other voice recognition equipment, was often actually located outside the LEC Defendant's certificated service territory. *Id.*

The FCSC Defendants and other FCSCs advertised through various medi-

---

**28.** Other FCSCs Aventure is alleged to have provided connections for include Global Conference Partners, Magellan, Blue Pacific, Rip- ple, Blue Mile, Zip Global, and Metro International.

ums to encourage their customers and potential customers to call one of the LEC Defendants' assigned telephone numbers, which connected to the FCSCs' equipment and allowed the caller to conduct conference calls, chat rooms, voice mail systems, adult content calls, and international calls. *Id.* ¶¶ 6364. The FCSC Defendants reside in large metropolitan areas in California, Nevada, and/or Texas, and not in Iowa; in fact, none of the FCSCs that partnered with the LEC Defendants resided in Iowa or ever had an agent or employee visit the communities supported by the LEC Defendants. *Id.* ¶ 66–67. Qwest further alleges that, for the most part, the FCSCs' equipment in Iowa does not terminate a call but instead forwards the communication to a distant or foreign location, or otherwise facilitates communication between multiple parties, none of whom reside in the LEC Defendant's local service area. *Id.* ¶ 69.

Qwest asserts that the following factors, which were included in the IUB's findings, indicate the LEC Defendants and the FCSCs' relationships were actually analogous to partnerships, joint ventures, or business arrangements, and not tariffed end user relationships:

1. The LEC Defendants did not issue monthly invoices for local exchange services to the FCSCs, did not bill the FCSCs for the right to place equipment in their central offices or their use of power from their central offices, and did not input the FCSCs into their traditional billing system;

2. The FCSCs did not pay the LEC Defendants EUCL or universal service charges, taxes (sales, municipal, state, excise, or other), or mandatory telephone-related surcharges for the local exchange service purportedly provided;

3. The LEC Defendant's local exchange tariffs did not include a cate-gory of customers that equates to FCSCs nor did their local tariffs define their relationships with their FCSCs partners, rather the terms of their relationships were defined in individual and confidential contracts;

4. The LEC Defendants did not offer or provide any local exchange service to the FCSCs pursuant to their local tariffs;

5. The FCSCs received the right to place equipment in a LEC Defendant central office (or another location control by a LEC Defendant) free of charge;

6. The LEC Defendants paid the FCSCs millions of dollars in kickbacks to route traffic to or through the LEC Defendants; and

7. The LEC Defendants did not pay any true end user customers for delivery of calls to them. *Id.* ¶ 72.

Qwest avers that the LEC Defendants' tariffs provide that terminating switched access revenue can only be obtained when the LEC terminates a telephone call, but that some, if not all, of the services provided by the FCSCs do not terminate in the LEC Defendants' respective local exchange area. *Id.* ¶ 73. Qwest points out that Reasnor, for example, has billed Qwest for switched access on calls that were delivered to affiliates in other exchange areas, taking advantage of an affiliate's higher access rates and/or inflating the mileage component of the switched access rates. *Id.* Qwest argues that this strategy is traffic laundering, and thus by charging Qwest terminating switched access charges for calls they did not terminate in the certificated local exchange area, the LEC Defendants violated the law and their own state and federal tariffs. *Id.* According to Qwest, Aventure, which had business relationships with FCSCs including FCSC Defendants Hometown and

Futurephone, routed the credit card, international, voice mail, and recorded call playback calls on to the called parties, who were located outside the exchange area, outside of Iowa, and in many cases, out of the country, and not at the local Iowa telephone number associated with the FCSC Defendant. *Id.* ¶ 74. Qwest asserts that like Reasnor, Aventure was also charging Qwest for terminating switched access in violation of its own tariff because it did not terminate such calls. *Id.*

Qwest contends that the LEC Defendants and the FCSCs, including the FCSC Defendants:

1. Entered into confidential contractual arrangements allowing the FCSCs without charge to place their equipment in the central office either of a LEC Defendant or that of a company related to the LEC Defendant; *Id.* ¶ 75

2. The contracts between the LEC Defendants and the FCSCs were not filed with the FCC or the IUB; *Id.* ¶¶ 76–77.

3. The contracts between the LEC Defendants and the FCSCs were not posted on the LEC Defendants' websites or otherwise made available to the public; *Id.* ¶ 78.

4. The chat lines, conference calls, international calls, and adult content calling services supplied by the FCSCs require substantial financial resources to operate; *Id.* ¶ 79

5. The FCSCs did not collect revenue from customers but instead their primary source of revenue came from the portion of terminating switched access revenues they received from the LEC Defendants and had been paid by the IXCs. The FCSCs obtained these kickbacks and offered services to their customers for free; *Id.* ¶ 80.

6. Had they not been receiving the revenue from IXCs like Qwest, the FCSCs would have been required to collect the revenue necessary to support the services provided from the calling services customers. *Id.* ¶ 81.

Qwest alleges that this traffic pumping scheme allowed LECs Dixon, Reasnor, and Aventure, along with FCSCs Audiocom, Free Conferencing, Futurephone, Hometown, and others, to make millions of dollars from proclaimed "free" services at the expense of IXCs, including Qwest, who subsidized the service through payments of what Dixon, Reasnor, and Aventure improperly billed as switched access charges. *Id.* ¶ 82. Qwest contends the LEC Defendants knowingly, intentionally, and willingly conspired with their FCSC partners, including Audiocom, Free Conferencing, Futurephone, and Hometown, to create this traffic pumping scheme; *id.* ¶ 83, that the goal of these relationships was to dramatically increase the amount of traffic delivered to or routed through these telephone numbers (traffic pumping), and to demand that IXCs (such as Qwest) subsidize this practice by paying unjustified switched access charges; *id.* ¶ 84, and that collectively, the Defendants' fraudulent, unfair and unreasonable schemes have increased Qwest's expenses by tens of millions of dollars. *Id.* ¶ 85.

Qwest describes that it is a traditional IXC that delivers calls as either a retail carrier, a wholesale carrier, or "least-cost routing" long distance carrier. *Id.* ¶ 86. As a retail carrier, when end-user customers that have chosen Qwest as their long distance carrier make telephone calls to telephone numbers associated with FCSCs with whom the LEC Defendants conduct business, Qwest delivers those calls to the LEC Defendants' switches associated with the telephone numbers the LEC Defendants assigned to the FCSCs,

and then the LEC Defendants bill Qwest switched access charges whether or not the calls satisfy the requirements of the LEC Defendants' access tariffs. *Id.* ¶ 86.A. When Qwest acts as a wholesale carrier, another long distance carrier hands off a call to Qwest for delivery to a LEC Defendant. When those other long distance carrier's end-users make telephone calls to a telephone number associated with a FCSC with whom a LEC Defendant has a partnership, the other long distance carrier hands the call to Qwest, who then delivers that call to the switch associated with the telephone number; the LEC Defendants then bill Qwest access charges, irrespective of whether the calls meet the requirements of the LEC Defendants' access tariffs. *Id.* ¶ 86.B. Finally, when Qwest delivers long distance calls to other long distance carriers for ultimate delivery to a LEC Defendant's telephone number, that is, Qwest is using other long distance carriers to provide wholesale carriage for Qwest, also called least cost routing, the call is routed in the manner that has the least cost. When wholesale delivery by another long distance carrier costs less than delivering the call directly to a LEC Defendant, the call is routed to the other long distance carrier for wholesale delivery. *Id.* ¶ 86.C. Qwest pays the other long distance carrier a contract rate to deliver the calls to the LEC Defendant, which includes a termination charge related to the LEC Defendant's terminating switched access charge. *Id.*

Dixon, Reasnor, and Aventure billed Qwest for switched access for calls destined for telephone numbers assigned to FCSCs from their interstate or intrastate tariffs. *Id.* ¶ 87. The kickbacks to the FCSCs, and thus the traffic pumping arrangement's very existence, was premised upon the LEC Defendants billing Qwest for switched access for calls destined for telephone numbers assigned to FCSCs.

*Id.* ¶ 88. Had the LEC Defendants complied with their access tariffs and not billed switched access for calls destined for telephone numbers assigned to FCSCs, Qwest could have saved money by delivering the calls to the LEC Defendants itself and would not have least cost routed any of the FCSC traffic. *Id.* ¶ 89. The LEC Defendants and the FCSC Defendants exploited the least cost routing system by having the LEC Defendants enter into preferential contracts with at least one long distance carrier, anticipating that carrier would pay the LEC Defendants when other carriers, like Qwest, would dispute payments. *Id.* ¶ 90. As a result of these preferential relationships, much of Qwest's traffic was handed to another long distance provider, resulting in Qwest paying at least a portion of the LEC Defendants' improperly billed switched access charges, simply through another carrier. *Id.*

Qwest asserts that assuming, arguendo, the FCSCs were end users, the LEC Defendants scheme unfairly, unreasonably, and illegally discriminated among end users because the LEC Defendants (1) shared a portion of its switched access revenue with the FCSCs but did not share that revenue with legitimate end users in the same manner or to the same degree; (2) provided service to FCSCs without charge while requiring legitimate end users to pay tariff rates; (3) provided service to FCSCs without requiring them to pay taxes and surcharges but required legitimate end users to pay taxes and surcharges; (4) allowed FCSCs to collocate in central offices without charge without allowing legitimate end users to do so without charge; and (5) discriminated between purported end-users due to the unique manner in which it interacted with FCSCs. *Id.* ¶¶ 91–96. According to Qwest, the LEC Defendants' discrimination was unreasonable and unjust because, inter alia, the revenue sharing with the FCSCs was

tied to an effort to exploit the LEC Defendants' exclusive ability to provide switched access services and collect exorbitant switched access charges from IXCs such as Qwest. *Id.* ¶ 97. Thus, while reasserting its firm belief that the FCSCs were not end-users but functional business partners, Qwest asserts that should the Court find otherwise, the LEC Defendants' conduct nonetheless constitutes "unreasonable discrimination" and is an unfair and unreasonable practice, and unreasonably discriminatory, in violation of Iowa law, *see* Iowa Code § 476.5 and 199 IAC 22.1(1)(a) and (d), and that the traffic pumping scheme is only possible by virtue of this unreasonable and unjust discrimination. *Id.* ¶ 98. Qwest avers that absent the discrimination at the very foundation of the business plan, the scheme would never take place because it would be impossible for the LEC Defendants to generate kickbacks to fund their FCSC partners. *Id.* ¶ 99.

Aventure and Dixon entered into business relationships with certain FCSCs, particularly Audiocom, knowing those FCSCs provided adult, indecent, and pornographic calling services and they assigned telephone numbers to those FCSCs to facilitate the provision of those calling services knowing that technical mechanisms had not been installed or implemented, nor steps taken, to restrict children from making calls to those telephone numbers or that parents or guardians had otherwise been provided with the ability to block children's access to these numbers. *Id.* ¶¶ 100–03. Qwest asserts that a substantial and material portion of calls delivered to Aventure and Dixon's FCSC partners is pornographic in nature and constitutes indecent communications and the Iowa Utilities Board found has found that LECs allowing their telephone facilities, which are under their control, to be used for purpose of indecent pornographic calling without technical mechanisms in place is contrary to the public interest. *Id.* ¶¶ 104–05.

Qwest explains that LECs bill long distance carriers switched access charges to compensate the LECs for the long distance carriers' use of their telecommunications network noting that the FCC has stated terminating switched access charges should be rate neutral and that its primary concern in regulating small telephone companies is to ensure that their access rates are not unreasonably high. *In re: Reg. of Small Tel. Cos.*, 2 FCC Rcd. 1010, 1012 (1986). Qwest contends that none of the stated purposes for which switched access services are invoiced or billed include revenue sharing between the LEC Defendants and their customers for the purpose of driving increased long distance traffic. *Id.* ¶ 106. Qwest's asserts that the collection of terminating switched access tariff revenue for the purpose of sharing that revenue with the FCSCs and through the traffic pumping schemes described is inconsistent with the overall purpose of switched access charges, because that revenue is not used, nor is it intended to be used, for the purposes described in the LEC Defendants' FCC or state tariffs, nor for the purposes set forth by the FCC or IUB, and that given the financial arrangements between the LEC Defendants and the FCSCs, the LEC Defendants are essentially delivering traffic to themselves, which is not subject to terminating switched access charges. *Id.* ¶ 107.

### a. Qwest's Claims

Qwest asserts eleven causes of action:[29] Count one—violation of § 201(b) for unreasonable practice against all LEC De-

---

**29.** Qwest has withdrawn Count Two—violation of § 254(k) for cross subsidization— against all LEC Defendants. *See* Qwest's Br. Resp. Suppl. Auth. 1 n. 3, ECF No. 467.

fendants; count three—failure to comply with § 223, which prohibits obscene calls, against Aventure and Dixon; count four—violation of § 203 for collection outside of tariff against all LEC Defendants; count five—violation of § 203 for providing rebates against all LEC Defendants; count six—common law unfair competition against all LEC Defendants and FCSC Defendants; count seven—breach of tariff/contract against all LEC Defendants; count eight—common law fraudulent concealment against all LEC Defendants and FCSC Defendants; count nine—tortious interference with contract against all LEC Defendants and FCSC Defendants; count ten—civil conspiracy against all LEC Defendants and FCSC Defendants; count eleven—unjust enrichment against all LEC Defendants and FCSC Defendants; and count twelve—a declaratory judgment against LECs Dixon, Reasnor, and Aventure, declaring Qwest is not responsible to pay for the interstate and intrastate access charges which those LECs have not provided access service and cannot collect pursuant to its tariff.

### 2. Factual Allegations in Dixon's Counterclaims

In its amended counterclaim, Dixon alleges (1) as a long-distance carrier, Qwest's facilities do not extend to the so-called "last mile" to end user customers, whereas ILECs like Dixon have extensive local telephone networks that extend the last mile to reach customers in the local exchanges that they serve; Dixon's C'Claims ¶ 7, ECF No. 247; (2) ILECs provide "switched access service" to IXCs, in order to terminate calls delivered by IXCs to customers in a local exchange area, and therefore IXCs are required to pay "access charges" to ILECs for the services they provide in terminating such calls for the IXCs; *Id.* ¶ 8; (3) Federal and state regulators have jurisdiction over the access charges that apply to any given interexchange call, depending upon whether the call is interstate or intrastate; *Id.* ¶ 9; (4) if the call originates in one state and terminates in another state, the access charges that apply fall exclusively within the jurisdiction of the FCC; *Id.;* and (5) if the calls originate and terminate within Iowa, the access charges fall within the jurisdiction of the IUB. *Id.*

According to Dixon, because Qwest provided interstate exchange access under Dixon's federal tariff, which had been properly filed with the FCC and deemed lawful under 47 U.S.C. § 204(a)(3), Dixon's tariffed rates for interstate access were compliant with FCC rules. *Id.* ¶ 10. Dixon alleges it had likewise provided intrastate exchange access and charged Qwest access rates pursuant to Dixon's concurrence in the tariff maintained by the Iowa Telecommunications Association (ITA), which is fully compliant with the IUB's regulations. *Id.* ¶ 11. Dixon alleges it has submitted invoices to Qwest for access charges associated with the interstate and intrastate access services it provided to Qwest, but Qwest has not paid for the access services it took from Dixon and that in doing so, Qwest did not follow the dispute resolution provisions of Dixon's tariff. *Id.* ¶¶ 12–13. Dixon alleges that by failing to pay the full amounts it invoiced, Qwest breached its obligations under Dixon's tariff. *Id.* ¶ 14.

#### a. Dixon's Counterclaims

In its Amended Counterclaim, ECF Nos. 247/323, Dixon asserts eight causes of action against Qwest: count one—collection action pursuant to federal tariff; count two—collection action pursuant to state tariff; count three—violation of § 201 of the Act for nonpayment of tariffed access charges; count four—violation of § 202(a) of the Act for unjust and unreasonably discriminatory treatment in connection with like communication services, count five—quantum meruit (im-

plied-in-fact contract); count six—unjust enrichment; count seven—intentional interference with contractual relations; and count eight—intentional interference with prospective business relationships.

### 3. Factual Allegations in Aventure's Claims and Counterclaims

Aventure alleges that beginning on September 1, 2006, and on the first day of each month thereafter, it billed Qwest for use of Aventure's access services in accordance with the applicable rates set forth in its tariffs filed with the FCC and that as of March 20, 2012, the total amount due to Aventure from Qwest for interstate access services billed is $1,772,839.73, including access charges and late fees. Aventure's Third Am. Compl. ¶ 26, 4:08–cv–0005 ECF No. 139. Aventure contends that Qwest continues to utilize the originating and/or terminating services provided by Aventure despite Qwest's intentional failure and refusal to pay Aventure lawfully billed charges for access services provided and that the amount Qwest owes Aventure continues to accrue. *Id.* ¶ 28. Aventure further alleges that Aventure's interstate tariff required inter-exchange carriers such as Qwest to pay specified rates for Aventure's originating and/or terminating access services for interstate traffic and, but for obligations Aventure was prevented from performing, which were excused or waived by Qwest's misconduct, Aventure fully performed its obligations under its federal access tariff. *Id.* ¶¶ 32–33.

#### a. Aventure's Claims/Counterclaims

Aventure asserts four causes of action against Qwest: count three [30]—violation of §§ 201(b) and 203(c) of the Act for failure to pay billed access charges; count four—breach of tariff for failure to pay for billed access services; count five—quantum meruit; and count six—unjust enrichment.

### 4. Factual Allegations in Future-phone's Counterclaims

Futurephone alleges that in September 2006, it launched a service to enable people to make very economical overseas calls. Specifically, for the cost of a call to a number in an Iowa telephone exchange, Futurephone would, through its Internet portals located in the telephone exchange areas served by the Iowa LECs, enable people to access the Internet and communicate overseas via the Internet at no additional charge. Futurephone C'claim ¶ 22, ECF No. 116–2.

In order to provide this Internet service, Futurephone obtained telephone numbers, IP addresses, and termination services from the Iowa LECs. Futurephone's process also required the services of Qwest, which provided long distance service to Iowa for tens of millions of customers in the U.S. *Id.* ¶ 23.

Futurephone contends that it conducted its business with each of the Iowa LECs as an independent contractor and was a customer of the Iowa LECs for their telecommunications services. Futurephone denies having had any partnership, or any type of agency relationship between itself and any of the Iowa LECs. However, Futurephone admits to having had agreements with the Iowa LECs wherein Futurephone would receive marketing fees regarding traffic routed to it. *Id.* ¶ 24.

Futurephone describes that a typical call to Futurephone's service originated outside of the exchange areas served by the Iowa LECs and that successful transmission of such a call required three telecommunications carriers: an originating LEC, an IXC (in this case, Qwest), and one of the Iowa LECs. *Id.* ¶ 25. The originating

---

**30.** Aventure did not file counterclaims in the present action but deferred to the affirmative claims Aventure asserted in its third amended complaint filed in Aventure's action against Sprint and Qwest, No. 4:08–cv–00005, ECF No. 139.

LEC would receive the transmission from the caller, then "hand off" the call to Qwest at Qwest's local POP. The call would then traverse Qwest's network to the exchange area served by an Iowa LEC, where Qwest would hand the call off to an Iowa LEC at the local POP. *Id.* The Iowa LEC then provided switched access service to deliver and terminate the call at one of Futurephone's local Internet portals. *Id.* At that point, Futurephone's Internet service would prompt the caller to enter the country code and overseas telephone number he or she was trying to reach. *Id.* When the correct number was entered, Futurephone would provide access to the Internet for people to place a new call through one of Futurephone's servers, and that call would be transmitted overseas to its destination via the Internet. *Id.*

According to Futurephone, the Iowa LECs provided switched access services to Qwest pursuant to then-effective federal tariffs; Aventure's tariff became effective on December 20, 2006. *Id.* ¶ 26. In late October 2006, the Iowa LECs started submitting invoices to Qwest for charges associated with the access services they provided that included the delivery and termination of traffic to Futurephone's Internet portals. *Id.* According to Futurephone, its services were well received and by late October 2006, it had a substantial number of daily calls to its service. *Id.* ¶ 27.

Beginning in November 2006, IXCs, specifically AT & T, aware of the increased traffic in the Iowa LECs' exchange areas, began disputing and withholding payments on invoices submitted to them for switched access services received from the Iowa LECs, including for the Futurephone traffic. In November 2006, AT & T requested call data records and other information from some LECs concerning their customers in its exchange area, and the destina-

tions of traffic therein and withholding payments for access services. *Id.* ¶ 28.

In December 2006, the Iowa LECs sent letters to the IXCs, requesting that they pay their bills for the switched access services they were receiving for the calls to Futurephone's Internet portals in Iowa. The IXCs refused to pay the charges. *Id.* ¶ 29.

In January 2007, AT & T filed suit against Futurephone and certain LECs, including Aventure, No. 4:07–cv–00043, alleging, inter alia, that the LECs had billed AT & T for "exorbitant" switched access fees since October 2006, that the switched access Futurephone traffic for which the Iowa LECs billed AT & T did not terminate at Futurephone's Internet portals, and that therefore AT & T was not and should not be required to pay for access services regarding that traffic. *Id.* ¶ 30. Qwest and Sprint subsequently filed similar civil actions against many of the same defendants, including Futurephone, 4:07–cv–00078 and 4:07–cv–00194, respectively. The Qwest and Sprint civil actions, like the AT & T civil action, alleged they were not obligated to pay the Iowa LECs' access charges for the Futurephone traffic. *Id.* ¶ 31.

Futurephone alleges that the civil actions filed by AT & T, Sprint, and Qwest (the IXCs), are objectively baseless because the IXCs had no reasonable or good faith basis to believe they could realistically expect success on the merits of their civil actions because at the time of filing these actions: (1) the IXCs knew or should have known that the Iowa LECs had valid and "deemed lawful" access termination tariffs that were binding on the LECs and the IXCs as a matter of law; (2) Futurephone was an Internet service provider, not a telecommunications provider, its Internet portals were located in the Iowa LECs exchange areas, and therefore Futurephone was the "called party" and

"end-user" respecting the IXC telecommunication services provided by the IXCs; (3) the Iowa LECs provided legally tariffed access termination services for the delivery of the IXCs' telecommunications services to Futurephone's Internet portals in Iowa; (4) the IXCs' refusal to pay the Iowa LEC's legally tariffed access charges for those termination services is unlawful, unjust and unreasonable; (5) Futurephone's arrangements with those Iowa LEC's under which it was to receive marketing fees for traffic routed to Futurephone's Internet portals were lawful and common in the industry, and in fact one or more of the IXCs had previously entered into similar marketing arrangements; and (6) the Iowa LECs' payments of those marketing fees to Futurephone depended on their receipt of lawfully tariffed access termination charges from the IXCs for access services they received for the termination of the IXC voice traffic at Futurephone's Internet portals in Iowa. *Id.* ¶ 32.

According to Futurephone, the IXCs' civil actions were motivated to misuse the litigation process as a weapon to harm Futurephone (with the process of litigation, as a opposed to the outcome of that process), and as a pretext for its unlawful self-help conduct aimed at disrupting Futurephone's lawful business relationships and driving it out of business. *Id.*

In early 2007, the Iowa LECs terminated service to Futurephone, and Aventure disconnected service from Futurephone's numbers without notice on or about January 29, 2007. On February 1, 2007, other LECs informed Futurephone it would shortly be terminating its services to Futurephone and did so one day later. *Id.* ¶ 33.

Futurephone alleges that because of the IXCs' self-help refusal to pay legally tariffed access termination charges and service terminations, Futurephone was forced to shut down its business and has

been unable to provide any service since February 2, 2007. *Id.* ¶ 34. According to Futurephone, as a direct and intended result of those actions by the IXCs, Futurephone's lawful arrangements and relationships with the LECs, under which Futurephone was to receive service and marketing fees for traffic routed contracts through them, have been disrupted and Futurephone has been deprived of significant economic advantages from those relationships. Further, existing and prospective customers of Futurephone services, subscribers of the IXCs, were also denied access to Futurephone's services, interfering with Futurephone's advantageous business relations with those customers and the marketing fees generated from access charges for their traffic to which Futurephone was entitled under the business relationships with the Iowa LECs. *Id.*

During the pertinent time period, the IXCs refused to pay any access charges bills submitted to them by the Iowa LECs for terminating their IXC calls to Futurephone Internet portals in the Iowa LECs' exchange areas. *Id.* ¶ 35. The access services provided by the Iowa LECs consisted of delivering and terminating the IXCs' calls at Futurephone's Internet portals. Futurephone alleges that each IXC was required to pay for those services. *Id.* Futurephone alleges that under the Commission Rules, Futurephone was and is the called party. *Id.* ¶ 36.

Futurephone contends that telephone calls provided by the IXCs were switched by the Iowa LECs at their end offices, delivered to Futurephone's Internet portals located in the Iowa LECs' exchange areas, which were the termination points for the telecommunications to the Iowa exchanges, that is, the use of the PSTN ended at Futurephone's Internet portals. *Id.* ¶ 37. Futurephone alleges entities such as Futurephone that utilize LEC ser-

vices to provide others with access to the Internet are deemed end-users of telecommunications services, and with respect to the telecommunications service delivered to them, Internet access providers like Futurephone are the "called parties" and the provided telecommunications service terminates at their portals. *Id.* ¶ 38.

### a. Futurephone's Counterclaims

In its amended counterclaims, ECF No. 116–2/252, Futurephone asserts eight causes of action against Qwest: count one—violation of § 201(a) of the Act by refusing to pay lawfully tariffed access charges for services received; count two—violation of § 201(b) of the Act by engaging in illegal self-help when by refusing to pay for services rendered; count three—violation of § 203(c) of the Act by procuring access services at rates not authorized by the LECs' tariffs; count four—violation of § 202(a) of the Act by unlawful discrimination against Future-phone; count five—intentional interference with existing contractual/business relationship and prospective business advantage; count six—quantum meruit; count seven—violation of Iowa Code § 476.5; and count eight—abuse of process.

### 5. Factual Allegations in Free Conferencing's Counterclaims

Free Conferencing alleges it is the conference calling service of choice for millions of customers and competes with the 800–number–based conferencing services offered by large telecommunications companies, including Qwest, which typically charge much higher rates than Free Conferencing. Free Conferencing C'Claims ¶¶ 6–7, ECF No. 226.

Free Conferencing alleges its subscribers pay their own way to access Free Conferencing's services by paying all long-distance charges to their long-distance telephone provider, such as Qwest, that they may incur in dialing the number associated with their conference call. *Id.* ¶ 8.

Rather than having conference call hosts pay for all callers, Free Conferencing's services allow their customers to collaborate without the host having to pay for all participants, as they would if they used other "toll free" services. Free Conferencing also offers premium conferencing services for a fee. *Id.*

To provide such competitive offerings to its consumers, Free Conferencing formed subscriber relationships with several LECs. *Id.* ¶ 9. The LECs have the network capacity to offer Free Conferencing the services required for multiple simultaneous conferences. *Id.* Because Free Conferencing does not own or provide any transport facilities, Free Conferencing subscribed to LECs' telecommunications services in order to provide its conferencing services to its customers. *Id.* ¶ 10. Free Conferencing relied entirely on the LEC Providers to terminate the calls made to Free Conferencing on the telephone numbers assigned by the LEC Providers. *Id.*

As part of Free Conferencing's relationship with the LECs, in exchange for the substantial volume of telecommunications traffic that Free Conferencing's conferencing services attracted to the LECs' networks, the LECs paid Free Conferencing a marketing fee in the form of a percentage of the access-charge revenue that the LECs collected in connection with services to the various long-distance companies in terminating those companies' customers' calls to Free Conferencing's conferencing equipment located on the LECs' networks. *Id.* ¶ 11. That negotiated percentage pays the LECs for Free Conferencing's use of LECs' telecommunications services and compensates Free Conferencing for attracting substantial call volume to LECs' network. *Id.*

As a result of Qwest's and other IXCs' refusal to pay the LECs' tariffed access charges, the LECs were unable to pay

Free Conferencing its marketing fee and some LECs have terminated their relationship with Free Conferencing as a result of Qwest's self help. *Id.* ¶ 12. Despite Qwest's efforts to characterize Free Conferencing's receipt of marketing fees as improper, the payment of marketing fees of the type that Free Conferencing receives from LEC Providers is common in the telecommunications industry, for example, AT & T paying Apple for wireless traffic that the iPhone attracts to AT & T's network. *Id.* ¶ 13. These marketing fees are similar to the fees that Qwest and/or its affiliate companies pay in connection with telecommunications services that it provides to commercial establishments with payphones, such as universities, hospitals, hotels, motels, and the like, where the telecommunications company shares its revenue associated with that traffic with the establishment that enables such traffic. *Id.*

When a Qwest long-distance subscriber used Free Conferencing's service, the Qwest customer's call was terminated to Free Conferencing's conferencing equipment using the LECs' telecommunications services and a telephone number that the LECs had assigned to Free Conferencing for that purpose. *Id.* ¶ 14. Free Conferencing asserts that when Qwest discovered Free Conferencing's services were competing with Qwest's conferencing services and that some of Qwest's customers were using Qwest's long-distance services but not also its conferencing services, Qwest also learned of Free Conferencing's relationship with the LECs. *Id.* ¶ 15.

To starve out the conferencing services competition and to interfere with Free Conferencing's relationship with LECs, Qwest engaged in unlawful acts of "self-help" by, inter alia, refusing to pay LECs' tariffed charges associated with, among other long-distance traffic, traffic that Qwest delivered to LECs for termination to Free Conferencing's equipment on LEC Providers' network. *Id.* ¶ 16.

Free Conferencing asserts that Qwest engaged in this conduct with the intent to harm both Free Conferencing and the LECs and to gain an unfair competitive advantage by continuing to bill its long-distance customers for the long-distance calls it sent to LECs for termination to Free Conferencing while maintaining that the calls to Free Conferencing were not subject to terminating access charges by the LECs. *Id.* ¶ 17. Free Conferencing alleges Qwest began a nationwide campaign of disparaging Free Conferencing and LECs by, inter alia, asserting that Free Conferencing's services were causing an unanticipated spike in traffic volumes that were thereby causing Qwest's unlimited long distance plans to become unprofitable. According to Free Conferencing, Qwest has alleged that consumers will suffer as Qwest is forced to raise its rates on the unlimited long distance calling plans it makes available to the public. *Id.* ¶ 18.

Free Conferencing alleges that Qwest has failed to support its allegations regarding lost profits on unlimited long distance plans and that failure is due to the fact that Qwest's unlimited long distance remains profitable for Qwest despite customer's preferences for Free Conferencing's calling services over those of Qwest. *Id.* ¶ 19. Despite Qwest's illegal self-help, Qwest continues to utilize the terminating access services that the LECs provided to Qwest in connection with the long-distance calls Qwest delivered to the LECs for termination to Free Conferencing's equipment located on the LECs' networks. *Id.* ¶ 20.

After Free Conferencing's relationship with the LECs began, the LECs have billed Qwest for the tariffed access services they provided to Qwest but Qwest has refused to pay all LECs' tariffed access charges even undisputed charges with

the intent to injure both LECs and Free Conferencing and to interfere with their relationship. *Id.* ¶ 22.

Free Conferencing asserts that Qwest targets and discriminates against other rural LECs that have conference-call-provider-customer relationships like the one between the LECs and Free Conferencing, and therefore Qwest is engaging in discriminatory practices and illegal "self-help." *Id.* ¶ 23. Free Conferencing alleges that Qwest by refusing to pay the LECs' lawfully assessed access charges, Qwest knowingly and proximately caused the LECs' inability to pay the marketing fees due Free Conferencing, a consequence that Qwest knowingly created with the purpose of injuring LECs and Free Conferencing. *Id.* ¶ 24. Free Conferencing asserts that Qwest's tortious interference also injured Free Conferencing's business in .other ways, including direct and consequential damages associated with attempting to mitigate the damages it suffered as a result of Qwest's unlawful "self-help" and discriminatory practices. *Id.* ¶ 25.

### a. Free Conferencing's Counterclaims

In its amended counterclaims, ECF No. 226, Free Conferencing asserts four causes of action against Qwest: count one—tortious interference with business relations; count two—violation of § 201(b) of the Act by refusing to pay for access services rendered; count three—violation of § 202(a) of the Act by unlawful discrimination against Free Conferencing; and count four—unjust enrichment.

### 6. LECs' Tariff Definitions: Customer, End User, Switched Access

#### a. Dixon: NECA Tariff FCC No. 5

The term "Customer(s)" denotes any individual, partnership, association, joint-stock company, trust, corporation, or governmental entity or other entity which subscribes to the services offered under this tariff, including both Interexchange Carriers (ICs) and End Users. Qwest's MSJ Pub.App. 1–7, ECF No. 572–1.

The term "End User" means any customer of an interstate or foreign telecommunications service that is not a carrier, except that a carrier other than a telephone company shall be deemed to be an "end user" when such carrier uses a telecommunications service for administrative purposes, and a person or entity that offers telecommunications service exclusively as a reseller shall be deemed to be an "end user" if all resale transmissions offered by such reseller originate on the premises of such reseller. Qwest's MSJ Pub.App. 1–8, ECF No. 572–1.

Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point communications path between a customer designated premises and an end user's premises. It provides for the use of common terminating, switching, and trunking facilities and for the use of common subscriber plant of the Telephone Company. Switched Access Service provides for the ability to originate calls from an end user's premises to a customer designated premises, and to terminate calls from a customer designated premises to an end user's premises in the LATA where it is provided. Specific references to material describing the elements of Switched Access Service are provided in 6.1.3 and 6.5 through 6.9 following. Qwest's MSJ Pub.App. 1–16, ECF No. 572–1.

#### b. Reasnor: ICORE Tariff FCC No. 2

The term "Customer(s)" donates any individual, partnership, association, joint-

stock company, trust, corporation, or governmental entity or other entity which subscribes to the services offered under this tariff, including both Interexchange Carriers (ICs) and End Users.

Qwest's MSJ Pub.App. 8–10, ECF No. 575. The term "End User" means any customer of an interstate or foreign telecommunications service that is not a carrier, except that a carrier other than a telephone company shall be deemed to be an end user when such carrier uses a telecommunications service for administrative purposes, and a person or entity that offers telecommunications service exclusively as a reseller shall be deemed to be an end user if all resale transmissions offered by such reseller originate on the premises of such reseller.

Qwest's MSJ Pub.App. 8–11, ECF No. 575. Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point communications path between a customer designated premises and an end user's premises. It provides for the use of common terminating, switching, and trunking facilities and for the use of common subscriber plant of the Telephone Company. Switched Access Service provides for the ability to originate calls from an end user's premises to a customer designated premises, and to terminate calls from a customer designated premises to an end user's premises in the LATA where it is provided. Specific references to material describing the elements of Switched Access Service are provided in Sections 6.1.3 and 6.5 through 6.9 following.

Qwest's MSJ Pub.App. 8–18, ECF No. 575.

#### c. Aventure: Tariff FCC No. 1

Customer—Any person, firm, partnership, corporation or other entity which uses service under the terms and conditions of this tariff and is responsible for the payment of charges. In most contexts, the Customer is an Interexchange Carrier utilizing the Company's Switched or Dedicated Access services described in this tariff to reach its End User customer(s).

Qwest's MSJ Pub.App. 7–2, ECF No. 574–1.

End User—Any person, firm, partnership, corporation or other entity which uses the service of the Company under the terms and conditions of this tariff. In many contexts, the End User is the customer of an Interexchange Carrier who in turn utilizes the Company's Switched or Dedicated Access services described in this tariff to provide the End User with access to the IC's communication and switching systems.

Qwest's MSJ Pub.App. 7–3, ECF No. 574–1.

Switched Access Service, which is available to Customers for their use in furnishing their services to End Users, provides a two-point communications path between a Customer's Premises and an End User's Premises. It provides for the use of common terminating switching and trunking facilities, and for the use of common subscriber plant of the Company. Switched Access Service provides for the ability to originate calls from an End User's Premises to a Customer's Premises and to terminate calls from a Customer's Premises to an End User's Premises in the LATA where it is provided.

Qwest's MSJ Pub.App. 7–7, ECF No. 574–1.

### IV. DISCUSSION

#### A. Motions to Dismiss

#### 1. Standard for Motion to Dismiss

To state a claim for relief, a party must submit "a short and plain state-

ment of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Under Rule 12(b)(6), a party may assert, by motion, the defense of "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To defeat this motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955); *Braden v. Wal–Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir.2009) (same). To meet the plausibility standard, "[t]he plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims . . ., rather than facts that are merely consistent with such a right." *Stalley v. Catholic Health Initiatives,* 509 F.3d 517, 521 (8th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

■■■ . In evaluating the complaint, factual allegations in the complaint are taken as true, and any reasonable inferences that may be drawn are drawn in favor of the non-moving party. *Id.; Gallagher v. City of Clayton,* 699 F.3d 1013, 1016 (8th Cir. 2012). However, "a pleading that offers 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden,* 588 F.3d at 594. The "evaluation of a complaint upon a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' "

*Id.* (quoting *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937).

**2. Hometown's Motion to Dismiss for Insufficient Service of Process**

As an initial matter, in its Motion to Dismiss, ECF No. 439, Hometown asserts that on April 13, 2007, Qwest served a person named Amy Creamer who was not qualified to receive service on behalf of Hometown. Hometown, however, has previously raised this issue in a motion to quash service, ECF No. 343, asserting the same basis it now asserts for dismissal. The motion to quash was before Judge Walters, who denied Hometown's motion in a very detailed and thorough order dated September 28, 2011, ECF No. 415 (noting that Federal Rule of Civil Procedure 4 "is a flexible rule that should be liberally construed to uphold service so long as a party receives sufficient notice of the complaint"; that Ms. Creamer held herself out as "Vice President of Hometown presumably, since she executed a service agreement for Hometown under [that] title," and while Qwest had delayed in attempting to correct the service problem, "delay without prejudice is not a basis to deny any otherwise appropriate amendment under [Rule 4]," and concluding Hometown had not sufficiently established prejudice, denied Hometown's motion (internal citations and quotation marks omitted)). Hometown did not file a motion to reconsider that order, nor did Hometown appeal that order. It is apparent from the record that Hometown is well aware of this action and has been an active participant. Further, Hometown concedes that Qwest corrected service. Hometown's previously raised arguments regarding insufficient service were addressed by Judge Walter's September 28, 2011, Order. The Court finds no reason or basis to revisit that issue. Hometown's Motion to Dismiss for Insufficient Service of Process is **denied.**

### 3. Reasnor's Motion to Dismiss [31]

Reasnor describes itself as an ILEC for Reasnor, Iowa—population is 190—that provides local telephone service and access service pursuant to tariffs filed with the IUB and the FCC. Reasnor states that one of its service subscribers was an FCSC named One Rate, with whom Reasnor denies affiliation, rather, Reasnor argues that when a Qwest customer called One Rate, the call would first be routed to the caller's local phone company, then across Qwest's long distance network, to Iowa Network Services, Inc., then to Reasnor, who would in turn route the call to One Rate. Reasnor explains that it would then bill Qwest for this terminating access service at the tariffed rate and Qwest would bill its customer for the long distance call.

Relying on *Jefferson Telephone Co.*, 16 FCC Rcd. at 16130, Reasnor argues it provides access service to Qwest when a Qwest customer places the call to One Rate's conference call service *in Reasnor, Iowa.* Reasnor denies that One Rate provided adult content calling, free chat rooms, or free international calling, but argues One Rate customers pay for and use conventional conference services and that One Rate's charges can be found on its website. Reasnor argues that contrary to Qwest's allegations, *Farmers II* only addressed the tariffs and business practices of that particular LEC, and did not express any opinion about different business models or courses of dealing.

Reasnor argues Qwest's second amended complaint should be dismissed because the primary jurisdiction to determine the applicability of Reasnor's interstate tariff and reasonable rates for its services resides with the FCC; the filed rate doctrine precludes Qwest's state law claims; and

primary jurisdiction also warrants the dismissal of Qwest's state law claims. .

#### a. Primary Jurisdiction of the FCC

Reasnor argues that the application of the doctrine of primary jurisdiction turns upon either of two factors, whether referral to the administrative agency will ensure uniformity and whether the issues raised require the exercise of administrative discretion, and that both factors are implicated here. Reasnor argues whether a particular entity is a customer or end user is an intensely fact-based question. Reasnor further argues that unlike other LECs, it has never had a contract with an FCSC and that issues of tariff interpretation and the reasonableness of carrier charges and practices are within the FCC's primary jurisdiction. Reasnor asserts FCC referral would ensure uniform nationwide treatment of Reasnor's tariff. According to Reasnor, the *Farmers II* decision instructed that the tariff language must be interpreted in connection with the LEC's contracts and practices with the FCSC, and since it has no contract with an FCSC, there is too much risk of inconsistent treatment. Reasnor also distinguishes that *Farmers II* confirmed that there was nothing inherently unreasonable about applying access service charges for the termination of conference calls that terminate at the bridge but that it was the particular tariff language and course of dealing with its FCSCs that prevented those entities from being end users for purposes of access charges.

Reasnor next argues that as in *Access Telecommunications v. Southwestern Bell Telephone Co.*, 137 F.3d 605, 609 (8th Cir. 1998), where the Eighth Circuit reasoned "whether 'all charges, practices, classifications, and regulations' are reasonable ....

---

**31.** Reasnor has not filed an answer or any counterclaims against Qwest. The Court summarizes the factual assertions in Reas- nor's motion solely to facilitate discussion of the motion.

clearly falls within the FCC's statutory authority," and whether charges and practices of a common carrier are unfair or unreasonable are matters that are exclusively within the province of the FCC. Reasnor asserts that Qwest's claims should be referred to the FCC because of its greater expertise and that without dismissal, this Court would be implicated in impermissible rate setting. Reasnor similarly argues that its intrastate traffic is governed by the IUB and claims regarding intrastate traffic should be submitted to the IUB. The Court must disagree. Reasnor's contentions collide head on with the ample precedent provided by both the FCC and the IUB.

"Primary jurisdiction is not implicated simply because a case presents a question, over which the FCC could have jurisdiction, regarding the interpretation of a single tariff. Rather, primary jurisdiction is properly invoked when a case presents a far-reaching question that 'requires expertise or uniformity in administration.'" *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir.2002) (quoting *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir.1987)). "Primary jurisdiction is properly invoked when a claim is cognizable in federal court but requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Id.*

The Commission's *Farmers II* order and the IUB's *Qwest v. Superior* decisions provided detailed direction for how to apply the tariffs to the facts of this case. Furthermore, the FCC and the IUB have already interpreted the inter- and intrastate tariffs to the LECs' traffic pumping arrangements. In *Farmers II*, the Commission examined the revenue sharing arrangement between the LEC and the FCSCs to determine whether the FCSC constituted an end user as defined in the

LEC's interstate access tariff. *Farmers II*, 24 FCC Rcd. at 14805. The Commission reasoned that to be an end user, an entity must also be a customer and to be a customer the entity must subscribe to the services offered under the tariff, but because the FCSCs did not subscribe to a services offered under Farmers' tariff, the FCSCs were not customers, and thus could not be end users. *Id.* The NECA tariff at issue in *Farmers II*, "defined an end user as any customer of an interstate or foreign telecommunication service that is not a carrier, and a customer as any entity that subscribes to services offered under [the NECA] tariff." *Id.* at 14803 (internal quotation marks omitted). These definitions are the same as those found in Reasnor's, Aventure's, and Dixon's interstate tariffs. *See* discussion *supra* Part III.D.6.

In *Farmers II*, the Commission next considered whether the FCSCs subscribed to a service under the tariff by examining the LEC's arrangements with the FCSCs, that is, whether the LEC and the FCSC structured their dealings as a customer relationship under the LEC's tariff:

> [T]he record demonstrates that the conference calling companies did not subscribe, nor did they seek to subscribe, to the services offered under the tariff. To the contrary, the evidence demonstrates that the conference call companies and Farmers expressly structured their telecommunications service contracts to avoid strict adherence to the terms of Farmers' filed tariff.

*Farmers II*, 24 FCC Rcd. at 14805.

Reasnor's argument that because billing for service it provided to One Rate was not based upon a contract, the FCC decisions in which LECs had entered into contracts with FCSCs do not apply to Reasnor, is misguided. As the FCC reasoned in *All American II*, 28 FCC Rcd. at 349495, *what*

*is lacking* in the LECs' provisions of service to the FCSCs—lack of written agreements to provide any local services to any customers pursuant to the tariffs, lack of entering the FCSCs accounts into the LECs' billing systems, and lack of billing the FCSCs for local telecommunications services—is what demonstrates the FCSCs are not end users. As with Aventure and Dixon, it is what is lacking in Reasnor's arrangement with One Rate that establishes end user status.

Reasnor's argument is that based on footnote 96 in *Farmers II,* the case must be referred for the FCC to determine the reasonable rate for the service Reasnor provided to Qwest. This argument, too, was addressed in *All American I,* wherein the Commission explained that footnote 96 in *Farmers II* did not hold that a carrier is *always* entitled to compensation for a service rendered, rather *depending upon the totality of the circumstances,* a carrier *may* be entitled to some compensation for non-tariffed services. *All American I,* 26 FCC Rcd. at 731. The Commission has repeatedly found that the types of service Reasnor and the other LECs provided to the FCSCs were not terminating access services because the FCSCs were not end users. Consequently, these services were not tariffed services within meaning of the Act. *Farmers II,* 24 FCC Rcd. at 14813 (setting forth the factors the Commission found to be very strong evidence that Farmers did not believe it was providing, nor intended to provide, the FCSCs tariffed services, and thus supported the Commissions conclusion that the FCSCs were not end users within the meaning of the tariff provisions).

The Commission reiterated its *Farmers II* end user analysis in its *All American, YMax, N. Valley I, N. Valley II,* and *Sancom* decisions, *see* discussion *supra* Part III.B.2.-B.5. The tariff language, specifically the definitions of end user and

customer, analyzed in those decisions is the same as the language in Reasnor's tariff. Reasnor's primary jurisdiction argument is foreclosed by *Farmers II* and its progeny.

### b. Filed Rate Doctrine

■■■ Title 47 U.S.C. § 203 of the Communications Act codifies the filed rate doctrine:

> Every common carrier, except connecting carriers, shall . . . file with the Commission and print and keep open for public inspection schedules showing all charges for itself and its connecting carriers for interstate and foreign wire or radio communication . . . and showing the classifications, practices, and regulations affecting such charges. . . .

" 'Under [the filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer.' " *Iowa Network Servs., Inc. v. Qwest Corp.,* 466 F.3d 1091, 1097 (8th Cir.2006) (alterations in original) (quoting *Evanns v. AT & T Corp.,* 229 F.3d 837, 840 (9th Cir.2000)).

Reasnor argues that Congress intended that once the FCC permits a federal tariff to become effective under § 204(a)(3), it should be treated by the courts as conclusively lawful. Reasnor concludes that because Qwest cannot seek damages arising from its payment of the rates contained in Reasnor's "deemed lawful" FCC tariff, Qwest's claim for damages fails to state a claim upon which relief can be granted and must be dismissed.

Reasnor next argues that Qwest's state and common law claims violate the filed rate doctrine because "[e]ven if a claim does not directly attack the filed rate, an award of damages to the customer that would, in effect, result in a judicial deter-

mination of the reasonableness of that rate is prohibited under the filed rate doctrine." *Hill v. BellSouth Telecommunc'ns, Inc.*, 364 F.3d 1308, 1317 (11th Cir.2004). Reasnor asserts Qwest cannot avoid payment of the tariff by invoking state or common law claims.

Qwest counters that the filed rate doctrine is inapplicable because the services for which it was billed were not tariffed services, and therefore its claims do not question the reasonableness of the rate, rather they question whether the service Reasnor and the other LECs provided was a tariffed service. Qwest is seeking the return of payments Reasnor wrongfully obtained from Qwest, it does not ask the Court to determine the reasonable or fair value for services rendered.

▮▮▮▮ Reasnor's filed rate doctrine argument, as with its primary jurisdiction argument, has been repeatedly rejected. *See Farmers II*, 24 FCC Rcd. at 14810 ("Despite this extensive evidence, Farmers argues that the application of the 'filed rate doctrine' to the relationship between itself and the conference calling providers compels a finding that the service it provided to the conference calling companies was pursuant to its tariff and, as a result, we should impute the status of tariffed 'customers' to the conference calling companies even if they were taking services under terms that were wholly outside the scope of the tariff. We disagree. The purpose of the filed rate doctrine is to prevent unreasonable and unjust discrimination among similarly-situated customers of a particular common carrier's service, and to ensure that carriers impose like charges for like services." (footnotes omitted)); *Qwest Commc'ns v. Superior Tel. Coop.*, Docket No. FCU–07–2, 2009 WL 3052208 (Iowa Util.Bd. Sept. 21, 2009) ("Thus, the language of Aventure's access tariff only contemplates Aventure's offering of special contract arrangements to its

IXC customers, who in turn use Aventure's switched access service to reach end users. Aventure's interpretation of this language as allowing it to make special contract arrangements with FCSCs ignores the distinction between the IXCs and end users."), *recon. granted in part, (IUB Recon. I)*, 2009 WL 4571832 (Iowa Util.Bd. Dec. 3, 2009), *further recon. denied, (IUB Recon. II)*, 2011 WL 459685 (Iowa Util.Bd. Feb. 4, 2011), *aff'd sub nom. Farmers & Merchants Mut. Tel. Co. of Wayland v. IUB*, 829 N.W.2d 190 (Iowa Ct.App.2013) (unpublished table decision); *Sancom I*, 28 FCC Rcd. at 1989 & n. 57 ("Section 203(c) of the Act requires a carrier to provide communications services in strict accordance with the terms and conditions of its tariff. As explained above, in order for Sancom to provide Switched Access Service under the Tariff, calls must originate or terminate with an 'end user' (i.e., a 'customer' that 'subscribes to the services offered' under the Tariff)" and noting that while the filed rate doctrine applies to rate setting, it also applies to tariff billing provisions). Qwest's claims are not barred by the filed rate doctrine.

### c. Dismissal under the Doctrine of Primary Jurisdiction

When Reasnor filed this motion, the IUB order had a petition for review pending. Thus, Reasnor argued that Qwest's state law claims implicating Reasnor's intrastate tariffs, rates, and practices, was already before the expert agency in Iowa that had primary jurisdiction over such issues, and therefore should be dismissed.

Since Reasnor made this argument, the IUB's decision and its adverse findings as to Reasnor, have been upheld by the Iowa District Court for Polk County, *see Farmers Telephone Co. v. Iowa Utilities Board*, Case No. 05771 CVCV 008561 (Iowa Dist. Ct. Oct. 11, 2011) (Gamble, J.), which was,

in turn, affirmed by the Iowa Court of Appeals, *see Farmers & Merchants Tel. Co. of Wayland v. Iowa Utilities Board,* 829 N.W.2d 190 (Iowa Ct.App.2013) (unpublished table decision), and denied further review by the Iowa Supreme Court, *see Farmers Telephone Co. v. Iowa Utilities Board,* No. 11–1899 (Iowa Apr. 24, 2013) (Order). In addition, the Court of Appeals for the District of Columbia Circuit affirmed the FCC *Farmers* decisions and, in doing so, rejected Farmers' arguments, which are the same as those Reasnor raises here. *See Farmers & Merch. Mut. Tel. Co. of Wayland,* 668 F.3d 714 (D.C.Cir.2011) (rejecting each of Farmers' arguments holding: (1) the Commission complied with § 405(b)(1) in granting Qwest's petition for reconsideration within ninety days; (2) the Commission's determination that Farmers' services were not tariffed service and Qwest was not required to pay Farmers' tariff, did not result in the Commission being without jurisdiction to consider Qwest's complaint because 47 U.S.C. § 208(a) provides the Commission the authority to adjudicate acts and omissions of common carriers; (3) the Commission properly interpreted the tariff in finding the FCSCs were not end users as the tariff's switched access service diagram illustrates, an end user is one of the sub-elements of that service; (4) Farmers' tariff rates were "deemed lawful" until the Commission determined otherwise, which it did in reviewing the new evidence; (5) the Commission found two alternate bases for § 201(b) liability: (a) Farmers did not provide switched access under its tariff making Farmers' practice of charging Qwest for such services unjust and unreasonable under § 201(b), and (b) even if traffic Farmers carried from Qwest to the FCSCs could be considered switched access service, Farmers violated § 201(b) by earning an excessive rate of return; (6) the Commission's finding that the FCSCs were not end users did not contravene prior precedent set in *Jefferson Telephone Co.,* 16 FCC Rcd. at 16131, because in *Jefferson Telephone,* end user status was assumed; and (7) because the Commission properly concluded the FCSCs were not end users under the tariff, the filed rate doctrine did not apply).

Reasnor's arguments have been addressed and are now foreclosed by subsequent precedent. Reasnor's motion to dismiss is **denied.**

### 4. Aventure's Motion to Dismiss Claims under the Act

Aventure argues for dismissal of Qwest's claims [32] under Rule 12(b)(1) and Rule 12(b)(6). Aventure's arguments strongly rely on its reading and interpretation of the *Connect America Order.*

#### a. 12(b)(1) Dismissal for Lack of Standing

Aventure first argues that Qwest's claim against Aventure for violation of § 223, which penalizes certain obscene or harassing acts over telephone lines, must be dismissed because § 223 does not create a private right of action, and therefore, Qwest lacks standing. Aventure argues Qwest cannot avoid that bar by bootstrapping the § 223 claim to its § 201(b) unjust and unreasonable practice claim. Aventure further argues that even if § 223 did create a private right of action, Qwest would not have standing to seek damages for the complained of conduct because Qwest, which is a corporation, is not the parent or guardian of any minor children and lacks standing to assert a claim based upon § 223.

---

**32.** Aventure filed a combined motion to dismiss claims by AT & T in 4:07–cv–00043; Qwest in 4:07–cv–00078; and Sprint in 4:07–cv–00194; and as to Qwest's and Sprint's counterclaims in 4:08–cv–0005.

Qwest acknowledges that § 223 does not create a private cause of action, but counters that Aventure misconstrues Count III. Qwest asserts that Count III alleges that Aventure's failure to comply with § 223, constitutes the predicate unjust and unreasonable practice for a violation of § 201(b). It is Qwest's contention that by entering into a business relationship with FCSCs who provide adult, indecent, and pornographic calling services, without technical means to block children's access to them, Aventure violated § 223, and thus committed an unjust and unreasonable act. Qwest argues that showing a violation of an FCC order is not the only way of demonstrating a § 201(b) violation, rather, it may show such a violation by demonstrating a carrier has violated another provision of the Act or an FCC rule. Qwest argues that Aventure's standing argument fails because count three alleges the LECs violated § 201(b) *by not complying with* § 223, and does not assert a private cause of action or remedy under § 223. Citing *Northern Valley Communications, LLC v. Qwest Communications Corp.*, 711 F.Supp.2d 1018, 1024–25 (D.S.D.2010); *Northern Valley Communications, L.L.C. v. Sprint Communications LP*, 618 F.Supp.2d 1076 (D.S.D.2009); and *Sancom, Inc. v. Qwest Communications Corp.*, 2008 WL 2627465, at *3 (D.S.D. Jun. 26, 2008), Qwest asserts that Aventure's argument confuses standing with whether Qwest states a claim and that courts have repeatedly rejected the standing argument Aventure raises herein. Qwest contends that to demonstrate standing only requires "at least one petitioner has 'alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'" *Horne v. Flores*, 557 U.S. 433, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)); *see also Ariz. Christian Sch.*

*Tuition Org. v. Winn*, 563 U.S. 125, 131 S.Ct. 1436, 1442, 179 L.Ed.2d 523 (2011); *Sprint Commc'ns Co., L.P. v. APCC Serv., Inc.*, 554 U.S. 269, 273–274, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008). Standing also requires showing prudential standing, i.e., that the plaintiff is not "raising another person's legal rights, or ... generalized grievances." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (internal quotation marks omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, —— U.S. ——, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014).

Qwest further argues Aventure does not contend that Qwest lacks a cognizable injury from Aventure's failure to implement the controls required under § 223 or that Aventure's business relationships with FCSCs that provide adult content, indecent, or pornographic calling services has not injured Qwest by inflating the volume of traffic on which Aventure has wrongfully billed Qwest. Qwest contends that Aventure has commit unjust and unreasonable acts by not furnishing FCSCs who provide adult content material with "900" telephone numbers which would allow parents to block access.

Qwest's final assertion is that to demonstrate standing, courts customarily accept all factual allegations in the complaint as true and draw all inference in the plaintiff's favor. *See Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 983–84 (8th Cir. 2009); *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir.2007) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992))).

Standing requires (1) an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) that the injury "be fairly traceable to the challenged action of the defendant," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Turkish Coal. of Am., Inc. v. Bruininks,* 678 F.3d 617, 621 (8th Cir.2012) (quoting *Republican Party of Minn., Third Cong. Dist. v. Klobuchar,* 381 F.3d 785, 791–92 (8th Cir.2004)).

 Count three of Qwest's second amended complaint alleges that the LECs' "failures to comply with the requirements of 47 U.S.C. § 223 constitute an unjust and unreasonable practice in connection with their provision of interstate communication services, in violation of their 47 U.S.C. § 201(b) duties." Qwest Second Am. Compl. ¶ 127, ECF No. 318. Qwest does not assert a cause of action *under* § 223, rather alleges that the LECs' conduct is contrary to their requirements under that provision of the Act, and therefore, they have violated § 201(b). Qwest has met the threshold pleading requirement of stating a cognizable injury under § 201(b).

## b. 12(b)(6) Dismissal for Failure to State a Claim

### i. § 201(b) claim(s)

Aventure also argues that Qwest's claims for violation of § 201(b) for sharing tariffed access charges on long distance calls with providers of conference calling and similar services fails to state a claim upon which relief may be granted and is subject to dismissal under Rule 12(b)(6). According to Aventure, absent an FCC order, rule, or regulation expressly finding certain conduct is unjust and unreasonable, there is no private right of action

under the Act. Aventure asserts a violation of § 201(b) requires a determination by the FCC that an action constitutes an unjust and unreasonable practice. Aventure argues that because Qwest has failed to plead the requisite FCC action, it cannot maintain a claim under § 201. Aventure further asserts that the *Connect America Order* expressly declined the IXCs' requests to declare revenue sharing to be a violation of § 201(b) and made it clear that carriers who receive tariffed services must pay the tariffed rates.

Qwest rejects Aventure's assertion that its cause of action for violation of 201(b) must be dismissed because Qwest has not pled a prior FCC decision that finds traffic pumping conduct unjust or unreasonable asserting that this the incorrect pleading standard since Communications Act claims are subject to Rule 8 notice pleading and Qwest's claim has met that standard. Qwest notes that *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.,* 550 U.S. 45, 53, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007), cited by Aventure for the proposition that a prior FCC decision must be pled to avoid dismissal of a § 201(b) claim, does not require that a prior FCC decision or order as a pleading requirement, rather *Global Crossing* noted that the *success* of a § 201(b) claim depends on whether the FCC, by rule or decision, could properly hold that a carrier's conduct was unjust and unreasonable.

Qwest also challenges Aventure's interpretation that the *Connect America Order* found revenue sharing was not unjust or unreasonable. Qwest points out that the *Connect America Order* repeats the FCC's previous holding in *All American,* noting "[a]s the Commission has previously stated, [w]e do not endorse such withholding of payment outside the context of any *applicable* tariffed dispute resolution provi-

sions.'" *Connect America Order,* 26 FCC Rcd. at 17890 (second alteration in original) (emphasis added) (quoting *All American I,* 26 FCC Rcd. at 728). Qwest asserts that its § 201(b) claims against Aventure are premised on Aventure assessing Qwest with switched access charges on calls that had no end users, no subscription to a service from Aventure's interstate tariff, no end user premises, and no common line, and thus failed to meet tariff requirements. Qwest posits that the IUB agreed with these premises regarding intrastate traffic. *See IUB I,* 2009 WL 3052208.

Qwest further challenges that Aventure's reading of the *Connect America Order* as finding revenue sharing lawful contradicts that order. Qwest argues that the new access stimulation rules use revenue sharing as a trigger but do not provide that access sharing is permissible nor do the new rules immunize LECs from their duty to refrain from billing IXCs tariff charges when the subject calling does not meet the LEC's tariff requirements. *See* 47 U.S.C. §§ 201(b), 203(c). Qwest continues that under the *Connect America Order,* IXCs continue to have the right to bring actions to address whether a LEC has complied with the *new* rule going forward, whether a LEC's traffic stimulation otherwise continues or becomes unjust or unreasonable despite the new rule, and had no effect on existing complaint actions. According to Qwest, through the *Connect America Order,* the FCC merely declined to find revenue sharing was a per se unlawful under § 201(b) reasoning that "[a] ban on all revenue sharing arrangements could be overly broad, and no party has suggested a way to overcome this shortcoming." *Connect America Order,* 26 FCC Rcd. at 17879 (footnote omitted). But the FCC also rejected the notion that it had previously "explicitly approved revenue sharing." *Id.* Qwest reiterates its position that contrary to Aventure's asser-

tions, the *Connect America Order* does not go so far as to find revenue sharing to be per se lawful, and in fact, in the *Connect America Clarification Order,* the FCC specifically noted that prior to the new rules, it had "adopted several orders resolving complaints concerning access stimulation under preexisting rules and compliance with the Communications Act," and clarified that the new rules order "complements these previous decisions, and nothing in the [new rules order] should be construed as overturning or superseding [those] previous [FCC] decisions." *Connect America Clarification Order,* 27 FCC Rcd. 605, 613 (2012).

Aventure's arguments for dismissal of Qwest's § 201(b) claims are premised on Qwest's *success* on those claims rather than, more properly, on whether those claims meet the Rule 12(b)(6) requirements of stating a claim. *Global Crossing* does not, as Aventure suggests, demand a heightened pleading requirement for § 201(b) claims. Rather, before the Court in *Global Crossing* was the gateway issue of whether § 207, which authorizes persons damaged by a violation of § 201(b) to bring a lawsuit to recover damages in federal court, would authorize payphone operators to bring a federal lawsuit against long-distance communications carriers who refused to compensate the payphone operator for certain calls. *Global Crossing,* 550 U.S. at 53, 127 S.Ct. 1513. The Court found that it did. *Id.* The adequacy of pleading a § 201(b) claim was not before the Court in *Global Crossing.* Furthermore, were there such a pleading requirement, Qwest has cited the Commission's *Farmers II* decision, which clearly established that the type of conduct alleged in Qwest's § 201(b) claim was unjust and unreasonable. While the application of the facts herein to the *Farmers II* decision has yet to occur, the predicate pleading requirement appears to have been met.

■ Of note, Qwest attached to its resistance, Aventure's "wholesale services agreement" with FCSC Global Conference Partners (GCP).[33] The terms of the agreement detail the arrangement between the parties whereby GCP would install and maintain, at its expense, equipment at the "switch site" located on Aventure's premises. In return, Aventure would provide GCP with telephone numbers and internet connectivity at the switch site that had a minimum of eight dedicated IP addresses, and would ensure internet connection to GCP's equipment would meet agreed upon service levels. The agreement detailed that Aventure would provide its services at no cost to GCP. Qwest's Resist. Ex. B, ECF No. 490–1. Exhibit B details the "marketing fee schedule" by which Aventure would pay GCP "per month based *upon revenue collected in accordance with the per minute marketing fee schedule*" to be sent to GCP "within 10 days of Aventure Communication collecting its revenue on said minutes," and if Aventure were to "suffer a substantial and material change in the amount of revenue it is contractually entitled to receive from its carriers," GCP agreed to accept from Aventure, a payment proportionate to the amount Aventure received from its carriers. *Id.* (emphasis added). Another noteworthy provision of the Aventure–GCP agreement is the clause "Relationship with End Users," which details that "Aventure Communication shall have no responsibility for dealing directly with any of Global Conference customers ("End Users") for any purpose relating to the services. Global Conference is solely responsible for all products and

services it provides to *its* end users." *Id.* (emphasis added).

### ii. § 203(c) claim

Aventure next argues Qwest fails to state claims for violations of § 203(c) because *Connect America* affirmed that LECs have the ability to share access revenues with their end users and that Qwest incorrectly defines rebates under § 203 as being payments back to the carrier paying the tariffed charges instead of payment to third parties. According to Aventure, Qwest confuses its relationship with Aventure, which is governed by Aventure's interstate access tariff and federal law, with Aventure's relationships with Aventure's local end user customer, which is governed by Aventure's agreement with those end users not by Aventure's tariff or by the FCC. Aventure describes that two distinct *and unrelated* transactions are at play. First, Aventure terminates a call brought to its network by its access-tariff customer, such as Qwest. This step entitles Aventure to collect access charges from Qwest for the work Aventure performs in completing Qwest's customers' long-distance calls. Next, Aventure delivers the call to *its own end user customer*, such as an FCSC, pursuant to the terms of the agreement with that end user. According to Aventure, § 203(c)'s prohibition on rebates only applies to customers that receive service pursuant to the tariff. Therefore, a violation would only occur if Aventure gave a refund or rebate to the IXC that took service pursuant to Aventure's interstate tariff and paid the tariffed access charges. Aventure points to the FCC's repeated position that is does not regulate the relationship between a LEC

---

**33.** GCP has filed for bankruptcy protection and the claims by and against GCP are stayed. While legal/fact issues may turn on the specific details of an FCSC–LEC agreement, for purposes of whether Qwest has stated a claim, the GCP–Aventure agreement provides a general overview of the workings of FCSC–LEC agreements and support Qwest's allegations.

and its end user customer. *See Seventh Report and Order*, 16 FCC Rcd. at 9938 ("[W]e continue to abstain entirely from regulating the market in which end-user customers purchase access service"). Aventure's final assertion is that the *Connect America Order* "expressly" states that local exchange carriers *are permitted* to enter into revenue sharing agreements with their end user customers and that *Connect America Order* language suggests access revenue sharing is an "important" feature in the definition of access stimulation.

Qwest asserts that its § 203(c) claim for relief for unlawful rebates or remissions of tariff charges is premised on Aventure's practice of taking revenues paid by the IXCs and remitting them to the FCSCs with whom Aventure does business, which, Qwest asserts, meets the requirements of § 203(c). Qwest points out that Aventure acknowledges billing Qwest for alleged interstate switched access services that are subject to the tariff requirements of § 203(a) and (c), thus Aventure is rebating or remitting part of its interstate tariff's charges to the FCSCs whom Aventure asserts are end users. Qwest argues § 203(c) prohibits refunding or remitting any portion of the charges without specifying to whom the refund or remittance is made, and is not restricted to refunds or remittance to the same customer, nor to customers of the same tariff under which Aventure charged Qwest. That is, the FCC did not restrict the provision solely to remittances back to the same customer who had been billed those tariff charges, nor to remittances to customers of the same tariff. Qwest distinguishes *Int'l Telecharge, Inc. v. AT & T Co.*, 8 FCC Rcd. 7304, 7306 (1993), cited by Aventure, noting that although in that case the FCC found private payphone commissions were not unlawful rebates, that finding was based on different facts, most importantly, the commissions were not paid to persons who AT & T alleged were end users, but to private payphone owners who did not make the calls, *id.* Qwest also distinguishes that contrary to Aventure's suggestion, *Panatronic USA v. AT & T Corp.*, 287 F.3d 840 (9th Cir.2002), does not stand for the proposition that § 203(c) is limited to customers covered by the tariff at issue. Rather, the issue in *Panatronic* was whether a long distance carrier committed unlawful price discrimination under § 202(a) by delaying the assessment of connectivity fees upon its tariff 12 customers, while assessing connectivity fees on its tariff 1 and tariff 27 customers. *Id.* at 843. After concluding the carrier's assessment did not constitute unlawful price discrimination, the court next considered whether the carrier violated § 203(c) by imposing the delayed connectivity fee on the tariff 12 customers after negotiating new contracts and filing amended tariffs. *Id.* at 845. The court "construe[d] § 203(c) as conferring a cause of action on customers covered by the tariff at issue, but not on customers covered by other tariffs. Because [the plaintiff] was not a customer covered by [tariff 12], it suffered no injury under section 203(c) by [the carrier]'s delay in imposing the [connectivity] fee on its [tariff 12] customers .... [and] lacks standing to invoke the independent protection of this section." *Id.*

■ Aventure's argument that Qwest has not stated a claim under § 203(c) fails. First, Aventure's assertion that it is still contested whether, under the LEC–FCSCs' agreements, the FCSCs were end users has been put to rest by both the FCC and the IUB. Second, in *N. Valley Recon. I*, the Commission rejected the contention advanced here by Aventure that the access charge requirements impermissibly regulate the LEC-end user relationship:

In addition to arguing that the Commission's CLEC access charge rules do not address the facts at issue, Northern Valley contends that the [*N. Valley I*] *Order*'s requirement that tariffed CLEC access charges be for transporting traffic to an end user "conflicts with the Commission's long-standing precedent establishing that it does not regulate the CLEC-end user relationship." According to Northern Valley, the *Order* "demand[s]" that CLECs assess a fee on end users. The *Order* does no such thing. Under the *Order*, Northern Valley may offer its services to individuals and businesses for any fee (or no fee). The *Order* provides only that, if Northern Valley chooses to assess access charges upon IXCs by *tariff*, the individuals or entities to whom Northern Valley provides access must be "end users" (i.e., paying customers).

*N. Valley Recon. I*, 26 FCC Rcd. at 14525 (footnotes omitted).

Third, Aventure again attempts to extend the scope of the *Connect America Order* suggesting it legitimizes past conduct. Aventure further ignores the FCC's clear directive that nothing in the *Connect America Order* vitiates or is contrary to previous FCC rulings. *Connect America Clarification Order*, 27 FCC Rcd. at 613 ("Prior to the [*Connect America*] Order, the Commission adopted several orders resolving complaints concerning access stimulation under preexisting rules and compliance with the Communications Act," and clarifying that the *Connect America Order* "complements these previous decisions, and nothing in the [new rules order] should be construed as overturning or superseding [those] previous Commission decisions."). The *Connect America–Notice of Proposed Rulemaking* order positively cited the *N. Valley* decision denying CLEC Northern Valley's motion to dismiss Qwest's § 203(c) claim for lack of standing, noting the Commission's long-standing prohibition on rebates as an important guard against rate discrimination. *See Connect America–Notice of Proposed Rulemaking*, 26 FCC Rcd. at 4773 & n. 1071 ("We note that the prohibition on rebates has long been an important guard against rate discrimination, and that the Commission has been vigilant in its review under section 203(c). We also note that section 203(c) claims have been asserted by carriers in the context of access stimulation disputes. We seek comment on whether the refund prohibition in section 203(c) of the Act has a prohibitive effect on revenue sharing arrangements between LECs and access stimulating entities, or, if there are aspects of these relationships that fall outside the scope of this statutory provision." (footnotes omitted)). Furthermore, as previously stated, the new rules set forth in the *Connect America Order* do not immunize LECs from their ongoing duties to provide tariffed services without discrimination among customers.

### 5. Aventure's/FCSC Defendants' Motions to Dismiss State Law Claims

Aventure argue that existing state law and the *Connect America Order* undermine Qwest's state law claims. Aventure first asserts that all Qwest's state law claims rest on the faulty premise that the LECs' revenue sharing agreements with FCSCs are somehow illegal, which is undercut by the *Connect America Order* that "expressly sanctions" LECs to engage in such fee sharing arrangements and collect tariffed switched access charges from IXCs. Audiocom, Free Conferencing, and Hometown also move to dismiss the state law causes of action brought against them by Qwest arguing the same general bases for dismissal as Aventure.

### a. Unfair Competition

Aventure argues that Qwest's assertion of a "myriad" of purported actions include

(1) Aventure providing a "kickback," (2) the provision of a service that was "subsidized" by long distance carriers, (3) participation in a scheme that violated the Act and Iowa law in undefined ways, and (4) Aventure's provision of a service that is likely to confuse parents of minor children. Aventure argues that even prior to the *Connect America Order*, these conclusory allegations were insufficient to establish that Qwest was entitled to relief for unfair competition but that the *Connect America Order*, nonetheless, put the issue to rest, that is, if the actions delineated by Qwest were not prohibited by law, there can be no violation of common law unfair competition. Thus, whether Aventure shares a portion of its revenue, which Aventure says Qwest derisively calls "kickbacks," with FCSCs, there can be no violation of common law unfair competition. Aventure further argues that Qwest assertions do not amount to stating a claim of unfair competition under Iowa law. Free Conference argues Qwest's unfair competition claim fails because in Iowa such a claim generally relates to trademark confusion and similar issues, none of which Qwest has alleged. Regarding specificity, Free Conferencing asserts that despite Qwest's broad stroke allegations of adult content websites, it does not provide any adult or pornographic service. Free Conferencing argues these emotion-laden allegations cannot give rise in any way to liability on Free Conferencing's part and cannot support Qwest's unfair competition claim against Free Conferencing.

Qwest defends the adequacy of its second amended complaint to state a cognizable claim for unfair competition arguing Aventure's and the FCSCs' assertions that Qwest has to allege the time, place and contents of false representations for unfair competition, presumes unfair competition claims must be pled with particularity under Rule 9, which is contrary to the notice pleading rules.[34] Qwest notes that only one of its claims, fraudulent concealment, *see* discussion *infra*. Part IV.A.5.b., needs to be, and is, pled with the requisite particularity.

---

**34.** Allegations in Count VI of Qwest's second amended complaint include: (1) The LEC Defendants have also misused their inherent and exclusive power over terminating switched access services; (2) The FCSC Defendants advertise and promote false and misleading information about how they are able to provide "free" services (e.g., websites stating tax dollars, a universal service fund, their website advertising banners pay for the free calls, which are actually paid by kickbacks from Qwest's payments to LECs); (3) These representations will likely confuse or deceive consumers leading them to wrongfully believe they are receiving free services; (4) The LEC and FCSC defendants have concealed information that prevented Qwest from understanding the nature of the calling; (5) The FCSC Defendants have deliberately misused the LEC Defendants inherent and exclusive power over intra state and interstate terminating switched access services to the telephone numbers assigned to them; (6) The LEC Defendants provide kickbacks to the FCSC Defendants but do not provide similar kickbacks to true end user customers and the LEC Defendants have absolute market power over the provision of switched access services; (7) The FCSCs knowingly participated in the scheme that depended upon kickbacks of a portion of switched access charges not authorized by tariff; (8) The Defendants knowingly participated in a scheme that depended upon numerous violations of the Communications Act and Iowa law; (9) Aventure and Audiocom's conduct is likely to confuse parents of minors who have no way of ensuring that their minor children do not call telephone numbers associated with adult and pornographic content; and (10) Defendants' unfair competition has caused Qwest to suffer harm to its business, and is therefore entitled to damages to be determined at trial. Qwest's Second Am. Compl. ¶¶ 142–151, ECF No. 318. In addition, Qwest seeks any non-duplicative gain that the Defendants have obtained from their wrongful conduct.

Under Iowa law, "[t]he doctrine of unfair competition is based on the principle of common business integrity. It goes to the question of a defendant's methods and representations in marketing his products, not to his right to manufacture or produce them." *Basic Chemicals, Inc. v. Benson,* 251 N.W.2d 220, 231 (Iowa 1977) (citing *B.H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1262–63 (5th Cir.1971) ("The gist of unfair competition in Florida is 'palming off.' Actual customer confusion is not a necessary element to the establishment of this claim, but evidence of customer confusion does have probative value on the issue of 'palming off.' ")).

In *Motor Accessories Manufacturing Co. v. Marshalltown Motor Material Manufacturing Co.,* 167 Iowa 202, 149 N.W. 184, 186 (1914), the Iowa Supreme Court set forth the following standard regarding unfair competition claims:

The ground of the action of unfair competition is fraud, and this may be shown by direct testimony, or by facts and circumstances or inferred from the manner in which the business is carried on. *This doctrine is applied in cases where one has established a business under a particular name, or by the use of certain marks or symbols, so that it has become known, in the trade, generally as designating the goods of that person.* Courts of equity will enjoin one who fraudulently assumes the same name, device, or symbol for the purpose of stealing away from the other the business so established, and thereby depriving him of the profit which flows from the business. *The object of the law is to protect the property rights of a person from invasion by one who fraudulently, by the use of the same devices, symbols, or name, seeks to and does take from him the custom, good will, and the business by him established and maintained.* There is no practical way, other than by prohibition to prevent the filch-ing of trade established by one in an article, through a name, symbol, or mark, than by prohibiting the use of the trade name or mark.

In *Johnson Gas Appliance Co. v. Reliable Gas Products Co.,* 233 Iowa 641, 10 N.W.2d 23, 27 (1943), the Iowa Supreme Court further noted that there were "many cases involving unfair competition decided by the State and Federal courts" and that the consensus from those other jurisdictions was the general rule that *"the essence of unfair competition consists in palming off, either directly or indirectly, one person's goods as the goods of another,* and while this involves an intent to deceive, it is not necessary to prove intent by direct evidence, where it is clearly to be inferred from circumstances." (emphasis added).

Qwest asserts the tort of unfair competition has a broader scope as applied by the court in *ProBatter Sports, LLC v. Joyner Technologies, Inc.,* C–05–2045–LRR, 2006 WL 140655, at *3 (N.D.Iowa Jan. 17, 2006). Qwest urges the Court to adopt the definition of unfair competition found in the Restatement (Third) of Unfair Competition § 1, comment g, which is cited in *ProBatter.*

Restatement (Third) of Unfair Competition § 1 (1995) in relevant part states as follows:

One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless:
(a) the harm results ... from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; or
(b) the acts or practices of the actor are actionable by the other under federal or

state statutes, international agreements, or general principles of common law apart from those considered in this Restatement.

Qwest argues that the breadth of the tort is to ensure that the law adequately addresses ever-changing tortious conduct and is elucidated in the comment g to the Restatement, which states in relevant part,

A primary purpose of the law of unfair competition is the identification and redress of business practices that hinder rather than promote the efficient operation of the market.

. . . .

It is impossible to state a definitive test for determining which methods of competition will be deemed unfair. . . . Courts continue to evaluate competitive practices against generalized standards of fairness and social utility. Judicial formulations have broadly appealed to principles of honesty and fair dealing, rules of fair play and good conscience, and the morality of the marketplace. The case law, however, is far more circumscribed than such rhetoric might indicate, and courts have generally been reluctant to interfere in the competitive process. An act or practice is likely to be judged unfair only if it substantially interferes with the ability of others to compete on the merits of their products or otherwise conflicts with accepted principles of public policy recognized by statute or common law.

As a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition. A competitor who interferes with the business of another by acts or threats of violence directed at the other, for example, is subject to liability for unfair competition. So also is one who interferes by institut-

ing or threatening to institute groundless litigation against a competitor.

. . . .

Liability at common law for acts of unfair competition has been supplemented by the widespread enactment of the Unfair Trade Practices and Consumer Protection Act, which commonly prohibits unfair methods of competition and unfair or deceptive acts or practices. The private right of action available under many of these statutes has been pursued primarily as an alternative to traditional contract and tort actions by disappointed purchasers attracted by the generous remedial provisions of the Act. In a number of jurisdictions, however, competitors also have standing to seek redress under the Act for harm to their commercial relations. Application of the Act in this latter context has thus far been generally limited to conduct falling within the traditional categories of unfair competition law. However, the broad substantive standards embodied in many of these statutes provide a flexible statutory counterpart to the general common law proscription against unfair competition.

Restatement (Third) of Unfair Competition § 1 cmt. g (1995).

Qwest avers that it has alleged numerous facts showing the Defendants have engaged in unfair, wrongful business conduct that has a likelihood of confusing consumers into believing the Defendants' services are actually free and has harmed Qwest in its commercial relation by: billing Qwest for access charges that were not authorized by tariffs; violating federal and Iowa law requiring compliance with filed tariffs; entering into secret agreements touting their so called free services to the public; and intentionally abusing the LECs' monopoly power. Qwest refutes Aventure and the FCSCs' assertions that

an unfair competition claim requires competition between the plaintiff and defendant stating that all that is required is competition "of some sort" and, furthermore, the focus of the claim is on the likelihood of confusion element. Qwest argues *ProBatter* and the Restatement recognize that unfair competition can take many forms and that the claim has consequently evolved to protect commercial interest from a myriad of unfair competition. The Court must disagree.

■ The allegations of unfair competition as alleged in Qwest's second amended complaint do not square with the principles for such a claim as established by the Iowa Supreme Court in *Motor Accessories, Johnson Gas,* and *Basic Chemicals,* which all involved competition between the plaintiff and defendant. In *Motor Accessories,* the plaintiff spark plug manufacturer brought an action against a former employee alleging that immediately after leaving the plaintiff's employ, the former employee formed a competing company that manufactured spark plugs containing the same essential and novel features as plaintiff's spark plugs, for which plaintiff had filed a patent application. *Motor Accessories,* 149 N.W. at 185. The plaintiff's complaint alleged, inter alia, that the defendants had taken this action with the intention of profiting by plaintiff's reputation, to deceive the public, and to palm off its spark plugs as those of the plaintiff. *Id.* at 185–86. In *Johnson Gas,* the plaintiff gas appliance manufacturer brought an action against former employees alleging that after leaving plaintiff's employ, the defendants had designed, manufactured, and marketed a furnace identical to plaintiff's product and that they had also taken the names and addresses of plaintiff's customers. *Johnson Gas,* 10 N.W.2d at 25. In *Basic Chemicals,* the plaintiff brought an action against a competing chemical company and its principals alleging the defendants had appropriated and removed

for their benefit the plaintiff's trade secrets and had enticed the plaintiff's employees to join defendants and enter into unfair competition with the plaintiff. *Basic Chemicals,* 251 N.W.2d at 222 (Iowa 1977). Even in *ProBatter,* upon which Qwest relies, which was a federal case applying Iowa law, the plaintiff held two patents on a baseball video pitching simulator and brought an action against a competitor alleging claims for patent infringement, unfair competition, and unfair trade practice. *ProBatter,* 2006 WL 140655, at *1. The defendant alleged counterclaims of non-infringement, unfair competition, and abuse of process. *Id.*

Qwest's unfair competition claim does not allege the LECs or FCSCs are Qwest's competitors. Nor does that claim allege that Qwest had "established a business under a particular name, ·or by the use of certain marks or symbols, so that it has become known, in the trade, generally as designating the goods of that person." *Motor Accessories,* 149 N.W. at 186. Neither does Qwest allege that the Defendants have assumed "the same name, device, or symbol for the purpose of stealing away from the other the business so established, and thereby depriving [Qwest] of the profit which flows from the business." *Id.* As the Iowa Supreme Court articulated, the object of the unfair competition law "is to protect the property rights of a person from invasion by one who fraudulently, by the use of the same devices, symbols, or name, seeks to and does take from him the custom, good will, and the business by him established and maintained." *Id.* Qwest's unfair competition claim makes no such allegations.

■ Qwest's reliance on *ProBatter* is misplaced. As discussed above, the unfair competition claims in that case were between direct competitors and involved, inter alia, allegations of product confusion and patent infringement. *ProBatter,* 2006

WL 140655, at *1. Furthermore, the *Pro-Batter* court looked to the Restatement (Third) of Unfair Competition after mistakenly concluding *Basic Chemicals* was the only Iowa case discussing the tort of unfair competition and that the elements of the tort had not been set forth in that case. *Id.* at *3. As set forth above, the Iowa Supreme Court did set forth the elements of the tort in *Motor Accessories*, 149 N.W. at 186. The Iowa Supreme Court did not look to the Restatement (Third) of Unfair Competition in recognizing the tort, and it would be error for this Court to do so. To the extent *ProBatter* applies a different standard for an unfair competition claim under Iowa law, the Court distinguishes that case.[35]

On this record, Qwest has failed to state a claim of unfair competition under Iowa law and the motions to dismiss this claim filed by Aventure, Free Conferencing, Audiocom, and Hometown will be granted.

**b. Fraudulent Concealment**

In its second amended complaint, Qwest presents over 20 paragraphs, ECF No. 318, ¶¶ 157–177, of factual allegations in support of its fraudulent concealment claim against all LECs (Aventure, Dixon, and Reasnor) and FCSCs (Futurephone, Audiocom, Free Conferencing, and Hometown) Defendants, who were named in Qwest's second amended complaint and remain in this litigation.

Qwest's allegations in support of its claim for fraudulent concealment include that the LECs and the FCSCs have all actively participated in, aided, and abetted a scheme to deliberately conceal the true nature of their business relationships, and to deliberately conceal information that should have been filed with the Iowa Utilities Board and/or the FCC. The alleged concealed information includes, but is not limited to, the terms of their written agreements; the LECs failing their duty to file their agreements with the FCC/IUB; LECs not issuing monthly invoices of its local exchange services to its FCSC partners; FCSCs not paying the LECs for local exchange services; FCSCs not paying services charges for the interstate tariff; the FCSCs not paying sales and other taxes for the services the LECs provided; the FCSCs not paying mandatory telephone related surcharges for services the LECs provided; the LECs not offering local service to their FCSC partners pursuant to local tariffs; LECs' local exchange tariffs not defining the relationships between the LECs and their FCSC partners; the LECs not inputting the FCSCs into their traditional billing systems; the LECs not billing the FCSCs for the right to place equipment in the LECs' central offices; the LECs not billing the FCSCs for their use of power from the LECs' central offices; the FCSCs receiv-

---

**35.** The Court notes that contrary to Qwest's assertion, a claim for unfair competition under Iowa law does contain a fraud element, *see Motor Accessories*, 149 N.W. at 186 ("The ground of the action of unfair competition is fraud, . . ."), which must be plead with particularity under Rule 9(b), *see Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir.2011) ("Under Rule 9(b)'s heightened pleading standard, allegations of fraud . . . [must] be pleaded with particularity. In other words, Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." (alterations in original) (quoting *Summerhill v. Terminix,*

*Inc.*, 637 F.3d 877, 880 (8th Cir.2011))). Although the Court primarily finds that Qwest failed to state a claim of unfair competition under Iowa law, the Court also finds that it is a reasonable extension of the Iowa court's view in *Motor Accessories Manufacturing Co.*, 149 N.W. at 186, that Qwest's unfair competition claim lacks the requisite specificity of time periods or locations and indication of who was making the various alleged representations, and therefore does not satisfy Rule 9(b), and thus is an alternative basis for dismissing Qwest's unfair competition claim. *Id.* at 880.

ing a right to place equipment in the LECs' central offices free of charge; the LECs paying the FCSCs millions of dollars in kickbacks to route traffic to or through the LECs; many of the calls to telephone numbers assigned to the FCSCs not terminating to an end-user customer's premises; none of the FCSCs who conduct business with the LECs actually residing in one of the Iowa communities supported by the LECs; FCSCs not having any employees who reside in the communities supported by the LECs; the FCSCs placing equipment within central offices and the LECs not charging the FCSCs for the power usage; many of the calls destined for telephone numbers the LECs assigned to FCSCs not terminating within one of the LECs' certificated exchanges; the LECs having thousands of telephone numbers at their disposal to assign to FCSCs but actively hiding the quantity of telephone numbers used by FCSCs (Dixon has only 595 access lines, but 10,000 telephone numbers available to it; Reasnor has 10,-000 telephone numbers available to it; and Aventure has at least 9000 telephone numbers available to it); and FCSCs routinely changing the telephone numbers that their participants call for the free services to prevent IXCs from tracking calls destined for FCSCs.

Qwest argues that concealment of these facts made it impossible for Qwest to understand that the calls destined for telephone numbers to which LECs assigned to FCSCs were not being delivered to end users, at end users' premises, over a common line ordered out of the LECs' local exchange tariff, or terminated in one of the LECs certificated exchanges and that without this concealment, Qwest would have known the calls delivered to telephone numbers LECs had assigned to FCSCs did not qualify for switched access charges and Qwest could have made informed business decisions that would have saved it millions of dollars.

Qwest further argues the LECs failed their duty to provide accurate information in support of their bills when such information was requested by Qwest and the FCSCs aided and abetted in the concealment of this information by inducing and substantially assisting the LECs to enter into confidential arrangements, requesting thousands of telephone numbers for the LECs, and frequently changing the telephone numbers they used. Qwest avers that the LECs and FCSCs performed this intentional, willful, and deliberate concealment (1) to induce Qwest and other IXCs to pay the switched access charges billed by the LECs that Qwest and other IXCs would not otherwise have paid; (2) with the expectation and intent that Qwest and other IXCs would rely upon the facts and information disclosed, and the invoices delivered to the IXCs necessarily failed to disclose true facts; (3) caused Qwest and other IXCs to pay the erroneous invoices to the LECs, who then kicked back a portion to the FCSCs; and (4) to induce Qwest and other IXCs to rely upon the same false appearance of the LECs compliance and thereby continue delivering calls to the telephone numbers that the LECs assigned to their FCSC business partners, in the usual manner, such as by delivering calls to the LECs via whole sale carriers through least cost routing principles.

Qwest continues that this deliberate concealment of material facts, and the continued delivery of calls to the LECs through all traditional methods, caused Qwest to pay fees to wholesale carriers, primarily Sprint and AT & T, for a portion of the terminating switched access charges that the LECs charged to the carrier who delivered the call. Qwest avers that the LECs and FCSCs knew about Qwest's use of wholesale carriers and least cost routing principles and yet received payments from

these route carriers for purported switched access even though they were not entitled to those payments under the LECs' tariffs, and that had Qwest delivered the traffic directly rather· than through a wholesale carrier, Qwest would not have paid switched access charges for the traffic. Qwest further alleges the LECs negotiated confidential agreements with AT & T that induced Qwest to route traffic through AT & T to receive the reduced rate AT & T would assess (as opposed to the LECs' higher tariff rate) and that the fraudulent concealment of the LECs and FCSCs caused Qwest significant harm.

Aventure and the FCSCs argue Qwest's fraudulent concealment claim fails to meet the Rule 9 pleading requirements and it fails to state a claim under Iowa law because the LECs had no duty to disclose any of the information that Qwest asserts was concealed. Aventure and the FCSCs argue that the LECs had no duty to disclose the nature and workings of their customer relationships with the FCSCs, including the terms of the agreements, in order to substantiate their bills to the IXCs and that the IXCs do not and cannot point to legal authority creating a duty to reveal contracts with third parties. Aventure and the FCSCs further argue that fraudulent concealment is rarely found between sophisticated business entities and that Qwest is a company with massive revenues and a sophisticated legal department and thus hardly the type of inexperienced party that would be entitled to rely upon small competitive carriers for guidance and advice. The proof that Qwest was not deceived is in Qwest's disputing the bills shortly after calls increased and then seeking self-help in refusing to pay for the LECs services.

Qwest counters that its fraudulent concealment claim is based upon an active concealment of facts making a duty to disclose unnecessary.[36] Qwest argues that

---

36. The Iowa Supreme Court has made the following distinction between actively concealing material information or merely being silent; one is actionable while the other is not:

"The law distinguishes between passive concealment and active concealment, or in other words, between mere silence and the suppression or concealment of a fact, the difference consisting in the fact that concealment implies a purpose or design, while the simple failure to disclose a fact does not. Mere silence is not representation, and a mere failure to volunteer information does not constitute fraud. Thus, as a general rule, to constitute fraud by concealment or suppression of the truth there must be something more than mere silence or a mere failure to disclose known facts. Where there is no obligation to speak, silence cannot be termed 'suppression,' and therefore is not a fraud. Either party may, therefore, be innocently silent as to matters upon which each may openly exercise his judgment.

Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances. In other words, there must be a concealment—that is, the party sought to be charged must have had knowledge of the facts which, it is asserted, he allowed to remain undisclosed—and the silence· must, under the conditions existing, amount to fraud, because it is an affirmation that a state of things exists which does not, and because the uninformed party is deprived to the same extent that he would have been by positive assertion. Concealment or nondisclosure becomes fraudulent only when there is an existing fact or condition, as distinguished from mere opinion, which the party charged is under a duty to disclose.

Concealment in the sense opposed to mere nonactionable silence may consist of withholding information asked for, or of making use of some device to mislead, thus involving act and intention, or of concealing special knowledge where there is a duty to

CLECs like Aventure have a duty to file their IXC agreements, including agreements for access services, and although Aventure would argue FCSCs are not carriers, the FCC has found otherwise. *See In re: Request for Review by Intercall, Inc. of Decision of Universal Serv. Adm'r,* 23 FCC Rcd. 10731, 10736 (2008) ("Indeed, all similarly situated stand-alone audio bridging service providers that offer their services to others for a fee are also providers of telecommunications. . . .").

Qwest further asserts, citing *McLeodU-SA Telecommunications Services, Inc. v. Qwest Corp.,* 469 F.Supp.2d 677 (N.D.Iowa 2007), that concealment by trick or contrivance independently creates a duty to disclose.

The elements of a claim of fraudulent non-disclosure or concealment are essentially the same as the elements of fraud, although the first element requires a false representation or concealment of a material fact when under a legal duty to disclose that fact. Thus, where the fraud was purportedly a nondisclosure or concealment, the claimant must show that the alleged tortfeasor was under a legal duty to communicate the withheld information to prevail (or must so plead to state a claim). Iowa cases have not provided a specific test for determining when a duty to disclose arises in fraudulent nondisclosure cases. They have, however, observed that, to prove the necessary duty to disclose, the plaintiff need not show a fiduciary duty existed, but may, instead, establish that a duty arose from inequality of condition and knowledge, or other circumstances shown by a particular fact situation. Thus, for concealment to be actionable,

the representation must relate to a material matter known to the party . . . which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances. The Iowa Supreme Court has recognized a duty to disclose in situations where the plaintiff and the defendant were involved in some type of business transaction, such as buyer/seller or owner/contractor, but only when the relative knowledge and experience of the parties warrants. The duty to disclose may also arise from the attendant circumstances, such as a contrivance intended to exclude suspicion and prevent inquiry.

*McLeodUSA,* 469 F.Supp.2d at 707–08 (alteration in original) (internal citations and quotation marks omitted); *see also Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 298 F.3d 736, 740 (8th Cir.2002) (noting that Iowa law recognizes a cause of action for fraudulent misrepresentation based on nondisclosure of material facts and that to be actionable, a misrepresentation must "relate to a material matter known to the party . . . which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances." (alteration in original) (quoting *Sinnard v. Roach,* 414 N.W.2d 100, 105 (Iowa 1987))).

Qwest also maintains that even if direct dealing was required between itself and the FCSCs, Qwest is a party to the three-way tariff transaction with the LECs and

---

speak. The term generally implies that the person is in some way called upon to make a disclosure. It may be said, therefore, that in addition to a failure to disclose known facts, there must be some trick or contrivance intended to exclude suspicion and

prevent inquiry, or else that there must be a legal or equitable duty resting on the party knowing such facts to disclose them." *Wilden Clinic, Inc. v. City of Des Moines,* 229 N.W.2d 286, 292–93 (Iowa 1975) (quoting 37 Am.Jur.2d, *Fraud and Deceit* § 145).

their end users; that is, the tariff contemplates a call from the IXC to an end user, the FCSCs, terminated by a LEC. Accordingly, the LECs and FCSCs had special knowledge to which Qwest, a party to this three-way transaction, did not have access because the LECs and FCSCs hid that information. Qwest also refutes the argument that special knowledge duty only applies to inexperienced ' entities, which Qwest is not. *See McLeodUSA,* 469 F.Supp.2d at 708 ("The fatal defect in McLeodUSA's contention that Qwest's fraudulent concealment claims merely rely on a contractual duty is that the duty to disclose material facts does not necessarily arise from contract, either legally or as alleged in this case. Rather, legally, the duty may arise, for example, from inequality of condition and knowledge, or from circumstances attending the parties' relationship, including contrivance intended to exclude suspicion and prevent inquiry. Here, Qwest has alleged that the duty to disclose the true nature of the calls at issue in the fraudulent concealment claims arose, inter alia, from McLeodUSA's sole control of information relating to calls that it sends to Qwest, and Qwest's inability to identify McLeodUSA as the source of call traffic in the absence of proper information, placing the parties in a position of inequality of knowledge. These allegations are sufficient to state the necessary duty for fraudulent non-disclosure claims, independent of any contractual duty." (internal citations and quotation marks omitted)).

█ In its second amended complaint, Qwest summarizes the LECs' and the FCSCs' conduct and pleads active concealment, which suffices to state a ' claim for fraudulent concealment without having to show there was an affirmative duty to disclose. *See Wilden Clinic, Inc. v. City of Des Moines,* 229 N.W.2d 286 (Iowa 1975) (distinguishing between passive and active concealment and reasoning that "[s]ilence,

in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances. In other words, there must be a concealment—that is, the party sought to be charged must have had knowledge of the facts which, it is asserted, he allowed to remain undisclosed—and the silence must, under the conditions existing, amount to fraud, because it is an affirmation that a state of things exists which does not, and because the uninformed party is deprived to the same extent that he would have been by positive assertion."). Based upon the record, Qwest has pled "allegations [that] are sufficient to state the necessary duty for fraudulent non-disclosure claims, independent of any contractual duty." *McLeodUSA,* 469 F.Supp.2d at 708. Aventure and the FCSCs motions to dismiss Qwest's claims for fraudulent concealment are denied.

### c. Tortious Interference with Contract

█ Paragraphs 178–186 of Qwest's second amended complaint set out the following allegations in support of its intentional interference with contract claim brought against Aventure and the FCSCs. Qwest asserts that it has contracts with numerous other long distance carriers, including AT & T and Sprint, that allow Qwest to use these carriers to deliver calls on Qwest's behalf to the LEC Defendants. Qwest alleges that due to LECs and the FCSCs' scheme, Qwest did not have correct information necessary to allow Qwest to make reasoned decisions about the calls that Qwest would itself deliver to the LECs, and those that it should route through other carriers to the LEC. Qwest further asserts that some of the LECs

entered into contracts with AT & T and/or other IXCs to charge these IXCs less than the LECs' tariff rates for switched access services, understanding that this would lead other long distance carriers like Qwest to least cost route traffic through AT & T or other carriers to the LECs and that these agreements were executed because the LECs and the FCSCs all knew it would lead to Qwest and other long distance carriers routing more traffic through AT & T as a wholesale carrier, thereby increasing their unjustifiable revenue stream. Qwest argues that the LECs and the FCSCs' tortious conduct intentionally and improperly interfered with Qwest's ability to take advantage of the full rights extended to Qwest under the contracts, which has decreased the value of those contracts to Qwest, and because these contracts are commonplace in the industry, the LECs and the FCSCs knew or should have known of the existence of provisions in these contracts that give Qwest the ability to deliver calls itself or through other IXCs. (Qwest notes that Free Conferencing commissioned a purported study that made reference to such agreements.) Qwest concludes the LECs and the FCSCs had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of wholesale carriage by long distance carriers.

Aventure and the FCSCs argue Qwest's tortious interference with contract claim should be dismissed for failure to state a claim, specifically, the facts alleged do not detail that Aventure (or the FCSCs) knew of Qwest's contract with AT & T, Aventure had a confidential agreement with AT & T, or that Aventure had any intention of improperly interfering with the Qwest–AT & T contract. Aventure argues, at most, Qwest has alleged that Aventure entered into a contract with AT & T to increase its own revenues, which even if factually correct, fails to state a claim for tortious interference. *See Green v. Racing Ass'n*

*of Cent. Iowa,* 713 N.W.2d 234, 244 (Iowa 2006) ("[I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor or motive carries little weight towards producing any determination that the interference was improper." (quoting *Berger v. Cas' Feed Store, Inc.,* 543 N.W.2d 597, 599 (Iowa 1996) (quoting the Restatement (Second) of Torts section 767 comment d))).

Qwest resists arguing the facts alleged in its second amended complaint clearly meet the pleading standard to place Aventure (and the FCSCs) on notice of the claim and to show the claim's plausibility. Qwest also rejects the argument that Aventure's below tariff contracts with AT & T are legal and legitimate noting that Aventure alleges it has a filed interstate access tariff; accordingly, the tariff governs the carrier-customer relationships and precludes Aventure from negotiating separate agreements that affect the rate for services once a tariff has been filed. *See All American I,* 26 FCC Rcd. at 730 n. 47 (reiterating "the undisputed notion that tariffs govern carrier-customer relationships and that 'parties are precluded from negotiating separate agreements that affect the rate for services once a tariff has been filed'" (quoting *Seventh Report and Order,* 16 FCC Rcd. at 9934 n. 71)); *see Advamtel, LLC v. AT & T Corp.,* 118 F.Supp.2d 680, 688 (E.D.Va.2000) ("Once a tariff has been validly filed with the FCC, the parties are precluded from negotiating any separate agreements that affect the rate for which services are charged.").

■ The tort of intentional interference with contract has the following elements: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the

contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 151 (Iowa 2013) (quoting *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008)). Qwest alleges it had least cost routing contracts with AT & T, Aventure and the FCSCs knew of those contracts, Aventure interfered with those contracts by surreptitiously entering into its own contract with AT & T, and damaging Qwest. These allegations are sufficient at the pleading stage and meet the *Iqbal* and *Twombly* plausibility standard. *See Hamilton v. Palm*, 621 F.3d 816, 817 (8th Cir.2010) (" '[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.' " (quot-

ing *Iqbal*, 129 S.Ct. at 1949)). "As the Court held in *Twombly*, 550 U.S. at 544, 127 S.Ct. 1955, the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). Aventure and the FCSCs' motions to dismiss Qwest's tortious interference with contract claim is denied.[37]

#### d. Civil Conspiracy

Qwest sets forth the following factual allegations in support of its claims for civil conspiracy against the LECs and the FCSCs in paragraphs 184–194 of its second amended complaint, ECF No. 318. The LECs agreed with their respective FCSC partners to illicit arrangements to violate numerous federal and state Communications statutes and rules, to compete

---

**37.** In its reply brief, Free Conferencing asserts that if, as Qwest argues, liability for violations of the Communications Act by the LECs can and will be imputed to the FCSCs, then any duty the FCSCs have arises under the Communications Act, which preempts Qwest's state law claims. However, Free Conferencing goes on to assert such vicarious liability is foreclosed by the plain language of the Communications Act. *See* 47 U.S.C. § 207 ("Any person claiming to be damaged by *any common carrier subject to the provisions of this chapter* may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies." (emphasis added)).

Free Conferencing next asserts that if the duty upon which the state law claims are based arises under the Communications Act, those claims are preempted. *See Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 678 (8th Cir.2009) ("Accordingly, if [the CLEC]'s purported state law claims, in actuality, seek

recovery for [the ILEC]'s alleged breach of duties imposed by sections 251 and 252 of the [Communications] Act, then [the CLEC]'s recourse was to bring claims pursuant to the Act, not [state] common law."). Free Conferencing misreads *Firstcom*.

The *Firstcom* court instructs that the Act does not *create* a common law cause of action, rather, *if* a cause of action *arises because of* provisions of the Act, the Act provides the only remedy. *See id.* (" 'The Act provides: "Nothing in [chapter 5 of title 47] ... shall in any way abridge or alter the remedies *now existing at common law or by statute,* but the provisions of this chapter *are in addition to such remedies."* (emphasis added) (quoting 47 U.S.C. § 414)). Therefore, § 414 "merely preserves *existing* state-law remedies" and does not create state law remedies for breaches of duties imposed by the Act.' " (first, second, and third alterations in original). The *Firstcom* court found the CLEC's negligence claim against the IXC alleged a breach of duty that arose under the Act, and was, therefore, preempted. *Id.* However, the court reasoned that the CLEC's other state law claims were not premised on a violation of the Act, and were not preempted. *Id.* at 678–79.

unfairly, to tortiously interfere with Qwest's contracts, and to fraudulently conceal material facts. Qwest alleges the facts showing numerous actions in concert in furtherance of the defendants' agreement included (I) the FCSCs would place equipment behind LECs' switches; (ii) LECs would assign telephone numbers to the FCSCs; (iii) LECs would bill Qwest and other long distance carriers for access charges on long distance calls that were routed to or through the FCSCs; (iv) the FCSCs would advertise services designed to increase volumes of traffic routed through LECs' switches; (v) LECs would bill the long distance carriers for switched access even though the calls did not qualify for such charges; and (vi) LECs would share an agreed-upon portion of the ill gotten switched access charges with its FCSC partners. LECs' conduct in billing Qwest for access services for these calls violates the terms of LECs' interstate and intrastate access tariffs, LECs' local exchange tariff, as well as federal and state law.

■■ Qwest alleges (1) the LEC—FCSC agreements constitute agreements to take unlawful actions; (2) the LEC—FCSC agreements constitute a civil conspiracy or conspiracies, and the LECs and the FCSCs are liable for the harm caused by the unlawful acts taken in furtherance of the conspiracy; and (3) the unlawful actions taken during and in furtherance of the unlawful LEC—FCSC agreements have injured Qwest. Qwest alleges the LECs and the FCSCs' conduct was intentional, fraudulent, and/or malicious toward the rights of Qwest, and therefore it seeks and is entitled to punitive or exemplary damages.

Aventure and the FCSCs argue the civil conspiracy claim fails because the claim is really a claim for multiple conspiracies, yet fails to plead any specific agreement between defendants, that is, the IXCs im-

properly attempt to hold each defendant liable for the other defendants' alleged conspiracy. Aventure and the FCSCs allege that the second reason the claim fails is because a civil conspiracy must be based upon underlying unlawful actionable conduct and the *Connect America Order* clearly demonstrates that the underlying agreements were not illegal, thus not conspiracies.

■■ Qwest resists arguing its second amended complaint is replete with allegations of independent tortious conduct, criminal misconduct, and statutory violation including: violations of the Communications Act; unfair competition, tortious interference, and fraudulent concealment. Qwest alleges it need not plead the agreement element with particularity because agreements are often clandestine and not information the plaintiff can plead with precision. Nonetheless, Qwest argues the factual allegations in its second amended complaint show the defendants agreed with their respective business partners to engage in a common scheme for the unlawful purposes alleged throughout the second amended complaint, actually committed tortious acts in concert in furtherance of the agreement, and thereby caused Qwest damage and injury. Qwest further distinguishes that some of the arguments raised in Aventure and the FCSCs' challenges to the civil conspiracy count do no more than take issue with the *form* of the claim; improper form could be corrected by a motion for more definite statement and therefore is not the basis for dismissal. Qwest argues the claim does allege specific LECs partnered with Audiocom and Free Conference, and thus, contrary to their arguments, Qwest *does not* attempt to impose joint liability on all defendants for all defendants' conspiracies. Regarding the necessary element of an underlying tort to maintain a claim of civil conspiracy, Qwest

alleges five torts—*see* counts three, five, six, eight, and nine—and that the FCSCs ignore they are jointly and severally liable for violations of the Communications Act, the claims under which sound in tort.

"Under Iowa law, '[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful.' Under this theory of liability, 'an agreement must exist between the two persons to commit a wrong against another.'" *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 172 (Iowa 2002).

*Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 172 (Iowa 2002).

"Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy [that] give rise to the action." Thus, conspiracy is merely an avenue for imposing vicarious liability on a party for the wrongful conduct of another with whom the party has acted in concert. Thus, the wrongful conduct taken by a co-conspirator must itself be actionable.

*Id.* at 172 (internal citations and quotation marks omitted). "Although our cases applying a civil conspiracy theory involve agreements to commit an intentional tort, [citing cases involving interference with contract, fraud, and unfair competition], our court has never held that a claim of civil conspiracy must be based on such an agreement." *Id.* (concluding, inter alia, that a "plaintiff may base a claim of civil conspiracy on wrongful conduct that does not constitute an intentional tort. Such underlying acts must, however, be actionable in the absence of the conspiracy").

Based upon the record, Qwest has sufficiently pled a cause of action for civil conspiracy under Iowa law.

#### e. Unjust Enrichment

Qwest alleges in support of its claim for unjust enrichment, simply that Defendants, through their wrongful, improper, unjust, fraudulent, and unfair conduct, have reaped substantial and unconscionable profits from Qwest through LECs' tariffs and have all received monies from Qwest to which they are not entitled. Therefore, in equity and good conscience, it would be unjust for Defendants to enrich themselves at the expense of Qwest.

Aventure and the FCSCs [38] argue that Qwest's unjust enrichment claims fail to state a claim and should be dismissed. They assert that the "monies" to which the Qwest refers are the very few access charges that they actually paid before engaging in self-help, and the claim stands in direct contravention with the FCC's determination in the *Connect America Order* that tariffed access charges apply to the traffic at issue in this case. Aventure and the FCSCs assert that the *Connect America Order* made it clear that access minutes terminated to the LEC and the LEC is entitled to access revenues and that the access service provided by LECs like Aventure to IXCs like Qwest and Sprint, is both valuable and compensable by expressly rejecting IXCs request to adopt arbitrary de minimis rates or to apply a bill-and-keep regime.

Qwest resists arguing Aventure and the FCSCs base dismissal of the unjust enrichment claim on the same misconstruction of the *Connect America Order* they apply in connection with other claims. Qwest counters that Aventure and the FCSCs' assertions that the *Connect America Order* found traffic pumping LECs are not unjustly enriched because IXCs are compensated by their long distance customers for delivering calls to the LECs

---

**38.** Free Conferencing did not move to dismiss the unjust enrichment count.

was expressly rejected by the FCC. *See Connect America Order,* 26 FCC Rcd. at 17876 n. 1090 ("Whether the IXC's revenues for a call are more or less than its cost of terminating the call is not at issue. The question is whether just and reasonable rates are being charged for the provision of interstate switched access services." (citing 47 U.S.C. § 201(b))). Qwest reiterates that the *Connect America Order* expressly stated that it did not overrule its prior rulings in *Farmers II* and *Farmers Recon. II* or its *Northern Valley* decisions, and thus Aventure is not entitled to compensation from Qwest on any theory and was unjustly enriched by payments made on ˙FCSC traffic. Qwest asserts, therefore, it meets the necessary elements of an unjust enrichment claim.

> Recovery based on unjust enrichment can be distilled into three basic elements of recovery. They are: (1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances.

*State, Dep't of Human Servs. ex rel. Palmer v. Unisys Corp.,* 637 N.W.2d 142, 154–55 (Iowa 2001) (footnotes omitted).

Based on the record and at the procedural stage of the litigation, Qwest has stated claims for unjust enrichment that meet the plausibility standard. Aventure and the FCSCs' motions to dismiss these counts must be denied.

### B. Qwest's Motion for Judgment on the Pleadings on Non–Tariff Counterclaims

Qwest moves for judgment on the pleadings on all Communications Act, unjust enrichment, and quantum meruit/implied contract counterclaims brought against Qwest by LEC Defendants Aventure and Dixon, and FCSC Defendants Free Conferencing and Futurephone (collectively, Counterclaimants).

### 1. Standard for Motion for Judgment on the Pleadings

Under Rule 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). A motion for judgment on the pleadings under Rule 12(c) is evaluated using the same standard used to evaluate a motion to dismiss under Rule 12(b)(6). *Gallagher v. City of Clayton,* 699 F.3d 1013, 1016 (8th Cir.2012); *Clemons v. Crawford,* 585 F.3d 1119, 1124 (8th Cir. 2009); *Ashley Cnty., Ark. v. Pfizer, Inc.,* 552 F.3d 659, 665 (8th Cir.2009). "A grant of judgment on the pleadings is appropriate 'where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law.'" *Poehl v. Countrywide Home Loans, Inc.,* 528 F.3d 1093, 1096 (8th Cir.2008) (quoting *Faibisch v. Univ. of Minn.,* 304 F.3d 797, 803 (8th Cir.2002)).

### 2. Communications Act Claims

Qwest argues the Counterclaimants' Communications Act claims are premised on Qwest not paying switched access charges the LECs billed to Qwest for tariffed switched access charges on calls destined for telephone numbers the LECs assigned to the FCSCs. Qwest asserts that these charges were not covered by tariff, as the tariffs specifically define long distance carriers who deliver calls to the LEC pursuant to access tariffs—such as Qwest—as the LEC Defendants' "customers." The counterclaims allege that Qwest had an obligation to pay these invoices in its role as "customer" of the LECs' tariffs and violated the Communications Act by disputing these invoices and refusing to pay.

■ The Commission addressed this issue in *All American I* and held that claims pursuant to the Act are limited to claims by a customer against the carrier who provided it with service, not the other way around:

> During the past twenty years, the Commission has repeatedly held that an allegation by a carrier that a customer has failed to pay charges specified in the carrier's tariff fails to state a claim for violation of any provision of the Act, including sections 201(b) and 203(c)— even if the carrier's customer is another carrier. These holdings stem from the fact that the Act generally governs a carrier's obligations to its customers, and not vice versa. Thus, although a customer-carrier's failure to pay another carrier's tariffed charges may give rise to a claim in court for breach of tariff/contract, it does not give rise to a claim at the Commission under section 208 (or in court under section 206) for breach of the Act itself.

*All American I*, 26 FCC Rcd. at 727 & n. 32 (footnotes omitted) (citing cases).

> In sum, all three of the CLECs' claims rest on the assertion that AT & T's failure to pay their tariffed access charges violates section 201(b) and/or section 203(c) of the Act. That assertion is erroneous. *The law is settled that a carrier-customer's failure to pay tariffed access charges does not violate either section 201(b) or section 203(c) of the Act. Accordingly, all three of All-American's claims must be denied for failure to state a claim cognizable under section 208 (or any other provision) of the Act.*

*Id.* at 732 (emphasis added). Qwest argues that the FCC's interpretation requires this deference regardless of whether the FCC departs from previous precedents. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) ("Chevron's [39] premise is that it is for agencies, not courts, to fill statutory gaps.... The better rule is to hold judicial interpretations contained in precedents to the same demanding Chevron step one standard that applies if the court is reviewing the agency's construction on a blank slate: Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.... [W]hether Congress has delegated to an agency the authority to interpret a statute does not depend on the order in which the judicial and administrative constructions occur."). According to Qwest, the FCC's *All American* decisions provide the FCC's reasoning for having already found numerous times that the Communications Act does not support claims against carriers in their role as customers, and for overruling a previous FCC decision.

The counterclaims at issue allege Qwest violated §§ 201, 202, or 203(c) of the Communications Act. Futurephone also alleges a Section 201(a) counterclaim claiming that Qwest refused to provide service to Futurephone and its end users. Specifically, Futurephone alleges that Qwest's withholding of payment from the LECs is tantamount to an unreasonable denial of service. In other words, Futurephone's 201(a) claim is effectively identical to its 201(b) claim.

*All American I* expressly held that the IXC's withholding of payment of tariffed charges "fails to state a claim for violation

---

**39.** *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

of any provision of the Act." *All American I*, 26 FCC Rcd. at 724, 726, 731. In addition, the Commission also recognizes that an IXC purchasing a terminating LEC's access service does not thereby provide service to the terminating LEC's customer; rather, the IXC provides long distance service to its own long distance customer that placed the call. *See, e.g., YMax*, 26 FCC Rcd. at 5753–55 ("[S]witched access is a wholesale service provided to IXCs ... as an input to the end-to-end long distance service they provide to their 1+ and 8YY customers....."). In *N. Valley II*, 26 FCC Rcd. at 10786–87, the FCC held that a LEC's attempt to deny long distance carriers the ability to withhold payment and dispute charges itself independently contravenes §§ 206 and 208 of the Act and therefore violates § 201(b). Qwest asserts that Counterclaimants' arguments that a decision to withhold payment violates the Act is not only wrong, the argument—if successful—would violate the Act and therefore these claims simply cannot stand.

At the time these motions were briefed, Qwest dismissed the Defendants' reliance on the possibility of reconsideration in *All American I* noting it was irrelevant to the deference owed the decision. This argument is moot since the Commission denied reconsideration in *All American*, reiterating that the two referral questions—(1) "Did AT & T violate § 201(b), § 203(c), or any other provision of the Communications Act by refusing to pay the billed charges for the calls at issue?"; and (2) "Did AT & T violate any provision of the Communications Act by refusing to pay the billed charges for the calls at issue and not filing a rate complaint with the FCC?"—had both been answered and that "the answer

to both of the Court's questions addressed in this Order is 'no.' AT & T did not violate sections 201(b), 203(c), or any other provision of the Communications Act by refusing to pay the billed charges for the calls at issue, regardless of whether it filed a rate complaint with the FCC. Accordingly, the CLECs' claims are denied." *All Am. Recon. I*, 28 FCC Rcd. at 3470. The final order in the *All American* case forecloses the Defendants' argument that the FCC has not made a final decision on the issue.[40]

Aventure asserts that Qwest's argument that LECs cannot assert Communications Act claims against an IXC when the IXC is acting in the role of an unregulated customer of LEC services applies to carriers only, so Qwest's motion against the non-carriers must be denied summarily. Aventure contends Qwest's assertion that LECs can only collect access charges from IXCs via a tariff or a negotiated contract because that is the regulatory structure the FCC has imposed on LECs is without legal substance. Citing authority that is several decades old, Aventure argues Qwest's interpretation of *All American* as standing for the proposition that a refusal by an IXC to pay tariffed charges does not violate §§ 201(b) and 203(c) of the Communications Act is contrary to precedent. Aventure quotes a large section of the Supreme Court's *Global Crossing*, 550 U.S. at 55–56, 127 S.Ct. 1513 (discussing long distance carriers' requirement to pay compensation to payphone owners), and argues that the Supreme Court therein refuted the long distance carrier's assertion that § 201(a) and (b) concerned only practices that harm carrier customers, not carrier suppliers as not what those sections, nor history, showed. Aventure con-

---

**40.** Aventure's now-outdated resistance argued that Qwest could not rely on *All American* or *N. Valley* because they were not final orders and thus not entitled to *Chevron* deference. To the extent that was ever correct, *All American* and *N. Valley* are now final and that argument is foreclosed.

cludes, therefore, either Qwest's interpretation of *All American* is incorrect, or the *All American* order is itself in error.

In reply, Qwest rejects Aventure's assertion that *All American* is contrary to legal precedent noting that the precedent cited is distinguishable, it is not binding on the FCC, and the FCC specifically distinguished the cases Aventure cites. Qwest further distinguishes that the cases Aventure cites simply state that customers are obligated under the Communications Act to pay the tariff rates of tariffed services received, which is different than asserting, as the Counterclaimants do here, that § 206 provides a private right of action. Further, Qwest notes that *All American I* specifically addresses the very arguments Aventure now raises, specifically distinguishing the issues in *Global Crossing* from those present in *All American I*, the same issues that are before this Court now.

> The CLECs also rely on several Commission orders and a court opinion holding that a carrier's failure to pay per-call compensation to payphone service providers in accordance with the Commission's payphone compensation rules constitutes a violation of section 201(b) of the Act. In the CLECs' view, if a carrier's failure to pay per-call compensation to payphone service providers is a violation of section 201(b), then surely a carrier's failure to pay access charges is such a violation, as well.
>
> The Commission has already explained why the payphone analogy raised by the CLECs fails. The Act requires the Commission to adopt rules ensuring that payphone service providers receive compensation for every completed call originated from their payphones. To implement that statutory directive, the Commission adopted rules requiring certain carriers to pay to originating payphone service providers a fixed amount for each completed payphone

call handled by those carriers. In subsequent decisions, the Commission held that a carrier's failure to pay the amount required to be paid by the Commission's payphone compensation rules constitutes a violation of our payment rules and a violation of section 201(b) of the Act.

> *By stark contrast, the provisions of the Act and our rules regarding access charges apply only to the provider of the service, not to the customer; and they govern only what the provider may charge, not what the customer must pay. Thus, failure to pay does not breach any provisions of the Act or Commission rules.*

*See All American I*, 26 FCC Rcd. at 730–31 (emphasis added) (footnotes omitted).

Despite this adverse authority, Aventure argues that *All American* was responding to referral questions as to whether the IXCs' refusal to pay violated §§ 201 and 203, therefore Qwest seeking dismissal of counterclaims under other provisions of the act were not expressly addressed by *All American* and Qwest cannot extend that holding to provide the bases for dismissal of the other Communications' Act counterclaims.

Again, arguments relating to the *All American* decisions (then) lack of precedential or binding effect are now moot because the final order has issued. Aventure further attacks Qwest's argument that the LECs may not pursue Communications Act or equitable claims against it, but does not address how non-LECs are subject to the FCC's *All American* and *N. Valley* decisions. That is, it is axiomatic that the FCC's regulatory authority extends only to the regulated common carriers and therefore FCSCs are not subject to the FCC's authority, or to the dictates of §§ 206 and 208. Aventure argues because Qwest has not made a prima facie

showing that its legal arguments apply to non-LEC parties, its motion for judgment on the pleadings should be summarily denied.

The Counterclaimant's arguments have been foreclosed by final decisions by the Commission. Qwest's Motion for Judgment on the Pleadings as to the Communication Acts Counterclaims must be granted.

### 3. Unjust Enrichment and Quantum Meruit Counterclaims

Qwest also moves for judgment on the pleadings on Defendants' alternative claims that if the LECs' tariffs do not apply to the FCSC traffic, they assert claims for unjust enrichment and implied contract (or quantum meruit). Qwest points out that some of the Defendants (it appears Reasnor is the only one left) even moved to refer issues to the FCC based on these counterclaims, asserting that if the tariffs do not apply, the FCC needs to determine the circumstances that will allow the LECs to recover in the absence of the tariff. Qwest argues for judgment on the pleadings on these counterclaims because in the *Northern Valley* cases the FCC addressed this exact issue and held that ILECs can only recover through tariffs and CLECs can only recover through tariffs or negotiated contracts:

> Since 1997, CLECs have been allowed to assess interstate switched access service charges upon IXCs [long distance carriers] either by filing tariffs with the Commission or by negotiating contracts with the affected IXCs. (In contrast, incumbent local exchange carriers ('ILECs') may assess interstate switched exchange access charges only by filing federal tariffs.)

*N. Valley II,* 26 FCC Rcd. at 10782; *see also N. Valley I,* 26 FCC Rcd. at 8335 ("In contrast to ILECs, CLECs may impose interstate access charges either through tariffs or contracts negotiated with IXCs."). Likewise if the service in question is not switched access under FCC rules because, for example, there was no end user customer who received the calls, the FCC has held that LECs can only recover from long distance carriers though negotiated contract. *N. Valley I,* 26 FCC Rcd. at 8338 (citing *In re: CLEC Access Charge Reform (Eighth Report and Order),* 19 FCC Rcd. 9108, 9114 (2004)).[41] These cases thus reiterate the FCC's analysis and holding in *Sprint PCS* and the *Eighth Report and Order.*

Qwest argues that in these cases, the FCC states that the Act requires the filing of access tariffs that contain applicable rates, terms, and conditions. *N. Valley I,* 26 FCC Rcd. at 8338 (citing 47 U.S.C. § 203(a); *In re: Tariff Filing Requirements for Interstate Common Carriers,* 7 FCC Rcd. 8072, 8072–73 (1992); *In re: Hyperion Telecomms., Inc.,* 12 FCC Rcd. 8596, 8596–8601 (1997)). *See also YMax,* 26 FCC Rcd. at 5748 ("Consistent with these statutory provisions, a carrier may lawfully assess tariffed charges only for those services specifically described in its applicable tariff."). Thus, the only way the LEC Defendants can charge Qwest is under the express terms of their respective tariffs (which must also comport with federal law), or for CLECs, through a negotiated contract.

■ Although the CLECs have the option of negotiating contracts, once a CLEC files a tariff, negotiating contracts is no longer an option for interstate access. *See All American I,* 26 FCC Rcd. at 730 n. 47

---

41. As stated, CLECs, not ILECs, can negotiate rates; nonetheless, even if ILECs had the ability to charge via negotiated contracts, neither of the ILECs remaining in this case—Dixon and Reasnor—allege having negotiated contracts with Qwest.

("[P]arties are precluded from negotiating separate agreements that affect the rate for services once a tariff has been filed" (quoting *Seventh Report and Order*, 16 FCC Rcd. at 9934 n. 71)). *See also XChange Telecom Corp. v. Sprint Spectrum L.P.*, No. 1:14–cv–54 (FLS/CFH), 2014 WL 4637042, at *5 (N.D.N.Y. Sept. 16, 2014) ("The 'filed rate doctrine,' then, 'forbids a regulated entity [from] charg[ing] rates for its services other than those properly filed with the appropriate federal regulatory authority.' " *Marcus v. AT & T Corp.*, 138 F.3d 46, 58 (2d Cir. 1998) (alterations in original) (quoting *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981))). In other words, "[u]nder the filed-rate doctrine, federal law preempts claims concerning the price at which service is to be offered, and ... claims concerning the services that are offered." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 711 (5th Cir.1999) (citing *AT & T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222–23, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998)). *See also Iowa Network Servs.*, 466 F.3d at 1097 ("Under [the filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer." (quoting *Evanns*, 229 F.3d at 840)); *Freedom Ring Commc'ns, LLC v. AT & T Corp.*, 229 F.Supp.2d 67, 70 (D.N.H.2002) ("[LEC] BayRing also argues that the filed rate doctrine has been 'fundamentally changed' by recent FCC rulings, which apparently allow certain communications carriers to enter negotiated agreements with other carriers in lieu of filing tariffs. Regardless of whether the application of the filed rate doctrine is altered in such circumstances, an issue which [the court] need not discuss here, BayRing simply does not allege that a non-tariff based, negotiated agreement exists in this case. To the contrary, BayRing expressly states that the rates, terms, and conditions of its filed tariffs govern the contractual relationship between BayRing and AT & T."); *Advamtel*, 118 F.Supp.2d at 688 n. 24 ("Plaintiffs' reliance on FCC discussions of permissive detariffing as permitting off-tariff contracts fails.... Permissive detariffing permits carriers to file tariffs and thus be bound by the rate established therein or, alternatively, to negotiate separate agreements in lieu of, or rather than, filing tariffs").

Qwest asserts, therefore, the FCC has plainly held that ILECs (and CLECs who have a filed tariff) cannot collect interstate access charges other than by meeting the terms of their filed tariffs, and CLECs who have not filed a tariff can only charge IXCs by negotiating contracts for the delivery of calls to FCSCs. There are no other bases for obtaining compensation on switched access services. Moreover, if the service in issue is not switched access service—because it does not comport with FCC rules—the only way in which LECs can recover from long distance carriers is through negotiated contract.

■ In this case, the unjust enrichment and quantum meruit counterclaims [42] allege the very same access services for which the LECs billed Qwest under their tariffs. Since all of the LEC Defendants

---

**42.** Qwest cites *Iowa Network Services, Inc. v. Qwest Corp.*, 385 F.Supp.2d 850, 909–910 (S.D.Iowa 2005) (citing *Iowa Waste Sys., Inc. v. Buchanan Cty.*, 617 N.W.2d 23, 29–31 (Iowa Ct.App.2000)), noting that it has been previously delineated that under Iowa law, quantum meruit is a contract law claim for implied-in-fact contracts, requiring proof of assent and all other elements of a contract, while unjust enrichment lies in equity and instead requires the elements of a benefit received unjustly at the expense of another.

allege that they have filed interstate access services tariffs, the only way they can recover from Qwest is via tariff. This precludes not only the LEC Defendants from claiming unjust enrichment or implied contract, but also the FCSC Defendants, whose claims assert that Qwest should have paid the LEC Defendants' tariff invoices.

Qwest alternatively argues that even if it were possible for the LEC Defendants to ignore their filed tariffs, none of the Counterclaimants allege negotiated contracts with Qwest. Those who style their claims as quantum meruit or implied contract do not allege any negotiation or negotiated instrument governing the relationship. Moreover, the constructive ordering doctrine requires that the service in question be covered by the express terms of the tariffs. *See Alliance Commc'ns Co-op., Inc. v. Global Crossing Telecomms. Inc.,* 663 F.Supp.2d 807, 821 (D.S.D.2009) ("[F]or a party to be deemed to have constructively ordered services, it must have actually received the services offered under the applicable tariff."). Thus, the only way a constructive ordering claim can survive is if the tariff covers the service in question—and thus the doctrine cannot support an implied contract claim.

For these reasons, Qwest asserts that the unjust enrichment and quantum meruit/implied contract counterclaims (and requests for declaratory judgment thereof) fail as a matter of law based on *N. Valley I* and *N. Valley II,* and the authorities the FCC cited therein.

Aventure attempts to distinguish the *N. Valley* decisions arguing in those cases, the FCC addressed specific tariff language and required the LEC to change tariff language and to refile its tariff, but the orders did not address state law quasi-contract or other equitable claims. Aventure further contends that not only do the *N. Valley* orders not establish that LECs can never pursue equitable relief in federal court, but such an interpretation is flatly inconsistent with FCC and federal court precedent and that where there is no tariff, federal courts have found equitable relief is available.

Qwest replies that *All American* is dispositive on not just some, but all counterclaimants' Communications Act claims. Qwest clarifies that contrary to Aventure's assertion, the referred question in *All American* was whether AT & T violated §§ 201(b), 203(c), or any other provision of the Communications Act and that the FCC answered that question in full: "AT & T did not violate sections 201(b), 203(c), or any other provision of the Communications Act by refusing to pay the billed charges for the calls at issue, regardless of whether it filed a rate complaint with the FCC. Accordingly, the CLECs' claims are denied." *All American I,* 26 FCC Rcd. at 726; *All Am. Recon. I,* 28 FCC Rcd. at 3470. Furthermore, a violation of §§ 201 or 203 hinges on an analysis of §§ 206 and 208, which define the right of action and the FCC's authority to adjudicate claims that a carrier has somehow allegedly violate the Communications Act itself. Qwest also disputes Aventure's argument that the FCSCs' claims can proceed because *All American* did not address a claim brought by a third party, noting that the issue before the FCC was not who the plaintiff was, but who was the proposed defendant. Qwest notes that in these related traffic pumping cases, the counterclaimants are all suing the IXCs not for its conduct in providing service, but for its conduct as a customer of the LECs. As such, the FCC stated, depending on the terms of the tariff, withholding payment of disputed tariff charges may breach a tariff, but is not actionable as a private cause of action for violation of the Communications Act. Thus, it does not matter whether the plaintiff was a carrier or a third-party FCSC.

Qwest argues that to avoid the bar to a Communications Act claim, Futurephone attempts to recast Qwest's service provision by asserting (1) Qwest withheld payment from the LECs in its *provision* of service, thus Qwest and the LEC jointly provided long distance service, and (2) Qwest blocked its calls to the telephone numbers the LECs assigned it. Qwest counters these arguments noting that the IUB found, following an exhaustive hearing on the matter, that Qwest did not block any calls to any of the LECs.

There are two forms of self-help at issue here: the first is [Qwest]'s and Sprint's actions in withholding payment of disputed access charges and the second is [Qwest]'s and Sprint's alleged call blocking.

With respect to the first form of self-help, the Board finds that unilaterally withholding payment is not a preferred form of dispute resolution in economic disputes between carriers unless it is clearly contemplated under the applicable dispute resolution provisions, which it was not in this case. However, based on the rulings the Board has made regarding the tariff compliance issues, specifically that terminating intrastate access charges were improperly assessed to the IXCs in this case, no money within the Board's jurisdiction is owed by [Qwest] or Sprint to Reasnor or to any other Respondent and there is no need for any remedy in this case.

With respect to the allegations of call blocking, the Board finds that there is not credible evidence in the record to support a finding that [Qwest] engaged in call blocking. The record indicates that [Qwest] was acting as a least cost router for a number of other IXCs. Under least cost routing arrangements, IXCs contract with other carriers who can deliver toll traffic to certain locations at lower cost. [Qwest] states that when conferencing traffic began to peak,

[Qwest] sent notices to IXCs stating that it would no longer be the least cost router to certain exchanges in Iowa. The Board finds that if there were undelivered calls to Reasnor, it is possible that this occurred after [Qwest] ceased delivering calls as a least cost router for another carrier, which would not be an instance of call blocking.

*Qwest Commc'ns v. Superior Tel. Coop. (IUB Sept. 2009),* Docket No. FCU–07–2, slip op. at 32, 2009 WL 3052208 (Sept. 21, 2009). Qwest further notes that in *All American,* the FCC distinguished cases where carriers and LECs were jointly providing service from the present traffic pumping cases where the LECs argued the long distance carriers were barred from withholding payment.

Qwest further argues that the referrals in the traffic pumping cases ask both if the traffic to FCSCs does not qualify for access charges under the LEC's tariff is the LEC nonetheless entitled to compensation by some other vehicle. *N. Valley's* final decision spoke directly to both questions. It defies credulity that the LECs continue to maintain, despite consideration of these very traffic pumping cases by various tribunals, that the resounding theme at the very core of the matter—if the tariff access charges do not apply, are the LECs nonetheless entitled to *some* compensation—has somehow been missed by all those tribunals. It has not; the answer is no.

Qwest's Motion for Judgment on the Pleadings as to the unjust enrichment and quantum meruit counterclaims must be granted.

## V. CONCLUSION

For the reasons stated,

1. Reasnor's Motion to Dismiss Qwest's Amended Complaint, ECF No. 250, must be **denied;**

2. Free Conferencing's Motion to Dismiss Counts Six, Eight, Nine, and Ten of Qwest's Second Amended Complaint, ECF No. 254, is **granted** in part, and **denied** in part. The Motion is **granted** as to Count Six of Qwest's Second Amended Complaint and **denied** as to Counts Eight, Nine, and Ten of Qwest's Second Amended Complaint;

3. Audiocom's Motion to Dismiss Counts Six, Eight, Nine, Ten, and Eleven of Qwest's Second Amended Complaint, ECF No. 257, is **granted** in part, and **denied** in part. The Motion is **granted** as to Count Six of Qwest's Second Amended Complaint and **denied** as to Counts Eight, Nine, Ten, and Eleven of Qwest's Second Amended Complaint;

4. Hometown's Motion to Dismiss, ECF No. 439, is **granted** in part, and **denied** in part. The Motion to Dismiss Qwest's Complaint for Inadequate Service of Process pursuant to Rule 12(b)(5) is **denied**; the Motion to Dismiss Count Six of Qwest's Second Amended Complaint is **granted**; the Motion to Dismiss Counts Eight, Nine, Ten, and Eleven of Qwest's Second Amended Complaint is **denied**;

5. Aventure's Motion to Dismiss Counts One, Three, Five, Six, Eight, Nine, Ten, and Eleven of Qwest's Second Amended Complaint, ECF No. 483, is **granted** in part, and **denied** in part. The Motion is **granted** as to Count Six of Qwest's Second Amended Complaint and **denied** as to Counts One, Three, Five, Eight, Nine, Ten, and Eleven of Qwest's Second Amended Complaint; and

6. Qwest's Motion for Judgment on the Pleadings, ECF No. 393, must be **granted**. Accordingly, Counts Three, Five, and Six of Aventure's Third Amended Complaint, ECF No. 139 in 4:08–cv–00005, are **dismissed**: Counts One, Three, Four, Five, and Six of Dixon's Amended Counterclaim Complaint are **dismissed**; Counts One, Two, Three, Four, and Six of Futurephone's Counterclaim Complaint are **dismissed**; and Counts Two, Three, and Four of Free Conferencing's Counterclaim Complaint are **dismissed**.

**IT IS SO ORDERED.**